### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

American Federation of Teachers,
555 New Jersey Ave. N.W.
Washington, DC 20001-2079

Civil Action No.1:25-cv-00802

       Plaintiff,

v.

U.S. Department of Education,
400 Maryland Avenue, SW
Washington, DC 20202

Linda McMahon, in her official
capacity as Secretary of Education,
400 Maryland Avenue, SW
Washington, DC 20202

       Defendants.

### COMPLAINT

### PRELIMINARY STATEMENT

1.      The U.S. government, through the U.S. Department of Education (ED or the Department), is the country's largest creditor of student loans. Today, there are nearly 43 million federal student loan borrowers, with approximately $1.62 trillion outstanding in debt.

2.      Congress designed this federal student loan program to expand access to higher education and increase economic mobility regardless of one's financial station. To that end, when designing and modifying the federal student loan system, Congress provided clear and specific directives to the Department so that millions of Americans could repay their loans without being hindered by the debt. Specifically, Congress directed ED to offer income-driven repayment (IDR) plans that tie a borrower's monthly payment to their income.

3.     Notwithstanding this clear Congressional command, the Department has chosen to shut down access to all income-driven repayment plans. Nor has the Department indicated when it will–if ever–resurrect the programs. The result: borrowers are unable to access affordable monthly payment plans, some borrowers are being thrust into default on their debt, and some public service workers are being denied their statutory right to lower their monthly payment and earn credit towards Public Service Loan Forgiveness (PSLF).

4.     This is not occurring in a vacuum for student loan borrowers. It comes in the context of the President repeatedly announcing his plans to close the Department of Education, which was created by an Act of Congress. And, it is on the heels of the recent equally-unlawful actions to gut critical student loan protections from the Consumer Financial Protection Bureau. This shutdown, which creates significant confusion for borrowers, therefore comes at a time when the official government offices meant to assist borrowers with their loans are being shuttered.

5.     The burden of this misconduct is already being felt by Plaintiff, the American Federation of Teachers (AFT), and its 1.8 million members. A significant number of AFT's membership has student debt, is working in public service, and has sought or will try to seek access to an IDR plan. Dr. Picolya Robinson incurred student loan debt to pursue her lifelong dream of becoming a psychologist and working in public service. As a single mother of two, the weight of this debt has brought considerable financial strain and emotional stress, overshadowing her professional achievements and impacting her personal life. Dr. Robinson was enrolled in an affordable payment plan and on track to qualify for PSLF until her repayment plan was abruptly enjoined by the 8th Circuit. Dr. Robinson needs to enroll in a different plan in order to ensure that these months of employment count towards PSLF but can no longer do so as a result of the Department's decision to shut down all of the IDR plans. And, for its part, AFT's resources have

been and will continue to be diverted to address the confusion caused by the Department's decision to leave millions of borrowers in this IDR limbo.

6.      At bottom, these borrowers simply want to pay back their student loans according to the terms that Congress, and their contracts, provide. Therefore, AFT, on its own behalf and on behalf of its members, brings this lawsuit to compel the Department to abide by Congress's command and provide borrowers with the ability to re-pay their loans through the affordable, income-driven repayment plans to which they are entitled.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, the Mandamus Act, 28 U.S.C. § 1361, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because Plaintiff's headquarters is in D.C., because Defendants reside in D.C. and because a substantial part of the events giving rise to these claims occurred in this District.

## PARTIES

9.      Plaintiff AFT is a membership organization representing 1.8 million pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals.

10.     AFT's headquarters is in Washington, D.C. Its 1.8 million members belong to more than 3000 locals across all fifty U.S. states.

11.     AFT's mission is to promote fairness, democracy, economic opportunity, and high-quality public education, healthcare, and public services for students, their families and

communities. It meets this mission by ensuring its members receive fair pay and benefits for their critical work, and by fighting for safe working conditions that also benefit students, patients, and all those who use public services. Helping children and students, and ensuring the economic security and dignity of AFT's members and their families, is at the core of this mission.

12.    As part of this work, AFT takes a leading role in fighting for the financial stability of public service, education, and health care workers, particularly when it comes to the increasingly crippling costs of education.

13.    Many of AFT's members have student loan debt and 75% of AFT's members work in roles that require a higher education degree and are eligible for PSLF.

14.    Thousands of AFT's members have previous access and/or are eligible for the Income-Based Repayment Plan, the Income-Contingent Repayment Plan, the Pay as You Earn Plan, and the Revised Pay as You Earn Plan, each defined and described below.

15.    However, according to a survey of AFT members who struggle financially, 8 in 10 say student debt is a "major burden," and it is a major driver of financial difficulties as compared to any other debt.[1] The result: 78% of these members report that they or someone in their household has previously fallen behind on making debt payments, and one in three have had their debts go into default.

16.    AFT is required by its mission to provide its members with assistance and accurate information on student loan repayment and PSLF—which is made all the more difficult by the Department's misconduct, as well as the Trump Administration's firing of the Consumer Financial Protection Bureau's Student Loan Ombudsman, the removal of the complaint function on

---

[1] https://www.aft.org/sites/default/files/media/2018/ppt_aft_member-debt_hart2018.pdf

studentaid.gov, and the firing of nearly all of the staff at federal student aid dedicated to resolving student loan borrower complaints.

17.     Under the leadership of AFT President Randi Weingarten, AFT has spent, and continues to spend, tens of thousands dollars on debt clinics to educate members to better navigate their repayment options, and it has diverted more than two thousand hours of valuable staff time that would otherwise have been spent focused on issues like collective bargaining; retirement security; healthcare; student learning conditions; and educators', public employees' and health care workers' working conditions. Since the Department shut down access to IDR plans, AFT staff have had to redraft clinic curriculum and have diverted significant additional staff time to answering member questions. The AFT committed to expanding economic security programs for members and was developing a new financial literacy clinic curriculum to help members. The program development has been delayed due to the actions of the Department and the new demand from members with student debt. The AFT was preparing to end a multi-year contract with a tech company called Summer which provided direct services to members with student debt. Due to the uncertainty and lack of communication from the Department, the union has had to reallocate resources and extend the contract through June 2026.

18.     The relief sought in this complaint would inure to the benefit of thousands of AFT members who are actually injured by the Department's violations of the statutes requiring that income-driven repayment plans be available.

19.     Defendant United States Department of Education is a federal agency with its principal place of business at 400 Maryland Avenue SW, Washington, D.C. Defendant is responsible for administering federal student loan and grant programs in the United States.

20.     Defendant Linda McMahon is the Secretary of Education (Secretary). Plaintiff sues

Secretary McMahon in her official capacity. Secretary McMahon is charged with the supervision and management of all decisions and actions of the United States Department of Education, and so all allegations in this complaint against the Department of Education are made against her.

## BACKGROUND

### *Income-Driven Repayment Plans*

21.     In 1965, Congress enacted the Higher Education Act (HEA) because "every citizen is entitled to an education to meet his or her full potential *without financial barriers*." 20 U.S.C. § 1221-1(2) (emphasis added). In other words, Congress aimed to "increase educational opportunities" and help students access the "benefits of postsecondary education." *Biden v. Nebraska*, 143 S. Ct. 2355, 2362 (2023).

22.     In 1994, Congress amended the HEA and created the William D. Ford Federal Direct Loan Program. This program increased the government's ability to directly lend money to students. As a result, the student loan system shifted from one mostly involving private lenders to one in which the U.S. government became the primary creditor of student loans.

23.     To ensure that student loans bolstered—rather than hampered–economic opportunity, Congress provided the Secretary with a clear directive: offer students various loan repayment options, including some that tether the borrower's monthly payment to their income. Such plans are known as income-driven repayment plans.

24.     Specifically, Congress enacted two statutory provisions requiring income-driven repayment plans.

25.     First, Congress requires the Secretary to offer "Income-Based Repayment" plans ("IBR"). *See* 20 U.S.C. § 1098e.

26.     The IBR statute provides an "income-based" affordable repayment plan for federal

student loan borrowers for whom paying their full loans would be a financial hardship.

27.     Congress used mandatory language when setting out the Secretary's requirement to offer an IBR plan, saying: the "Secretary shall carry out a program under which a borrower . . . who has a partial financial hardship . . . may elect, during any period the borrower has the partial financial hardship, to have the borrower's aggregate monthly payment for all such loans not exceed" a payment formula set by statute. 20 U.S.C. § 1098e(b).

28.     The Department has similarly acknowledged that it has a mandatory duty to offer IBR to borrowers. 88 Fed. Reg. 43,820, 43,837 (Department "do[es] not believe that sunsetting the IBR plan is permitted by section 493C(b) of the HEA which authorized the IBR plan.").

29.     Second, Congress requires the Secretary to create and implement an "Income-Contingent" repayment plan ("ICR").

30.     The ICR statute has been around since 1994, while the IBR statute was enacted in 2007. Congress created this second program to respond to the rising costs of college, a corresponding increase in student loan debt, and the increasing number of borrowers defaulting.

31.     The ICR statute mandates that "The Secretary shall offer a borrower of a loan . . . an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower." 20 U.S.C. § 1087e(d)(1)(D).

32.     The Department has also acknowledged its mandatory obligation to offer ICR to direct loan borrowers. *See* 90 Fed. Reg. 3695 (Jan. 15, 2025) (explaining that certain changes were being made to meet the "Department's statutory obligation under the HEA to offer borrowers an income-contingent repayment plan.").

33.     Over time, the Secretary has crafted four different options to effectuate these statutory directives.

34. Each payment plan has different characteristics that vary meaningfully with respect to the calculation of monthly payments, the length of the repayment term (and if/when the loans are forgiven after a certain amount of time in repayment), and the amount of discretionary income that factors into the equation.

35. Implementing the commands of the IBR statute, the Secretary created the Income-Based Repayment Plan.

36. And implementing the commands of the ICR statute, the Secretary created three plans: the Income-Contingent Repayment Plan (ICR Plan), the Pay As You Earn plan (PAYE Plan), and the Revised Pay As Your Earn plan (REPAYE Plan, later, as described below, renamed the SAVE Plan).

37. In addition to its statutory and regulatory obligations, ED has contractual obligations to ensure that borrowers can access these plans.

38. When a borrower first takes out a student loan, they sign a legally enforceable promissory note with the Department of Education.

39. In addition to identifying the borrower's obligations, the contract identifies the borrower's rights under the contract.

40. These rights include the ability to repay the loans under one of these different income-driven repayment plans.

41. Indeed, the contract includes an entire section on the different plans, and crystalizes that "[u]nder an income-driven repayment plan, your required monthly payment amount is based on your income and family size, instead of being based on your loan debt, interest rate, and repayment period, as under a traditional repayment plan."

42. Although the four statutorily mandated IDR plans have not operated perfectly, they

have been a lifeline in preventing student loan borrowers from default. This saves borrowers from the punitive impacts of such a default, including the potential seizure of tax refunds, wages, or government benefits.

### *Public Service Loan Forgiveness*

43.    In addition to providing borrowers with access to IDR plans, Congress also requires the Secretary to discharge a borrower's student debt in certain circumstances.

44.    Most notably, federal law provides loan cancellation for public service workers who have worked for ten years in eligible public service jobs while making eligible payments on their loans. 20 U.S.C. § 1087e(m)(1).

45.    The PSLF statute states: that the Secretary of Education "shall cancel the balance of interest and principal due . . . on any eligible Federal Direct Loan" for a borrower who "has made 120" eligible "monthly payments on the eligible Federal Direct Loan after October 1, 2007" and "has been employed in a public service job during the period in which the borrower ma[de] each of the 120 payments." 20 U.S.C. § 1087e(m)(1).

46.    To be eligible for PSLF, a borrower must be enrolled in a standard repayment plan (in which case the borrower pays the entire debt off over a period of ten years), or one of the income-driven repayment plans.

47.    The Secretary has issued implementing regulations for the PSLF statute which further requires the Secretary to provide loan discharges to borrowers who have satisfied the eligibility criteria.

48.    Just as with IDR, the borrower's initial master promissory note informs borrowers of their PSLF rights, telling borrowers that "Under this program, we will forgive the remaining balance due on your Direct Loans after you have made 120 payments (after October 1, 2007) on

those loans under certain repayment plans while you are employed full-time by a qualifying employer."

49.     Again, while PSLF has not operated without issues, it has been key in allowing individuals to serve their communities and the public without fear that their student loan debt will drive them into poverty.

## FACTUAL ALLEGATIONS

### *The Prior Administration Issues a New IDR Rule, but States Sue to Block the Effort*

50.     On July 10, 2023, the Department of Education issued a final rule to improve its REPAYE plan.

51.     In the Rule, the Department renamed the "REPAYE Plan" the "SAVE Plan," and made changes so that it would be the best option for the bulk of student loan borrowers. *See* Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43,820.

52.     In an effort to simplify borrowers' options, the Rule also sunsetted enrollment in the ICR and PAYE Plans.

53.     Certain provisions of the Rule were designated for early implementation and went into effect in 2023. *See* 88 Fed. Reg. 43,820; 88 Fed. Reg. 72,685.

54.     As a result, millions of student loan borrowers, including thousands of public service workers, enrolled in the SAVE Plan in 2023 and the first half of 2024.

55.     Though the SAVE Plan was designed to help millions of borrowers, in April 2024, a group of states sued the Department to challenge the Rule in the U.S. District Court for the Eastern District of Missouri.

56.     The states' lawsuit does not challenge the IBR statute or regulations, nor does the

lawsuit challenge the PSLF statute or regulations. The lawsuit also does not challenge the legality of the ICR Plan or the PAYE Plan.

57.     On June 24, 2024, the U.S. District Court for the Eastern District of Missouri preliminarily enjoined the Department from providing loan forgiveness under the SAVE Rule.

58.     On July 18, 2024, the Eighth Circuit Court of Appeals granted the states' emergency motion for an administrative stay prohibiting the Department from implementing the new Rule, and on August 9, 2024, the Eighth Circuit Court of Appeals enjoined portions of the SAVE Plan pending appeal.

59.     On February 18, 2025, the Eighth Circuit Court of Appeals issued its opinion. It agreed with the District Court and concluded that the forgiveness provisions of the SAVE Rule were invalid. It found the provision un-severable from the rest of the Rule and therefore affirmed the injunction.

60.     The Eighth Circuit also opined on the forgiveness provisions of the pre-2023 version of the REPAYE rule. It said that the forgiveness provisions of the prior REPAYE rule were likely invalid. It did not otherwise speak to the rest of the pre-2023 REPAYE plan, nor preclude ED from utilizing it in the future.

61.     The Eighth Circuit's decisions do not impact the IBR statute, regulations, or ED's contractual obligations with respect to IBR.

62.     The Eighth Circuit's decisions do not impact the PSLF statute, regulations, or ED's contractual obligations with respect to PSLF.

63.     The Eighth Circuit also did not enjoin the Department from using the ICR plan or the PAYE plan.

***During the Litigation, the Prior Administration Provides Borrowers with Access to IDR to Meet its Statutory Obligation***

64.     In the face of this litigation, the prior Administration took a number of steps in 2024 and January 2025 to adhere to the court order and offer borrowers the repayment plans mandated by statute, regulation, and contract.

65.     On July 19, 2024, the day after the Eighth Circuit granted an emergency stay, the Department placed all borrowers who had been making payments in the SAVE Plan into a forbearance (i.e., a status during which the Department delays the borrower's obligation to make monthly payments). The Department does not count months during this forbearance as months of eligible payment for PSLF purposes.

66.     From July to October 2024, the Department ensured borrowers could apply for IBR using a paper or PDF application form.

67.     On October 2, 2024, the Department of Education re-opened its online IBR application.

68.     The Department also recognized its obligation to offer a plan under the ICR statute, and that the Eighth Circuit did not preclude it from doing so.

69.     On November 15, 2024, the Department of Education issued an Interim Final Rule to ensure that it was "in compliance with the statutory requirement to offer an income-contingent repayment plan to borrowers."

70.     Under this Rule, the Department reversed its sunsetting of the ICR and PAYE plans, allowing borrowers to enroll in ICR or PAYE until July 1, 2027.

71.     On January 15, 2025, the Department finalized its Rule allowing borrowers to enroll in ICR or PAYE until July 1, 2027.

72.     As a result, as of 11:59 a.m. on January 20, 2025, ED offered borrowers enrollment in plans under both the IBR and ICR statutes.

*The Current Administration Halts Access to IDR Plans*

73.    Under the current legal landscape, the Department of Education can offer three IDR plans and still comply with the Eighth Circuit's decisions: the IBR plan, the ICR plan, and the PAYE plan. It can also utilize the bulk of the prior REPAYE plan.

74.    Indeed, the Eighth Circuit specifically distinguished the IBR statute and IBR plan when discussing the purported problems with the Department's new Rule.

75.    Nonetheless, the Department is now following the President's command. On February 26, 2025, the current Administration issued a Stop Work Order, directing all loan servicers to stop accepting and processing income-driven repayment applications.

76.    The Stop Work Order shuts income-driven repayment options down for at least three months, but does not specify when, if ever, they will be reinstated.

77.    The Department's action also precludes borrowers from recertifying their income so that they can remain in an income-driven repayment plan.

78.    The Department's action applies to all online and paper applications.

79.    The Department also put a notice on its website confirming this decision, though it blamed the Eighth Circuit, saying: "Application Unavailable. A federal court issued an injunction preventing the U.S. Department of Education from implementing the Saving on a Valuable Education (SAVE) Plan and parts of other income-driven repayment (IDR) plans. As a result, the IDR and online loan consolidation applications are temporarily unavailable."

80.    In other words, despite its obligation to ensure borrowers' access to IBR and ICR plans, and despite its ability to do so notwithstanding the Eighth Circuit's decisions, the Department has halted borrowers' ability to enroll in these programs.

*The Department's Decision Harms Borrowers, Including AFT and its members*

81.    The Department's decision to shut off IDR is actively harming borrowers.

82.    Borrowers with lower earnings cannot access any IDR plans. Denied access to statutorily mandated repayment options, many are stuck on unaffordable repayment plans that they are unable to pay. Many of these borrowers will likely default on their loans as a result of the Department's decisions not to follow the statutes.

83.    Similarly, thousands of eligible public service workers are stuck in either the SAVE forbearance or in plans that are not PSLF-eligible. Because of the Department's actions, thousands of eligible public service workers are being denied progress towards the student loan forgiveness to which they are statutorily entitled.

84.    Some borrowers who are in default now lack access to an IDR plan that would, following certain steps, allow them to get back on the path of re-payment.

85.    AFT, and its members, are a case in point. Thousands of AFT members are eligible for each and every one of the statutorily required repayment plans described above. Thousands of AFT members have contractual rights to participate in each of these statutorily required repayment plans.

86.    One member, Rachel Dubreuil, teaches high school Social Studies at a technical high school. She dedicated herself to public service as a teacher and has taught for over ten years. Rachel was on track to have most of her loans forgiven in November of 2024, but that progress was halted overnight. In July 2024, her loans, which had been in the SAVE plan, were placed into an administrative forbearance. As previously discussed, her time in this forbearance does not count toward PSLF. Additionally, she has applied for PSLF forgiveness, but her time since July 2024 is not being credited. She has also applied for IDR payment plan change, and to have her forbearance time counted though a special program known as the "Buy Back" program, but none of these

applications have been processed. The stress from this debt, and the sheer tension that it causes on her day to day, is unbearable. Through no fault of her own, Rachel is unable to make payments based on her income and to progress toward PSLF forgiveness, and is therefore being deprived her statutory and contractual rights. As a result, she will owe her debt for longer than if she was able to enroll and progress under an IDR plan.

87.    Another member, Corey Mason, took out loans to become a teacher in order to fulfill a lifelong dream of helping children who were marginalized or otherwise left out. To better meet her students' needs, she ultimately earned a master's degree and a Sixth-Year Certificate. She incurred more debt to pay for both credentials. Corey has 117 of her 120 payments necessary to have her debt cancelled under PSLF, but has been unable to earn her final months of payments, through no fault of her own. During the summer of 2024, her loans were placed into forbearance because of the SAVE plan litigation. She requested that her loans be moved into another qualifying repayment plan, but was told that that was not possible. Despite this, she continued to make voluntary payments on her loans. In November 2024, when she believed she had achieved 120 payments for PSLF, she submitted a "Buy Back" application in an effort to make her time in forbearance count toward forgiveness. As of March 2025, approximately three months later, her application has not been processed and she is still waiting for a determination. In an effort to remedy the situation, Corey has filed complaints, has resubmitted her "Buy Back" application, and has submitted a new IDR plan to remove her loans from forbearance. To the best of her knowledge, these requests have not been processed. She continues to make payments in the hope that they will eventually be counted toward PSLF, but feels as though she is stuck in limbo while ED has cut off her access to IDR plans and to debt forgiveness.

88.    Critically, these members would all have standing in their own right to sue.

89.     AFT, however, is vindicating their interests because, as highlighted above, the issues are at the heart of AFT's purpose.

90.     No individual member is a necessary party in this case as the claims and relief sought are challenging an unlawful government policy that is being applied in the same manner as to all individuals.

91.     The Department's unlawful action is also harming AFT as an organization because its resources have been, and continue to be, diverted to address the unlawful conduct, which directly impedes its ability to develop and implement additional financial literacy programs and resources that it had planned for its members. It has had to increase its efforts to assist its members with their student loans as a result of the Department's shut down of the IDR applications.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
*Unlawful Withholding of Agency Action in Violation of the
Administrative Procedure Act, 5 U.S.C. § 706(1)*

92.     The APA authorizes this Court to "compel agency action" that has been "unlawfully withheld." 5 U.S.C. § 706(1).

93.     As alleged above, the Secretary has a mandatory statutory, regulatory, and contractual duty to offer borrowers access to an IBR repayment plan.

94.     As alleged above, the Secretary has a mandatory statutory, regulatory, and contractual duty to offer borrowers access to an ICR repayment plan.

95.     As alleged above, the Secretary has a mandatory statutory, regulatory, and contractual duty to cancel the balance of any borrower who has made 120 PSLF-qualifying payments.

96.     Following the Stop Work Order, Defendants are unlawfully preventing borrowers

from accessing any IBR program.

97.    Following the Stop Work Order, Defendants are unlawfully preventing borrowers from accessing any ICR program.

98.    Following the Stop Work Order, Defendants ire unlawfully withholding PSLF forgiveness.

## SECOND CAUSE OF ACTION

*Arbitrary and Capricious Agency Action in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)*

99.    The APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

100.    The Department's decision to halt access to all IDR plans constitutes a final agency action under the APA.

101.    Defendants have acted in a manner that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law by, among other actions:

   a.    The Department's abrupt and unjustified halting of the IBR and ICR plans is inconsistent with the governing statute and regulation.

   b.    The Department's abrupt and unjustified halting IBR and ICR plans is inconsistent with its contractual obligations.

   c.    The Department's abrupt and unjustified halting of the IBR and ICR plan is not mandated by the Eighth Circuit's decision, is without any rational basis, and is arbitrary and capricious.

   d.    The Department's hold on PSLF relief is inconsistent with the governing statute and regulation.

   e.    The Department's hold on PSLF relief is inconsistent with its contractual

17

obligations.

    f.  The Department's hold on PSLF relief is not mandated by the Eighth Circuit's decision, is without any rational basis, and is arbitrary and capricious.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court:

A. Declare that the Department is unlawfully withholding the IBR and ICR programs;

B. Declare that the Department is unlawfully withholding PSLF program in contravention of law;

C. Issue preliminary and permanent injunctive relief preventing the Department from collecting from borrowers who are eligible for income-driven repayment until it satisfies its statutory, regulatory, and contractual obligations under IBR, ICR, and PSLF.

D. Issue preliminary and permanent injunctive relief compelling the Department to comply with its statutory, regulatory, and contractual obligations, by:

    a.  Complying with the IBR statute by restoring an IBR plan;

    b.  Complying with the ICR statute by restoring an ICR plan;

    c.  Complying with the PSLF statute by restoring public service workers' ability to obtain credit toward PSLF forgiveness and timely granting PSLF forgiveness to those borrowers.

E. Award attorneys' fees as authorized by law; and

F. Grant such further relief as may be just and proper.

Date: March 18, 2025

/s/Julie Selesnick

Julie Selesnick, DC Bar No. 485558
BERGER MONTAGUE PC
1001 G Street, NW
Suite 400 East
Washington, DC 20001
T. 202.221.5279
F. 215.875.4604
jselesnick@bm.net

Persis Yu, DC Bar # 90014714
STUDENT BORROWER PROTECTION
CENTER (a fiscally sponsored project of the
Shared Ascent Fund)
1025 Connecticut Ave NW, #717
(202) 618-1328
persis@protectborrowers.org

R. T. Winston Berkman-Breen, NY Bar No.
5559372
STUDENT BORROWER PROTECTION
CENTER (a fiscally sponsored project of the
Shared Ascent Fund)
40 Rector Street, 9th Floor
New York, NY 10006
winston@protectborrowers.org

*Attorneys for Plaintiff*