## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

American Federation of Teachers,

      Plaintiff,

v.

Linda McMahon, in her official
capacity as Secretary of Education,

      Defendant.

Civil Action No. 1:25-cv-00802

**PLAINTIFF'S MOTION FOR A
TEMPORARY RESTRAINING ORDER
OR PRELIMINARY INJUNCTION**

Pursuant to Local Civil Rule 65.1(a), Plaintiff American Federation of Teachers, hereby moves for a temporary restraining order or preliminary injunction, to remain in effect until such time as the Court can further consider the merits of the plaintiff's claims, enjoining the defendants Secretary of Education Linda McMahon, and the United States Department of Education from their continued shut down income-driven repayment plans for student loan borrowers.

As set forth in more detail in the accompanying memorandum, the defendants has unlawfully shut down access to income-driven repayment plans for student loan borrowers. The defendants' actions should be enjoined under the Administrative Procedures Act because it is in excess of the defendants authority and is arbitrary and capricious. The plaintiff and its members will suffer imminent and irreparable injury should the unlawful shutdown of the plans be permitted to continue.

Pursuant to Local Civil Rule 65.1(a), on March 24, 2025 in the late afternoon, counsel for Plaintiff emailed the Assistant Directors for the Federal Programs Branch of the Department of Justice and the Chief of the Civil Division of the U.S. Attorney's Office in D.C. to provide them with electronic copies of the complaint, motion for a temporary restraining order or preliminary

injection, and accompanying memorandum, declarations, and proposed order via e-mail before completing this electronic filing.

Respectfully submitted,

Date:   March 24, 2025

/s/ John G. Albanese
Julie Selesnick, DC Bar No. 485558
F. Paul Bland (*pro hac vice*)
BERGER MONTAGUE PC
1001 G Street, NW
Suite 400 East
Washington, DC 20001
T. 202.221.5279
F. 215.875.4604
jselesnick@bm.net
pbland@bm.net

John G. Albanese (*pro hac vice*)
BERGER MONTAGUE PC
1229 Tyler Street NE
Suite 205
Minneapolis, MN 55413
T. 612-594-5997
jalbanese@bm.net

Persis Yu, DC Bar No. 90014714
STUDENT BORROWER PROTECTION
CENTER (a fiscally sponsored project of the
Shared Ascent Fund)
1025 Connecticut Ave NW, #717
Washington, DC 20036
(202) 618-1328
persis@protectborrowers.org

R. T. Winston Berkman-Breen, NY Bar No.
5559372
STUDENT BORROWER PROTECTION
CENTER (a fiscally sponsored project of the
Shared Ascent Fund)
40 Rector Street, 9th Floor
New York, NY 10006
winston@protectborrowers.org

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

American Federation of Teachers,                Civil Action No. 1:25-cv-00802

      Plaintiff,

v.

U.S. Department of Education; Linda McMahon,
in her official capacity as Secretary of Education,

      Defendants.

_____

**STATEMENT OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER OR**
**PRELIMINARY INJUNCTION**

_____

## TABLE OF CONTENTS

PAGE

I. INTRODUCTION .................................................................................................... 1

II. BACKGROUND ................................................................................................... 3

    A. Congress requires the defendants (and only the defendants) to create and provide borrowers access to income-driven repayment plans. ........................................................ 3

    B. Congress creates the Public Service Loan Forgiveness (PSLF) Program. ........................ 5

    C. The Biden Administration attempts to revise the income-contingent repayment plans and litigation ensues................................................................................................ 6

    D. The Trump Administration shuts down access to all income-driven repayment plans, orders closure of the Department of Education, and declares that the Small Business Administration will handle student loans. ......................................................... 9

    E. The defendants' failure to offer income-driven repayment plans harms the plaintiff and its members. ................................................................................................ 11

    F. DISCUSSION ................................................................................................ 16

        a. The plaintiff has Article III standing. .......................................................... 16

        b. Immediate injunctive relief is appropriate. ................................................... 16

            1. Plaintiff is likely to succeed on its claims because the defendants are failing to meet their statutory and contractual obligations. .................................................. 17

                a. Under the Administrative Procedure Act, this Court is likely to compel the Agency to offer an income-driven repayment plan under § 706(1)............... 18

                b. The defendants' action is also unlawful under § 706(2) because it is inconsistent with the statute, regulation, and contract, and is without a rational basis. .................................................................................... 20

                c. The Eighth Circuit's decision is not a valid reason for shutting off access to all income-driven repayment plans........................................................... 22

            2. The defendants' misconduct is causing the plaintiff and its members irreparable harm. ................................................................................................ 23

            3. The public interest and balance of equities warrant an injunction........................ 26

III. CONCLUSION........................................................................................................ 26

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Action NC v. Strach*,
   216 F. Supp. 3d 597 (M.D.N.C. 2016) ................................................................ 23

*AFGE, AFL-CIO, Local 1929 v. Fed. Labor Rels. Auth.*,
   961 F.3d 452 (D.C. Cir. 2020) ............................................................................ 22

*Anglers Conservation Network v. Pritzker*,
   809 F.3d 664 (D.C. Cir. 2016) ............................................................................ 18

*Bennett v. Spear*,
   520 U.S. 154 (1997) ............................................................................................ 20

*Biden v. Nebraska*,
   600 U.S. 477 (2023) ....................................................................................... 1, 21

*C.G.B. v. Wolf*,
   464 F. Supp. 3d 174 (D.D.C. 2020) .................................................................... 26

*Calvillo Manriquez v. DeVos*,
   345 F. Supp. 3d 1077 (N.D. Cal. 2018) .............................................................. 24

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) ............................................................................ 17

*Ctr. for Biological Diversity v. Zinke*,
   260 F. Supp. 3d 11 (D.D.C. 2017) ...................................................................... 19

*Dep't of Commerce v. New York*,
   588 U.S. 752 (2019) ............................................................................................ 23

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) ............................................................................ 16

*Golden v. Kelsey-Hayes Co.*,
   73 F.3d 648 (6th Cir. 1996) ................................................................................. 24

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ............................................................................................ 16

*Ind. State Conf. of the NAACP v. Lawson*,
   326 F. Supp. 3d 646 (S.D. Ind. 2018) ................................................................. 23

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ................................................................. 23

*Lopez v. Davis*,
531 U.S. 230 (2001) ............................................................................ 18

*Mackinac Ctr. for Pub. Pol'y v. Cardona*,
102 F.4th 343 (6th Cir. 2024) ............................................................... 6

*Missouri v. Biden*,
738 F. Supp. 3d 1113 (E.D. Mo. 2024) .................................................. 7

*Missouri v. Trump*,
128 F.4th 979 (8th Cir. 2025) ............................................ 7, 8, 24, 26

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .............................................................................. 21

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
No. 25-cv-239 (LLA), 2025 WL 368852 (D.D.C. Feb. 3, 2025) ........... 20

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
No. 25-cv-239 (LLA), 2025 WL 597959 (D.D.C. Feb. 25, 2025) ..... 17, 20

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .............................................................................. 18

*Open Cmtys. Alliance v. Carson*,
286 F. Supp. 3d 148 (D.D.C. 2017) ...................................................... 26

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
831 F.3d 500 (D.C. Cir. 2016) ............................................................. 26

*Tanner-Brown v. Haaland*,
105 F.4th 437 (D.C. Cir. 2024) ............................................................ 16

*United Steelworkers of Am., AFL-CIO v. Textron, Inc.*,
836 F.2d 6 (1st Cir. 1987) ................................................................... 24

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*,
758 F.2d 669 (D.C. Cir. 1985) ............................................................. 23

**STATUTES**

* 20 U.S.C. § 1082 .................................................................................. 4

* 20 U.S.C. § 1087a ................................................................................ 1

* 20 U.S.C. § 1087e ..................................................................... 4, 5, 18

\* 20 U.S.C. § 1098e ........................................................................................................... passim

20 U.S.C. § 1221-1 .................................................................................................................. 1

\* 5 U.S.C. § 706.............................................................................................................. 18, 20

**OTHER AUTHORITIES**

Improving Education Outcomes by Empowering Parents, States, and Communities,
Exec. Order § 2(a) (Mar. 20, 2025) ......................................................................... 10

Improving Income Driven Repayment for the William D. Ford Fed. Direct Loan Program and the
Fed. Family Ed. Loan (FFEL) Program,
88 Fed. Reg. 43820 (July 10, 2023)...................................................................... 7, 19

Income Contingent Repayment Plan Option,
89 Fed. Reg. 90221 (Nov. 15, 2024)....................................................................... 8, 9

*Income-Contingent Repayment Plan Options*,
90 Fed. Reg. 3695 (Jan. 15, 2025) ....................................................................... 9, 19

**TREATISES**

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts (2012) .... 18

**REGULATIONS**

34 C.F.R. § 682 ........................................................................................................................ 7

34 C.F.R. § 685 ........................................................................................................................ 7

34 C.F.R. § 685.209 ........................................................................................................... 4, 18

34 C.F.R. § 685.219 ......................................................................................................... 13, 25

## I.    INTRODUCTION

Congress designed the federal student loan system to "increase educational opportunities" and to help students access the "benefits of postsecondary education," "without financial barriers." *Biden v. Nebraska*, 600 U.S. 477, 483–84 (2023); 20 U.S.C. § 1221-1. As part of this effort, it created, in 1994, a federal Direct Loan program that provided the defendants authority to lend money directly to students. *See* 20 U.S.C. §§ 1087a, *et seq.* The result: the federal Government today is the largest creditor of student loans, with approximately 43 million borrowers and $1.6 trillion in outstanding debt.[1] This case is about the income-driven repayment programs that Congress created to benefit these borrowers and the Department of Education's and Secretary of Education Linda McMahon's (collectively "the defendants") unlawful failure to carry out these programs.

Congress requires the defendants to provide student loan borrowers with repayment plans that tie student's monthly payment to their incomes. These plans are called income-driven repayment or "IDR." The defendants, through regulations and contracts with every single student loan borrower, guarantee borrowers access to these programs. Congress delegated these duties specifically to the defendants, and they may not be ignored, or fobbed off on other departments or agencies without Congress changing the authorizing statutes.

Nonetheless, without Congressional authorization, the defendants have inexplicably and irrationally issued a Stop Work order shutting down *all* access to *all* income-driven repayment plans for borrowers seeking to enroll. Millions of student loan borrowers are being denied Congressionally mandated student loan repayment and forgiveness programs, simply because the defendants have unlawfully ceased to accept and process enrollment applications.

---

[1] *A Snapshot of Federal Student Loans*, Cong. Res. Servs. (last updated Feb. 19, 2025), *available at* https://www.congress.gov/crs-product/IF10158.

After this lawsuit was filed, the defendants could have restarted income-driven repayment plans. Instead, they went to the press and said that an income-driven repayment plan application form might "be available as soon as next week."[2] The very next day, President Trump signed an Executive Order directing the defendants to close the Department of Education. And, the next day, the President issued a statement to reporters declaring that the responsibilities that Congress specifically delegated to the Department of Education and the Secretary will instead be handed to the Small Business Administration (SBA).[3] In other words, the defendants have not made any firm commitments on when—if ever—income-driven repayment program applications will again be live. Nor have they addressed when—if ever—they will *process* those applications. The President's Executive Order casts doubt on the defendants' out-of-court representations and strongly suggests that the already-weeks long withholding of these rights will be extended indefinitely. And even if the defendants' actions were consistent with their Congressional authority (and they are not),[4] as a practical matter, the Small Business Administration is unlikely to be capable of assuming these responsibilities in a reasonable time frame. All of this underscores, the urgent need for judicial intervention to protect borrowers' interests.

Plaintiff American Federation of Teachers, along with many of its 1.8 million members, are harmed by this misconduct. Many members—who work critical jobs in education, healthcare, and in federal, state, and local government roles—are burdened with high levels of student debt but cannot access an affordable, statutorily-mandated repayment plan. Many are facing the choice of paying their student loan bills or putting food on their table. An imminent threat of bankruptcy

---

[2] Lexi Lonas Cochran, *AFT sues Education Department over removal of IDR student loan applications*, The Hill (Mar. 19, 2025).

[3] Lexi Lonas Cochran, *Trump says student loans moving to SBA, 'special needs' to HHS*, The Hill (March 21, 2025)
[4] 20 U.S.C. § 1098e(b).

hangs over their heads. Further, while 75 percent of them work in roles that are eligible for public service loan forgiveness, these individuals now lack access to plans that would allow them to earn credit towards that forgiveness. To put it simply: these members are stuck in a devastating limbo. And for its part, the plaintiff is diverting its limited resources to attempt to help guide them through it.

Ultimately, the defendants are ignoring their legal obligations at the expense of working-class Americans like the plaintiff's members. The plaintiff therefore filed this action to ensure access to these programs, on which its members rely every day. The plaintiff seeks emergency relief to return to the status quo ante—a period where its members had access to income-driven repayment plans. Alternatively, the plaintiff asks the Court to order the defendants to halt all collections on borrowers and ensure that this time can count towards Public Service Loan Forgiveness until the defendants can satisfy its income-driven repayment plan obligations again.

## II.    BACKGROUND

### A. Congress requires the defendants (and only the defendants) to create and provide borrowers access to income-driven repayment plans.

As part of the federal student loan program, Congress enacted two separate, but related provisions requiring the Secretary of Education to offer repayment options that tie a borrower's monthly payment to their income. Each payment plan has different characteristics that vary meaningfully with respect to the calculation of monthly payments, the length of the repayment term (and if/when the loans are forgiven after a certain amount of time in repayment), and the amount of discretionary income that factors into the equation. The plans created by these statutes are broadly referred to as income-driven repayment plans or IDR.

First, since 2007, Congress has required the Secretary to offer to federal student loan borrowers "Income-Based Repayment" options. 20 U.S.C. § 1098e. Congress directed: the

"Secretary shall carry out a program under which a borrower . . . who has a partial financial hardship . . . may elect, during any period the borrower has the partial financial hardship, to have the borrower's aggregate monthly payment for all such loans not exceed" the figure set out in a payment formula set by statute. 20 U.S.C. § 1098e(b). This statute assigns this duty to the Secretary of the Department of Education, not the Small Business Administration or any other entity. Using this statute, the Department of Education created a plan called the Income-Based Repayment Plan (IBR). 34 C.F.R. § 685.209(a).

Separately, Congress, since 1994, has also required the Secretary of the Department of Education (and not some other secretary, agency, or department) to offer at least one Income-Contingent Repayment Plan (ICR). The Income Contingent Repayment Plan statute mandates that "the Secretary shall offer a borrower of a loan . . . an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower." 20 U.S.C. § 1087e(d)(1)(D). Using this statute, the Secretary created three plans: the Income-Contingent Repayment Plan (ICR Plan), the Pay As You Earn Plan (PAYE Plan), and the Revised Pay As Your Earn Plan (REPAYE Plan, later, as described below, renamed the Saving on a Valuable Education or SAVE Plan). 34 C.F.R. § 685.209(a).

In addition to these statutory and regulatory provisions, Congress instructed the Secretary of the Department of Education to ground borrowers' obligations and rights in contract. *See* 20 U.S.C. § 1082(m)(1)(D). The Department of Education, in turn, developed a Master Promissory Note that expressly provides that student loan borrowers may apply to repay their loans under one of these different income-driven repayment plans. Indeed, the contract includes an entire section describing the different plans, and states that "[u]nder an income-driven repayment plan, your

required monthly payment amount is based on your income and family size, instead of being based on your loan debt, interest rate, and repayment period, as under a traditional repayment plan."[5]

### B. Congress creates the Public Service Loan Forgiveness (PSLF) Program.

In addition to providing borrowers with access to income-driven repayment plans, Congress also required the Secretary to discharge a borrower's student debt in certain circumstances. Most notably, federal law provides loan cancellation for public service workers who have worked for ten years in eligible public service jobs while making eligible payments on their loans. *See* 20 U.S.C. § 1087e(m)(1).

The statute states: that the Secretary of Education "shall cancel the balance of interest and principal due . . . on any eligible Federal Direct Loan" for a borrower who "has made 120" "monthly payments on the eligible Federal Direct Loan after October 1, 2007" and "has been employed in a public service job during the period in which the borrower ma[de] each of the 120 payments." 20 U.S.C. § 1087e(m)(1)(A) & (B).

To be eligible for Public Service Loan Forgiveness, a borrower must be enrolled in a standard repayment plan (in which case the borrower pays the entire debt off over a period of ten years), or one of the income-driven repayment plans. Because a Public Service Loan Forgiveness borrower would never benefit from Public Service Loan Forgiveness if they were in the ten-year standard repayment plan (since they would pay off the entirety of the loan over the 10-year period), and public-service salaries are generally lower than private sector counterparts, Public Service Loan Forgiveness borrowers typically enroll in one of the income-driven repayment plans. Notably the ten-year standard plan is not available to borrowers who consolidated their loans—i.e., taking out a new federal student loan to refinance and combine one or several existing federal student

---

[5] Master Promissory Note (MPN), at 10 (*available at* https://studentaid.gov/sites/default/files/Sub_Unsub_MPN_508-en-us.pdf, attached hereto as Exhibit 1.

loans—and for these borrowers income-driven repayment plans are the only eligible repayment plans.

The Secretary has issued implementing regulations for the Public Service Loan Forgiveness statute that further requires the Secretary to provide loan discharges to borrowers who have satisfied the eligibility criteria. Just as with income-driven repayment plans, the borrowers' initial master promissory note informs them of their Public Service Repayment Plan rights: "Under this program, we will forgive the remaining balance due on your Direct Loans after you have made 120 payments (after October 1, 2007) on those loans under certain repayment plans while you are employed full-time by a qualifying employer."[6]

### C. The Biden Administration attempts to revise the income-contingent repayment plans and litigation ensues.

Income-driven repayment plans and Public Service Loan Forgiveness have served as critical lifelines to student loan borrowers. The income-driven repayment plans ensure that borrowers can repay their loans in amounts they can afford and thus avoid the negative and punitive impacts of a default (such as wage garnishment, tax offset, and negative credit reporting). Similarly, Public Service Loan Forgiveness allows students to serve their communities without fear of being unable to pay back their student loan debt. But these programs have not been without their flaws, and so the prior Administration took steps to reform both programs. *See Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343, 347–49 (6th Cir. 2024) (discussing history with these programs).

Relevant here, on July 10, 2023, the Department of Education issued a final rule to improve its income-contingent repayment program—specifically the REPAYE Plan. *See* Improving Income Driven Repayment for the William D. Ford Fed. Direct Loan Program and the Fed. Family

---

[6] Master Promissory Note (MPN), *supra* at 13.

Ed. Loan (FFEL) Program, 88 Fed. Reg. 43820 (July 10, 2023). In the rule, the Department renamed the REPAYE Plan to the "SAVE" Plan, and made a number of changes to the program to make it the best option for the bulk of student loan borrowers. These changes included lowering a borrower's monthly payment amount to account for the skyrocketing costs of education and shortening, for some borrowers, the period of time that borrowers would remain in the plan before their loans were forgiven was shortened. The Department also wanted to simplify borrowers' options, and so it sunsetted enrollment in the other two income-contingent repayment plans (the ICR Plan and PAYE Plan); as long as at least one income-contingent repayment plan was available, the Department remained compliant with the statute's mandate. It kept the IBR Plan in place given the statutory requirement for at least one income-based repayment plan.

Certain provisions of the Rule were designated for early implementation and went into effect in 2023. *See* 34 C.F.R. §§ 682, 685. As a result, millions of student loan borrowers, including thousands of public service workers, enrolled in the SAVE Plan in 2023 and the first half of 2024. But, as borrowers began receiving the benefits of this plan, in April 2024, a group of states sued the Department in the United States District Court for the Eastern District of Missouri. The lawsuit focused on SAVE; it did not challenge the other income-contingent repayment plans (the ICR Plan and the PAYE Plan), nor did it focus on the IBR Plan.

The district court entered an injunction blocking the loan forgiveness aspect of the SAVE Plan, and then the case went on appeal to the Eighth Circuit. *See Missouri v. Biden*, 738 F. Supp. 3d 1113, 1123 (E.D. Mo. 2024)*; Missouri v. Trump*, 128 F.4th 979, 985 (8th Cir. 2025). On February 18, 2025, the Eighth Circuit found that the forgiveness provisions of the SAVE Plan were likely invalid. 128 F.4th at 991–96. Because, in the Eighth Circuit's view, the provisions were interconnected with the rest of the rule, the court expanded the injunction to all aspects of the

SAVE Plan. *Id.* at 997–98. The Eighth Circuit also opined on the forgiveness provisions of the pre-2023 version of the REPAYE Plan, concluding that the forgiveness provisions of the prior REPAYE Plan were likely invalid. *Id.*

The Eighth Circuit decision did not speak to the rest of the pre-2023 REPAYE Plan, the income-based repayment statute and IBR Plan, or Public Service Loan Forgiveness, nor did it preclude the defendants from utilizing them in the future. In fact, it used the existence of forgiveness through Public Service Loan Forgiveness and the IBR statute to reach its decision, saying "if Congress had given [the forgiveness] power through ICR, creating IBR and requiring low-income borrowers to make payments for twenty or twenty-five years to obtain forgiveness [through that plan] would have been unnecessary. The separate program for loan forgiveness in ten years for public service employees would similarly be superfluous." 128 F.4th at 995.

As that litigation moved forward in 2024, the Biden Administration took steps to fulfill its legal obligation to provide borrowers with access to income-driven repayment plans.[7] From July to October 2024, the Department ensured borrowers could apply for the IBR Plan using a paper or PDF application form, and on October 2, 2024, the Department of Education re-opened its online application to apply to the IBR Plan. Then on November 15, 2024, the Department of Education issued an Interim Final Rule to ensure that it complied "with our statutory duty…to provide borrowers with an income contingent repayment plan option." Income Contingent Repayment Plan Option, 89 Fed. Reg. 90221, 901224 (Nov. 15, 2024). Under this rule, the Department reversed its sunsetting of the ICR and PAYE Plans, allowing borrowers to enroll in these plans until July 1, 2027, thereby ensuring that borrowers had access to a plan under the income-contingent repayment

---

[7] On July 19, 2024, the day after the Eighth Circuit granted an emergency stay, the Department placed all borrowers who had been making payments in the SAVE plan into a forbearance. The Department does not count months during this forbearance as months of eligible payment for PSLF purposes.

statute. *Id.*  The rule became final on January 15, 2025. *See Income-Contingent Repayment Plan Options*, 90 Fed. Reg. 3695 (Jan. 15, 2025).

> **D.  The Trump Administration shuts down access to all income-driven repayment plans, orders closure of the Department of Education, and declares that the Small Business Administration will handle student loans.**

As of 11:59 a.m. on January 20, 2025, borrowers could enroll in plans under both the income-based repayment and income-contingent repayment statutes. However, this soon changed.

On February 26, 2025, the defendants issued a Stop Work Order, directing all loan servicers to stop accepting and processing income-driven repayment applications.[8] The Stop Work Order shuts down all income-driven repayment options for at least three months, but did not specify when, if ever, they will be reinstated. The defendants' action applies to all online and paper applications.

The defendants' public notice on its website confirms this decision. It says:

 **Application Unavailable**

A federal court issued an injunction preventing the U.S. Department of Education from implementing the Saving on a Valuable Education (SAVE) Plan and parts of other income-driven repayment (IDR) plans. As a result, the IDR and online loan consolidation applications are temporarily unavailable. Borrowers can still submit a paper loan consolidation application.

Declaration of Sarah Tammelleo ("Tammelleo Decl."), Ex. A.

The plaintiff commenced this litigation on March 18, 2025.  In response to this litigation, the defendants gave a statement to the Press saying: "The Department is working to ensure these programs conform with the 8th Circuit's ruling, and anticipates the revised form allowing

---

[8] Tara Siegel Bernard, *Student Loan Borrowers Blocked From Affordable Repayment Plans*, N.Y. Times (Feb. 28, 2025) (last updated Mar. 3, 2025); Jessica Blake, *Applications for Some Student Loan Repayment Plans Frozen*, Inside higher Ed (Feb. 26, 2025); Adam S. Minsky, *Trump Administration Suspends 4 Student Loan Payment Plans—Here's What Borrowers Should Know*, Forbes (Mar. 3, 2025). https://www.insidehighered.com/news/government/politics-elections/2025/02/26/trump-admin-pauses-all-income-driven-repayment-plans; https://www.forbes.com/sites/adamminsky/2025/03/03/trump-administration-suspends-4-student-loan-payment-plans---heres-what-borrowers-should-know/

borrowers to change repayment plans to be available as soon as next week."[9] The defendants made no firm commitment in the statement, nor did they speak to when the *processing* of applications would start.

Then, on March 20, 2025, only two days after the present action was commenced and while access to income-driven repayment plans remained restricted, President Trump signed an executive order, *Improving Education Outcomes by Empowering Parents, States, and Communities*. The order directs The defendants to "take all necessary steps to facilitate the closure of the Department of Education[.]" Improving Education Outcomes by Empowering Parents, States, and Communities, Exec. Order § 2(a) (Mar. 20, 2025).[10]

One day later, on March 21, 2025, the President changed course from the Executive Order signed the day before:

> President Trump said Friday he is "immediately" moving the handling of federal student loans to the Small Business Administration (SBA), . . . as his White House seeks to wind down and eventually eliminate the Education Department.
>
> "I've decided that the SBA, the Small Business Administration, headed by Kelly Loeffler, will handle all of the student loan portfolio," Trump told reporters in the Oval Office, noting it is a "pretty complicated deal, and that's coming out of the Department of Education immediately."[11]

The Administration has not provided further details publicly about how it will handle the move of student loans from the Department of Education to the Small Business Administration would be administered, or about how to ensure access to programs, like income-driven repayment and

---

[9] Lexi Lonas Cochran, *AFT sues Education Department over removal of IDR student loan applications*, The Hill (Mar. 19, 2025); Rebecca Carballo, *Teachers union sues Education Department for blocking access to repayment plans*, PoliticoPro (Mar. 19, 2025).

[10] Available at https://www.whitehouse.gov/presidential-actions/2025/03/improving-education-outcomes-by-empowering-parents-states-and-communities/

[11] Lexi Lonas Cochran, *Trump says student loans moving to SBA, 'special needs' to HHS*, The Hill (March 21, 2025)

Public Service Loan Forgiveness, that the Department of Education is required by Congress to offer.

### E.  The defendants' failure to offer income-driven repayment plans harms the plaintiff and its members.

Because the defendants ordered servicers to stop accepting and processing income-driven repayment plan applications, and because they placed all SAVE Plan borrowers into forbearances, only borrowers who were already in the IBR, ICR, or PAYE Plans can continue making payments as Congress intended. If they are not already in an income-driven repayment plan, they cannot get into an income-driven repayment plan. If they are in default, they cannot get out of default and into an income-driven repayment plan. And, if they are working in public service, they are unable to get into an affordable repayment option that allows them to earn credit towards forgiveness.

The plaintiff, and its members, are harmed by this conduct. The plaintiff's mission is to promote fairness, democracy, economic opportunity, and high-quality public education, healthcare, and public services for students, their families and communities. Tammelleo Decl. ¶ 4. It does this by ensuring its members receive fair pay and benefits for their critical work, and by fighting for safe working conditions that also benefit students, patients, and those who use public services. *Id*. Helping children and students, and ensuring the economic security of its members and their families, are at the core of this mission. *Id.* The plaintiff's mission requires it to provide its members with assistance and accurate information on student loan repayment and Public Service Loan Forgiveness—which is made all the more difficult by the defendants' misconduct, as well as the Trump Administration's firing of the Consumer Financial Protection Bureau's Student Loan

Ombudsman[12] and the firing of nearly all of the staff at Federal Student Aid dedicated to resolving student loan borrower complaints.[13]

According to a survey of the plaintiff's members, 8 in 10 say student debt is a "major burden," and it is a major driver of financial difficulties as compared to any other debt.[14] The result: 78% of these members report that they or someone in their household has previously fallen behind on making debt payments, and one in three had debts go into default. *Id.*

Given this, the plaintiff must divert its resources to address the defendants' decision to stop borrowers from accessing income-driven repayment plans. The plaintiff has spent, and continues to spend, tens of thousands of dollars on debt clinics to educate members on how to better navigate their repayment options, and it has diverted valuable staff time that would otherwise have been spent focused on issues like collective bargaining; retirement security; healthcare; student learning conditions; and working conditions for educators, public employees and healthcare workers. Tammelleo Decl. ¶¶ 13, 22-24. Since the defendants shut down access to all income-driven repayment plans, the plaintiff's staff have had to redraft clinic curriculum and have diverted significant additional staff time to answering member questions. *Id.* ¶ 23. And, while the plaintiff committed to expanding economic security programs for members and was developing a new financial literacy clinic curriculum to help members, this program development has been delayed and impeded due to the defendants' actions and the new demand from members with student debt. *Id.* ¶ 25.

---

[12] Katherine Knott, *Student Loan Watchdog on the Chopping* Block, Inside Higher Ed (Feb. 18, 2025), https://www.insidehighered.com/news/quick-takes/2025/02/18/cfpbs-student-loan-watchdog-chopping-block.

[13] Michael C. Bender and Dana Goldstein, *Education Department Fires 1,300 Workers, Gutting Its Staff*, N.Y. Times (Mar. 11, 2025), https://www.nytimes.com/2025/03/11/us/politics/trump-education-department-firings.html.

[14] *2018 AFT Student Debt Survey' results tell a heartbreaking story*, Am. Fed'n of Teachers (*available at* https://www.aft.org/sites/default/files/media/2018/studentdebtsurvey.pdf)

A few members' experiences exemplify the problem. One member, Rachel Dubreuil, teaches Social Studies at a technical high school. Declaration of Rachel Dubreuil ("Dubreuil Decl.") ¶ 5. She dedicated herself to public service as a teacher and has taught for over ten years. *Id*. Rachel was on track to have most of her loans forgiven under Public Service Loan Forgiveness in November 2024, but that progress was halted overnight, just a few months short of resolution. *Id*. ¶¶ 6–10. In July 2024, her loans, which had been in the SAVE Plan, were placed into an administrative forbearance. *Id*. ¶ 11. As previously discussed, her time in this forbearance does not count toward Public Service Loan Forgiveness. She has applied to switch plans, *id*. ¶ 14, and to have her forbearance time counted though a special program known as the "Buy Back" program,[15] *id*. ¶ 12, but neither of these applications has been processed, *id*. ¶¶ 12, 14. The stress from this debt, and the sheer tension that it causes her day to day, is unbearable. Because of her student loan debt, she and her husband have not been able to save for retirement, nor have they been able to make contributions to their daughter's college savings fund. *Id*. ¶ 16. They have looked into obtaining higher life insurance policies as a benefit for their daughter, in case anything were to happen to them, but could not afford those policies due to Rachel's loans. *Id*. Not only is Rachel being deprived of her statutory and contractual rights, but as a result, she will be stuck in her debt for longer and is deprived of the opportunity to plan for her family's future.

Dr. Picolya McCall-Robinson incurred student loan debt at each step of her education leading to her doctorate. Declaration of Picolya McCall-Robinson ("McCall-Robinson Decl.") ¶¶ 3-5. As an adjunct professor, she relies on income-driven repayments plans to make her monthly

---

[15] The "Buy Back" program allows qualifying borrowers who were temporarily not making payments because they were in an ineligible deferment or their loan was in forbearance to retroactively pay for months while such deferment or forbearance in order to meet the 120 month requirement of the Public Service Loan Forgiveness program. 34 C.F.R. § 685.219(g)(6); https://studentaid.gov/manage-loans/forgiveness-cancellation/public-service/public-service-loan-forgiveness-buyback.

loan payments, and on Public Service Loan Forgiveness as a long-term plan for her loans. *Id.* ¶¶ 6-8. Despite years of making consistent payments, her current balance is over $580,000, making any payments other than income-driven repayment plan payments unaffordable. *Id.* at ¶ 9. She should have qualified for debt forgiveness in November 2024, but she has not been able to accrue the final months of payments on an income-driven repayment plan that she needs since her loans were put in the SAVE Plan forbearance in July 2024. *Id.* ¶ 13. She tried in December 2024 to switch income-driven repayment plans, but her application was never processed; she tried again in February 2025, but was unable to submit the application. *Id.* ¶ 14. As a single mother of two, if her debt forgiveness is delayed, it will prevent her from building a life for her children. *Id.* ¶ 18. Her debt has already inhibited her ability to buy a home and to secure a job. *Id.* ¶¶ 16-17.

And, yet another member, Corey Mason, was already struggling and sacrificing to afford her loans, and now feels that her financial future is uncertain. She has 11 years of teaching experience and a bachelor's degree in education, a master's degree in Teaching English to Speakers of Other Languages, and a Sixth-Year certificate in reading. Declaration of Corey Mason ("Mason Decl.") ¶¶ 3-4. She currently owes $78,476.89 in federal student loans, $75,926.52 of which is principal, despite having consistently made payments. *Id.* ¶ 5. She has already paid off her private student loan. *Id.* ¶ 6. Living on a teacher's salary, Corey relies on access to income-driven repayment plans to make her monthly payments affordable, *id.* ¶ 7, and relies on the Public Service Loan Forgiveness program and the promise of debt forgiveness in planning her life, *id.* ¶ 8. Corey has 117 of the 120 months she needs to have her loans forgiven under Public Service Loan Forgiveness, and her loans should have been forgiven in August 2024, but she has been stuck in the SAVE Plan forbearance since June 2024. *Id.* ¶ 12. She has been proactive in trying to remove her loans from the forbearance and to receive credit for past monthly payments. *Id.* ¶¶ 13-14 She

has continued to make payments, but she is still stuck in limbo. *Id.* She was told by her loan servicer that her payment would be $900 per month, up from her income-driven repayment plan payment of $364 per month. *Id.* ¶ 15. She cannot afford payments of $900 per month. *Id.* She has already spent years struggling with her loans. At times she has forgone heating her home and has accrued credit card debt to cover household expenses in order to remain current on her student loans. *Id.* ¶ 16. She spent her existing savings on paying off her private student loan, cannot afford to save more while still paying her federal student loans, and cannot afford a new car. *Id.* Corey is concerned about planning for her future. She is worried about her job security in light of the efforts to close the U.S. Department of Education and about her retirement if the Social Security system ends. *Id.* ¶ 17. She is engaged and was waiting for her student loans to be forgiven before getting married, which she had expected would happen in August 2024 but which now is uncertain. *Id.* ¶ 18. Corey has started to consider bankruptcy as a way to manage her unaffordable debt, if she cannot access income-driven repayment and Public Service Loan Forgiveness. *Id.* ¶ 19.

The plaintiff has had contact with other individual members who, since the defendants ended access to income-driven repayment plans, are considering bankruptcy, Tammelleo Decl. ¶ 18, cannot save for and afford childcare, *id.* ¶ 19, plan to retire but currently has student loan payments that are greater than their mortgage payments, *id.* ¶ 20, and cannot meet their children's basic needs without income driven repayment and Public Service Loan Forgiveness, *id.* ¶ 21.

The ongoing harm also extends beyond the plaintiff's members. For instance, Dr. Carly Baetz was enrolled in the SAVE Plan and is currently stuck in forbearance. Declaration of Dr. Carly Baetz ("Baetz Decl.) ¶¶ 8-9. She has been enrolled in Public Service Loan Forgiveness and was scheduled to have all of her loans forgiven this fall, but due to the forbearance and inability to change plans, it is unknown when she will be able to have her loans forgiven and the crushing

weight on her student loans debt off her back. *Id.* ¶¶ 10-16. Similarly, Tammy Sabens, a former nurse who had to retire early for health reasons, has an income of only $1,486 per month, consisting entirely of social security. Declaration of Tammy Sabens ("Sabens Decl.") ¶¶ 3-9.) She is unable to access any income-driven repayment programs to lower her monthly student loan payments from $390.65 per month, and as a result loses sleep, has panic attacks, and feels like her only option to is default on her loans. *Id.* ¶¶ 10-16.

### F. DISCUSSION

#### a. The plaintiff has Article III standing.

As a preliminary matter, the plaintiff has Article III standing to bring this case on two independent grounds. First, the plaintiff has associational standing as a representative of its members. As discussed above, its members are harmed by the defendants' actions and would have standing to sue in their own right, the issue is at the heart of plaintiff's mission, and no individual participation is needed in the suit since it is a case challenging an unlawful government policy where the remedy would be broadly applicable to its members. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (providing three elements for associational standing); *Tanner-Brown v. Haaland*, 105 F.4th 437, 447 (D.C. Cir. 2024) (citing *Hunt* elements). Second, the plaintiff has organizational standing on its own behalf because the defendants' actions, as described above, have impeded its activities and caused the plaintiff to spend its resources on assisting its members in order to meet its mission; the plaintiff has thereby suffered a concrete and demonstrable injury to its activities. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (discussing standard for organizational standing).

#### b. Immediate injunctive relief is appropriate.

When seeking a temporary restraining order or a preliminary injunction, the moving party must show: "1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable

injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "These four considerations are factors, not elements." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239 (LLA), 2025 WL 597959, at *12 (D.D.C. Feb. 25, 2025).

A temporary restraining order or preliminary injunction is appropriate here. ***First,*** the plaintiff is likely to succeed on their two Administrative Procedure Act claims – the defendants have a non-discretionary and a non-transferrable duty to offer income-driven repayment plans but abruptly stopped offering such plans. The defendants also lack any legal or rational basis to shut down every such plan. ***Second,*** the plaintiff, on its own and as a representative of its members, faces ongoing irreparable harm. Some members must choose between basic necessities and paying their loans, while others are considering bankruptcy, and still others are unable to plan for their future after relying on eventual debt forgiveness under Public Service Loan Forgiveness. The plaintiff will be forced to dedicate unrecoverable amounts of resources to assist borrowers during this confusing time, resources that were intended to be used for new programs that are now postponed. ***Third,*** it is never in the public interest for the Government to violate the law in this way, particularly when it comes as part of a broader campaign to dismantle a Congressionally created agency and program.

### 1. Plaintiff is likely to succeed on its claims because the defendants are failing to meet their statutory and contractual obligations.

Plaintiff asserts two claims under the Administrative Procedure Act in this case: (1) that defendants are unlawfully withholding access to income-driven repayments plans in contravention of legal mandates; and (2) that the defendants' decision to shut off access to all income-driven repayment plans in this way—and then delegate duties assigned specifically to it by Congress—is

contrary to law and arbitrary and capricious. The plaintiff, as described below, is likely to succeed on both claims.

> **a. Under the Administrative Procedure Act, this Court is likely to compel the Agency to offer an income-driven repayment plan under § 706(1).**

Section 706(1) of the Administrative Procedure Act states that courts "shall compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). A plaintiff suing under § 706(1) must show two things: first that the agency has a "ministerial or non-discretionary' duty amounting to a 'specific unequivocal command;" *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016), and second that the agency "failed to take" that discrete agency action, *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004).

Here, there is no serious question as to either element. ***First,*** the defendants (and the defendants specifically, not the Small Business Administration or any other governmental or private entity) have a statutory, regulatory, and contractual obligation to provide access to plans under *both* the IBR and ICR statutes. Specifically:

- **Statutory.** Congress has said that the Secretary "shall" "carry out a program" for borrowers to "elect, during any period the borrower has the partial financial hardship," an IBR Plan. 20 U.S.C. 1098e(b). Similarly, Congress stated that the Secretary "shall offer a borrower of a loan . . . an income contingent repayment plan." 20 U.S.C. § 1087e(d)(1)(D). By using "shall," language, Congress sought "to impose discretionless obligations[.]" *Lopez v. Davis*, 531 U.S. 230, 241 (2001); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 112 (2012) ("The traditional, commonly repeated rule is that *shall* is mandatory and *may* is permissive . . . .")

- **Regulatory.** The defendants have also imposed this duty on themselves through their implementing regulations. In addition to its rules that broadly describe the plans, the income-driven repayment program regulations require, "[a]fter the Secretary obtains sufficient information to calculate the monthly payment amount," the Secretary must "calculate[] the borrower's payment and establishes the 12-month period during which the borrower will be obligated to make a payment in that amount." 34 C.F.R. § 685.209(l)(4). The regulations then mandates that the Secretary send the borrower a "repayment disclosure." *Id.* § 685.209(l)(4). In other words, the defendants' own regulations incorporate this statutory duty to provide borrowers with access to these plans. *See Ctr. for*

*Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 21 (D.D.C. 2017) ("[T]he 'law' that generates a mandatory duty need not be a statute – it can also be an "agency regulation[] that has the force of law") (citations omitted).

- **Contract.** As noted above, Congress directed the defendants to develop a master promissory note that identifies borrowers' obligations and rights. the defendants have done so, and every federal student loan borrower has signed such a contract. The Borrowers master promissory notes specifically tells them that they have access to "an income-driven repayment plan," in which "your required monthly payment amount is based on your income and family size." *See* Ex. 1 attached hereto.

The defendants have confirmed this mandatory duty. They have said they could not "sunset" the IBR Plan because doing so was not "permitted by section 493C(b) of the [Higher Education Act] which authorized the IBR plan." 88 Fed. Reg. 43,820, 43,837 (July 10, 2023). Relatedly, the defendants have acknowledged their "statutory obligation under the [Higher Education Act] to offer borrowers an income-contingent repayment plan." Income-Contingent Repayment Plan Options, 90 Fed. Reg. 3695, 3696 (Jan. 15, 2025). Any argument to the contrary now would flout the defendants' prior, consistent position.

***Second,*** the defendants have breached their legal obligation by shutting off all access to income-driven repayment plans to borrowers seeking to enroll, thereby failing to "carry out a program" or "offer" borrowers these options. 20 U.S.C. § 1098e(b). As noted before, the defendants have issued a Stop Work Order to their servicers and issued a public statement confirming that borrowers do not have access to any income-driven repayment plans, all while the defendants are being instructed to dismantle their own agency. Borrowers, too, report that they are stuck in an untenable limbo. For § 706(1) purposes, this is enough. The defendants' withholding of this legal obligation warrants relief and the plaintiff is likely to succeed on this claim.[16]

---

[16] The Administrative Procedure Act includes § 706(1) relief for unlawful withholding and, separately, unreasonably delaying agency action. For the latter set of cases, courts have developed a series of factors to evaluate whether a delay is unreasonable. In this context though, where the relief is simply being shut off entirely, the inquiry ends.

**b. The defendants' action is also unlawful under § 706(2) because it is inconsistent with the statute, regulation, and contract, and is without a rational basis.**

In addition to section 706(1), the Administrative Procedure Act also directs courts to "hold unlawful and set aside agency action," when such action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Here, too, the plaintiff meets its burden.

To start*,* the defendants' decision to issue a Stop Work order, and therefore close off access to all income-driven repayment plans for borrowers seeking to enroll, constitutes final agency action warranting review under § 706(2). To be final, an action must (1) "mark[] the consummation of the agency's decision-making process" and (2) be one by which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–79 (1997) (internal quotation marks omitted).

Here, the defendants' decision satisfies both requirements. The Stop Work Order represents the consummation of a decision – i.e., the defendants made the final decision that they will not accept or process applications to enroll in an income-driven repayment plan, and as a result an entire population of otherwise eligible borrowers cannot access income-driven repayment plans. *See Nat'l Council of Nonprofits*, 2025 WL 597959, at *13 (finding that "ordering a nationwide pause on federal financial assistance" constitutes a final agency action); *see also Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239 (LLA), 2025 WL 368852, at *10 (D.D.C. Feb. 3, 2025) (contrasting guidance documents with final agency actions). And, legal rights are curtailed by that decision.  The plaintiff's members are shut out of income-driven repayment programs. *See* Dubreuil Decl. ¶ 14 ("I submitted an Income-Driven Repayment plan application to switch repayment plans, so that I could continue to make payments to receive forgiveness, but

my application has been stuck in review."); Mason Dec. ¶ 15 ("I submitted an application for the Income Based Repayment plan, which I understood was not part of the SAVE forbearance. That application is still pending."); McCall-Robinson Decl. ¶¶ 13-14 ("I was on track to have my loans forgiven in November 2024, but that was ripped away in July 2024 when my payments were placed in forbearance . . . I tried again in February [to switch plans] but was unable to submit an application at all.").

*Second,* the decision is contrary to law and is arbitrary and capricious in various ways. As discussed above, there is a statutory, regulatory, and contractual obligation for the defendants to provide access to income-driven repayment programs. If the defendants are permitted to simply shut down access to all income-driven repayment programs for new applicants, notwithstanding these requirements, they would essentially have "unlimited power to rewrite the Education Act," and would "effect[] a 'fundamental revision of the statute, changing it from [one sort of] scheme . . . of regulation' into an entirely different kind." *Biden v. Nebraska,* 600 U.S. at 502 (citation omitted). Furthermore, the defendants' newly declared plan to take a raft of income-driven repayment obligations which Congress specifically entrusted to the defendants and instead send those responsibilities to the Small Business Administration is inconsistent with the plain terms of the Higher Education Act. The defendants' failure to offer any income-driven repayment plans to borrowers seeking to enroll violates these various laws and is therefore impermissible under the Administrative Procedure Act.

The decision is also irrational. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (explaining governing standard as including where the agency "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency

expertise"). This is particularly true with respect to the IBR Plan. As discussed, even in the face of the ongoing litigation, the Biden Administration kept the IBR Plan open to borrowers because it had a legal obligation to do so and in light of the fact that earlier decisions (like the more recent one) did not speak to the IBR Plan. This shows that the defendants can keep the IBR Plan open even if they have to modify aspects of the income-contingent repayment plans in light of the Eighth Circuit's decision. Further, cutting off the IBR Plain is particularly irrational given the language in the Eighth Circuit's decision underscoring its legality.  Again, the Eighth Circuit expressly pointed to the provisions and existence of IBR as a reason to strike down provisions of the SAVE Rule. *See, e.g., AFGE, AFL-CIO, Local 1929 v. Fed. Labor Rels. Auth.*, 961 F.3d 452, 459 (D.C. Cir. 2020) ("[T]he Authority departed from precedent based on a misreading of case law and without explaining the departure. Such a change is not 'sensibly explained.')(citation omitted);

### c.  The Eighth Circuit's decision is not a valid reason for shutting off access to all income-driven repayment plans.

Despite their legal obligations, the defendants will likely come into court and argue that the Eighth Circuit's decision left them no choice and that they are re-evaluating the income-driven repayments plans given that decision. As noted above, in response to this litigation, the defendants have claimed that the "form" could be available as soon as this week. If the defendants make this argument, it will be flawed in several ways (beyond the fact that the defendants cannot just put off compliance with legal obligations indefinitely, and that it is unclear whether the form's mere availability will mean that the defendants will process such applications). This is all the more true in light of the subsequent announcement by President Trump instructing the defendants to self-destruct.

To start, nothing in the Eighth Circuit's decision that casts any doubt on the legality of the IBR Plan, and there is no valid justification for shutting off access to the IBR Plan in light of that

decision. Indeed, the Eighth Circuit invoked the existence and terms of the IBR statute and plan to conclude that the forgiveness provision of income-contingent repayment plans was unlawful. Said plainly: even if the defendants had *some* justification for temporarily closing plans based on the ICR statute, they have *no* justification for shutting off access to the IBR Plan.

Even if this Court would typically give the Government the benefit of the doubt in light of the Eighth Circuit decision, the broader context—mass firing and an order directing the defendants to shutter themselves—suggests that this action is part of a broader scheme to completely stop all of the defendants' work. *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019) ("We are presented, in other words, with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process" and "[a]ccepting contrived reasons would defeat the purpose of the enterprise.").

## 2. The defendants' misconduct is causing the plaintiff and its members irreparable harm.

The plaintiff, on its own behalf and on behalf of its members, seek an injunction because their injures are "certain and great," "actual and not theoretical," and "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (emphasis in original). This is so in several ways.

***First,*** the plaintiff as an organization is suffering irreparable harm because the defendants' conduct is causing it "to divert and expend" its "resources to address" the "allegedly wrongful conduct," which is "enough to satisfy the[] burden of showing a likelihood of suffering irreparable harm." *Ind. State Conf. of the NAACP v. Lawson*, 326 F. Supp. 3d 646, 662 (S.D. Ind. 2018) (citing *Action NC v. Strach*, 216 F. Supp. 3d 597, 643 (M.D.N.C. 2016)); *see also League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (stating defendant's actions "unquestionably make

it more difficult for the" organizations "to accomplish their primary mission," which "provide[s] injury for purposes both of standing and irreparable harm"). As the plaintiff's representative explains in her declaration, the organization has had to put other projects, including a new financial literacy curriculum, on pause while it reallocates staff time to help its members with their student loans and to revise existing student loan resources in light of The defendants' actions. Tammelleo Decl. ¶¶ 23-25. The plaintiff has also spent $250,000 to extend a contract with a technology company called Summer, which provides direct services to members with student debt, to help its members navigate this uncertainty. *Id.* ¶ 26. The plaintiff had planned to end this contract, but felt it could not given the turmoil. *Id.* Because the defendants have sovereign immunity as to those financial harms, these costs are not recoverable, rendering the injury irreparable. *Missouri v. Trump*, 128 F.4th at 996.

**Second,** the Government's action is leaving Plaintiff's members in a position where they are financially harmed in a way that threatens their access to basic necessities. Indeed, "[a]lthough economic harm generally does not constitute irreparable injury, economic injury may be the basis for an injunction where a plaintiff lives on a fixed income and where minimal increases in the cost of living creates a 'potential [for] financial disaster' and the possible deprivation of 'life's necessities.'" *Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018) (quoting *United Steelworkers of Am., AFL-CIO v. Textron, Inc.*, 836 F.2d 6, 8 (1st Cir. 1987); *see also Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 657 (6th Cir. 1996) (economic harm satisfied factor of irreparable injury because plaintiffs were "unable to absorb even relatively small increases in their expenses without extreme hardship"). Here, because the plaintiff's members cannot access income-driven repayment plans and Public Service Loan Forgiveness, the plaintiff's members are

considering bankruptcy as an alternative,[17] have forgone basic necessities,[18] and are in distress about how to navigate major life milestones.[19]

**Finally,** the plaintiff's members are being denied the ability to earn credit towards Public Service Loan Forgiveness and have no way to ever rectify the issue absent an injunction ensuring access to the income-driven repayment plans.[20] As declarants explain: As declarants explain:

- "Every month I spend in this forbearance delays my forgiveness, thus delaying freedom from my student loan debt, and affording me an opportunity to live a better life. The weight of my student loan debt has felt like a ball and chain and impacts every life decision that I make." Dubreuil Decl. ¶ 15;

- "According to my account with StudentAid.gov, I have 117 of the 120 credits needed for Public Service Loan Forgiveness. This does not reflect any of the time or payments that I have made since my loan was placed in forbearance in June 2024. I should have accrued the three remaining credits by August 2024, at which point I should have had my loans forgiven." Mason Decl. ¶ 12;

- "I submitted an application to switch to a different IDR plan in December 2024, but the application has continued to process without any update. I tried again in February 2025 but was unable to submit an application at all." McCall-Robinson Decl. ¶ 14.

This constitutes irreparable harm since because they have no recourse, absent an injunction, to gain credit towards a cancellation program for which they have a statutory right. And, not for nothing, it would be bizarre if *granting* borrowers forgiveness could constitute irreparable harm

---

[17] Mason Decl. ¶ 19; Tammelleo Decl. ¶ 18.

[18] Mason Decl. ¶ 16 (not heating home to save money); Tammelleo Decl. ¶¶ 19, 21 (members struggling to afford childcare and children's basic needs); McCall-Robinson Decl. ¶ 18 ("If forgiveness is delayed, it will continue to prevent me from building a better life for myself and my children.").

[19] Dubreuil Decl. ¶ 16 (unable to save for retirement); Tammelleo Decl. ¶ 20 (member approaching retirement cannot obtain an affordable monthly payment); Mason Decl. ¶ 18 ("I am engaged to be married, but wanted to have my student loan debt forgiven before marrying and expected this would occur in the fall of 2024. Because I have not been able to accrue more credit toward Public Service Loan Forgiveness, I am stressed at the prospect of bringing my debt into my marriage.").

[20] The Government may assert the "buy back" provision in the Public Service Loan Forgiveness regulations solve for this issue. 34 C.F.R. § 685.219(g)(6). However, as the declarations attached to this brief show, the "buy back" provision exists only in name, not in practice, and the defendants have never provided any guidance on when, if ever, it will actually be an available option for borrowers.

when a plaintiff challenges a student loan forgiveness program, *see Missouri v. Trump,* 128 F. 4th at 966*,* but for borrowers to be denied access to injunctive relief when the government *prevents* them from accessing loan forgiveness programs.

### 3.  The public interest and balance of equities warrant an injunction.

When a government entity is a party to the case, the third and fourth factors merge. *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). "It is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Cmtys. Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)). "There is generally no public interest in the perpetuation of an unlawful agency action." *Id.* (citation omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws." *Id*. (citation omitted).

Here, in light of the ongoing and severe irreparable harm in continuing to deny access to statutorily mandated access to income-driven repayment plans and Public Service Loan Forgiveness benefits, there is no public interest in the continuation of the defendants' unlawful hold on these programs. The plaintiff's members and anyone who cannot afford to repay their student loans (*see generally* Sabens Decl. and Baetz Decl.) will be continued to be forced into untenable financial circumstances, unable to pay bills and contemplating bankruptcy, while these programs remain on indefinite hold. The public has a strong interest in restoring access to these congressionally mandated programs while the Government cannot possibly claim any harm from cessation of an unlawful shutdown of these income-driven repayment programs.

## III.  CONCLUSION

At bottom, the defendants are failing to meet their legal obligations, all at the expense of hard-working public servants and vulnerable student loan borrowers. The Court should grant this

motion and direct the defendants to return to the status quo ante and ensure access to at least one

income-driven repayment program.[21]


Date:   March 24, 2025                    /s/ John G. Albanese
                                         Julie Selesnick, DC Bar No. 485558
                                         F. Paul Bland (*pro hac vice*)
                                         BERGER MONTAGUE PC
                                         1001 G Street, NW
                                         Suite 400 East
                                         Washington, DC 20001
                                         T. 202.221.5279
                                         F. 215.875.4604
                                         jselesnick@bm.net
                                         pbland@bm.net

                                         John G. Albanese (*pro hac vice*)
                                         BERGER MONTAGUE PC
                                         1229 Tyler Street NE
                                         Suite 205
                                         Minneapolis, MN 55413
                                         T. 612-594-5997
                                         jalbanese@bm.net

                                         Persis Yu, DC Bar No. 90014714
                                         STUDENT BORROWER PROTECTION
                                         CENTER (a fiscally sponsored project of the
                                         Shared Ascent Fund)
                                         1025 Connecticut Ave NW, #717
                                         Washington, DC 20036
                                         (202) 618-1328
                                         persis@protectborrowers.org

---

[21] Any security under Rule 65(c) should be waived in this case. The Court has "broad discretion . . . to determine the appropriate amount of an injunction bond, including the discretion to require no bond at all." *Simms v. District of Columbia,* 872 F. Supp. 2d 90, 107 (D.D.C. 2012). No bond is particularly appropriate in "public-interest litigation," which courts have recognized as "an exception to the Rule 65 security requirement." *City of Atlanta v. Metro. Atlanta Rapid. Auth.,* 636 F.2d 1084, 1094 (5th Cir. 1981). Indeed, "[i]t would be a mistake to treat a revenue loss to the Government the same as pecuniary damage to a private party." *Natural Res. Def. Council, Inc. v. Moorton,* 337 F. Supp. 167, 169 (D.D.C. 1971).

R. T. Winston Berkman-Breen, NY Bar No.
5559372
STUDENT BORROWER PROTECTION
CENTER (a fiscally sponsored project of the
Shared Ascent Fund)
40 Rector Street, 9th Floor
New York, NY 10006
winston@protectborrowers.org

*Attorneys for Plaintiff*

# Exhibit 1



# Master Promissory Note (MPN)
## Direct Subsidized Loans and Direct Unsubsidized Loans
### William D. Ford Federal Direct Loan Program

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

**WARNING**: Any person who knowingly makes a false statement or misrepresentation on this form or any accompanying document is subject to penalties that may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. 1097.

**BEFORE YOU BEGIN**

Before you begin, read the Instructions on page 14 of this MPN.

**BORROWER INFORMATION**

**1.** Name and Permanent Address (see Instructions)

**2.** Social Security Number

**3.** Date of Birth (mm-dd-yyyy)

**4.** Driver's License State and Number

**5.** Email Address (optional)

**6.** Area Code/Telephone Number

**REFERENCE INFORMATION**

List two persons with different U.S. addresses who have known you for at least three years. The first reference should be a parent or legal guardian.

**7.** First Name: _____  Middle Initial: _____  Last Name: _____

Permanent Address (Street, City, State, Zip Code):

_____

Email Address (optional): _____

Area Code/Telephone Number: _____

Relationship to You: _____

**8.** First Name: _____  Middle Initial: _____  Last Name: _____

Permanent Address (Street, City, State, Zip Code):

_____

Email Address (optional): _____

Area Code/Telephone Number: _____

Relationship to You: _____

**SCHOOL INFORMATION – TO BE COMPLETED BY THE SCHOOL**

**9.** School Name and Address

**10.** School Code/Branch

**11.** Identification No.

11/2019

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

Borrower's Name: _____     Social Security Number: _____

## BORROWER REQUEST, CERTIFICATIONS, AUTHORIZATIONS, AND UNDERSTANDINGS

**12.** I request a total amount of Direct Subsidized Loans and/or Direct Unsubsidized Loans under this Master Promissory Note (MPN) that cannot be more than the maximum amounts I am eligible to receive, as provided under federal law and explained in the MPN Terms and Conditions and in the Borrower's Rights and Responsibilities Statement that accompanies this MPN.

**13.** Under penalty of perjury, I certify that:

**A.** The information I provide on this MPN and that I update from time to time is true, complete, and correct to the best of my knowledge and belief.

**B.** I will use the loan money I receive only to pay for my authorized educational expenses for attendance at the school that determined I was eligible to receive the loan, and I will immediately repay any loan money that is not used for that purpose.

**C.** If I owe an overpayment on a Federal Perkins Loan or on a grant made under the federal student aid programs (as defined in the MPN Terms and Conditions), I have made satisfactory arrangements to repay the amount owed.

**D.** If I am in default on a federal student loan, I have made satisfactory repayment arrangements with the loan holder to repay the amount owed.

**E.** If I have been convicted of, or if I have pled *nolo contendere* (no contest) or guilty to, a crime involving fraud in obtaining federal student aid funds, I have fully repaid those funds.

**14.** For each Direct Subsidized Loan and Direct Unsubsidized Loan I receive under this MPN, I authorize:

**A.** My schools, the U.S. Department of Education (ED), and their agents and contractors to release information about my loan to the references I provide and to my immediate family members unless I submit written directions otherwise or as otherwise permitted by law.

**B.** My schools, ED, and their agents and contractors to contact me regarding my loan request or my loan, including repayment of my loan, at any cellular telephone number I provide now or in the future using automated dialing equipment or artificial or prerecorded voice or text messages.

**15.** I understand that:

**A.** My school is authorized to credit my loan money to my account at the school and to pay to ED any refund that may be due up to the full amount of the loan.

**B.** I have the option of paying the interest that accrues on my loans during grace, in-school, deferment (including in-school deferment), forbearance, and certain other periods, but if I do not do so, ED may add unpaid interest that accrues on my loans to the principal balance of those loans at the end of the grace, deferment, forbearance, or other period. This is called "capitalization." Capitalization will increase the principal amount owed on the loan and the total amount of interest I must pay.

**C.** ED has the authority to verify information reported on this MPN with other federal agencies and to report information about my loan status to persons and organizations permitted by law to receive that information.

D. My school will notify me of the type of loan and loan amount that I am eligible to borrow.

E. Within certain timeframes, I may cancel a loan or request a lower amount by contacting my school, or by refusing to accept or returning all or a portion of a loan disbursement that is made to me.

**F.** More than one loan may be made to me under this MPN for the same or different loan periods.

**G.** I am entitled to an exact copy of this MPN and the Borrower's Rights and Responsibilities Statement.

## PROMISES

**16.** I promise to pay to ED the full amount of all loans that I receive under this MPN in accordance with the terms of the MPN, plus interest and any other charges and fees that I may be required to pay under the terms of the MPN.

**17.** If I do not make a payment on a loan made under this MPN when it is due, I promise to pay reasonable collection costs, including but not limited to attorney fees, court costs, and other fees.

**18.** I promise that I will not sign this MPN before reading the entire MPN, even if I am told not to read it, or told that I am not required to read it.

**19.** By signing this MPN, whether electronically or on a paper copy, I promise that I have read, understand, and agree to the terms and conditions of the MPN, including the Borrower Request, Certifications, Authorizations, and Understandings, the MPN Terms and Conditions, and the Borrower's Rights and Responsibilities Statement.

**I UNDERSTAND THAT I MAY RECEIVE ONE OR MORE LOANS UNDER THIS MPN, AND THAT I MUST REPAY ALL LOANS THAT I RECEIVE UNDER THIS MPN.**

**20.** Borrower's Signature _____

**21.** Today's Date (mm-dd-yyyy) _____

*11/2019*

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

**MPN TERMS AND CONDITIONS**

This section summarizes some of the major terms and conditions of your loans. You can find more detailed information about the terms and conditions of your loans in the Borrower's Rights and Responsibilities Statement (BRR) that accompanies the MPN. Each topic covered in this section of the MPN is followed by the number of the item in the BRR that provides additional information about that topic. The BRR is considered to be part of the MPN. Whenever we refer to the MPN, the term "MPN" includes the BRR.

We contract with servicers to process Direct Loan payments, deferment and forbearance requests, and other transactions, and to answer questions about Direct Loans. We will provide you with information about how to contact us or our servicers after your school disburses (pays out) your loan. It is important to keep in contact with your servicer.

The words "we," "us," and "our" refer to the U.S. Department of Education or our servicers. The word "loan" refers to one or more loans made under the MPN.

The term "federal student aid" refers to aid awarded under the following programs: the Federal Pell Grant Program; the Federal Supplemental Educational Opportunity Grant (FSEOG) Program; the Federal Work-Study (FWS) Program; the Leveraging Educational Assistance Partnership Grant Program; the Teacher Education Assistance for College and Higher Education (TEACH) Grant Program; the William D. Ford Federal Direct Loan (Direct Loan) Program; the Federal Family Education Loan (FFEL) Program; and the Federal Perkins Loan Program.

**LAWS THAT APPLY TO THIS MPN AND OTHER LEGAL INFORMATION (BRR Item 1)**

The terms of this MPN are determined in accordance with the Higher Education Act of 1965, as amended (the HEA), our regulations, and other federal laws and regulations. Throughout this MPN, we refer to these laws and regulations as "the Act."

Any notice we are required to send you about your loans, even if you do not receive the notice, will be effective if it is sent by first-class mail to the most recent address that we have for you, emailed to an email address you have provided, or sent by any other method of notification that is permitted or required by the Act. You must immediately notify your servicer of a change in your contact information or status (see BRR Item 14).

If we do not enforce a term of this MPN, that does not waive any of our rights to enforce that term or any other term in the future. No term of your loan may be modified or waived, unless we do so in writing. If any term of your loan is determined to be unenforceable, the remaining terms remain in force.

**TYPES OF LOANS YOU CAN RECEIVE UNDER THIS MPN (BRR Item 3)**

This MPN is used to make Direct Subsidized Loans and Direct Unsubsidized Loans. Only undergraduate students with financial need are eligible to receive Direct Subsidized Loans. Both undergraduate and graduate or professional students can receive Direct Unsubsidized Loans.

**TIME LIMITATION ON YOUR ELIGIBILITY TO RECEIVE DIRECT SUBSIDIZED LOAN IF YOU ARE A FIRST-TIME BORROWER ON OR AFTER JULY 1, 2013 (BRR Item 4)**

If you are a first-time borrower on or after July 1, 2013, there is a limit on the maximum period of time for which you can receive Direct Subsidized Loans (this is called your "maximum eligibility period"), and under some circumstances you may become responsible for paying interest on those loans during all periods.

**USE OF THE MPN TO MAKE MORE THAN ONE LOAN (BRR Item 5)**

This MPN can be used to make multiple loans to you to pay your educational expenses over a period of up to 10 years. If you do not want to receive more than one loan under this MPN, you must notify your school or your servicer in writing.

Each loan you receive under this MPN is separately enforceable. At or before the time of the first disbursement of each loan, we will send you a disclosure statement that tells you the amount of the loan and additional terms of the loan. Any disclosure statement we send to you in connection with a loan made under this MPN is considered to be part of the MPN. You can also find information about the amount of your loan and the disbursement dates in the National Student Loan Data System (NSLDS).

**AMOUNT YOU MAY BORROW (BRR Item 6)**

There are annual loan limits (the maximum loan amount you can borrow each academic year) and aggregate loan limits (the maximum loan amount you can borrow for undergraduate and graduate or professional study) under this MPN. The annual and aggregate limits vary depending on your academic level (first-year, second-year, etc.) and, for undergraduate students, whether you are a dependent or independent student.

**INTEREST RATE (BRR Item 7)**

Unless we notify you in writing that a different rate will apply, the interest rate for any loan you receive under this MPN is a fixed rate (meaning that your interest rate will never change) that is calculated each year. When the rate is calculated, it applies to Direct Subsidized Loans and Direct Unsubsidized Loans with first disbursements made during the period beginning on July 1 of one year and ending on June 30 of the following year. This means that different loans you receive under this MPN may have different interest rates.

The calculated interest rate cannot be more than the maximum rate set by the Act. The maximum interest rate for Direct Subsidized Loans and Direct Unsubsidized Loans made to undergraduate students is 8.25%. The maximum interest rate for Direct Unsubsidized Loans made to graduate or professional students is 9.5%.

If you are in the military and the interest rate on your loan is greater than 6%, you may qualify to have the rate limited to 6% during any period of active duty service or other qualifying periods.

**PERIODS WHEN WE CHARGE INTEREST (BRR Item 8)**

Generally, we do not charge interest on Direct Subsidized Loans while you are enrolled at an eligible school on at least a half-time basis, during your 6-month grace period, during deferment periods, or during certain periods of repayment under certain repayment plans that base your monthly payment amount on your income. Generally, we charge interest on Direct Subsidized Loans during all other periods, starting on the day after your grace period ends.

Generally, we charge interest on Direct Unsubsidized Loans during all periods (including while you are in school and during your grace period), starting when your loan is first disbursed.

You are responsible for paying all interest that we charge on your Direct Loans. If you do not pay this interest, we may capitalize the interest (add it to the principal balance of your loan).

**LOAN FEE (BRR Item 9)**

We charge a loan fee for each loan you receive. The loan fee is a percentage of the loan amount and will reduce the amount of money you receive to pay for your educational expenses. However, you are required to pay the full amount of the loan, including the amount that was taken for the loan fee. The specific loan fee you are charged will be shown on disclosure statements that will be sent to you.

11/2019

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

**MPN TERMS AND CONDITIONS (CONTINUED)**

**LATE CHARGES AND COLLECTION COSTS (BRR Item 10)**

If you do not make your full monthly loan payment within 30 days of your due date, we may require you to pay a late charge of not more than six cents for each dollar of each late payment.

We may also require you to pay any other charges and fees that are permitted by the Act related to the collection of your loan. If you default on a loan, you must pay reasonable collection costs, plus any court costs and attorney fees.

**YOUR RIGHT TO CANCEL ALL OR PART OF A LOAN (BRR Item 11)**

Before your loan money is disbursed, you may cancel all or part of the loan at any time by notifying your school. After your loan money is disbursed, you may cancel all or part of the loan within certain timeframes set by the Act. These timeframes and the procedures for cancelling all or part of your loan will be explained in a notice that will be sent to you at the time of each loan disbursement.

**HOW YOU WILL RECEIVE YOUR LOAN MONEY (BRR Item 12)**

Generally, your school will pay out your loan money in more than one installment (called a "disbursement") according to a schedule determined by your school. In most cases, the loan money will be applied to your school account to pay for tuition, room and board, and authorized school fees. If there is money left after those charges are paid, the school will give the excess amount (this is called a "credit balance") to you directly, unless you authorize the school to hold the credit balance.

**GRACE PERIOD (BRR Item 15)**

You will receive a 6-month grace period on repayment of your loan. The grace period begins the day after you cease to be enrolled at least half-time at an eligible school.

You are not required to make any payments on your loan during the grace period. However, we charge interest during the grace period on Direct Unsubsidized Loans and, in some cases, on Direct Subsidized Loans, and this interest will be capitalized at the end of the grace period if you do not pay it.

**REPAYING YOUR LOAN (BRR Item 16)**

You must repay each loan you receive under the MPN in monthly installments during a repayment period that begins on the day immediately following your 6-month grace period on that loan. You have a choice of several repayment plans, including plans that base your required monthly payment amount on your income.

If you are temporarily unable to make your monthly loan payments, you can request a deferment or forbearance that allows you to temporarily stop making payments or to temporarily make a smaller payment amount (see BRR Item 20). In some cases, we may grant you a forbearance without a request.

You may prepay all or any part of your loan at any time without penalty.

After you have fully repaid a loan, we will send you a notice telling you that you have paid off your loan. You may fully repay different loans made under this MPN at different times.

**DEFAULTING ON YOUR LOAN (BRR Item 17)**

You will be considered in default on your loan if:

- You do not make your monthly loan payments for a total of at least 270 days;
- You do not comply with other terms of the loan, and we determine that you do not intend to repay your loan; or
- We accelerate your loan (see "CONDITIONS WHEN WE MAY REQUIRE YOU TO IMMEDIATELY REPAY THE FULL AMOUNT OF YOUR LOAN") and you do not pay the amount due.

If you default, we may:

- Capitalize all outstanding interest, which will increase the principal amount due on the loan and the total amount of interest you will pay;
- Report the default to nationwide consumer reporting agencies (credit bureaus), which will significantly and negatively affect your credit history;
- Demand that you immediately repay the loan in full;
- Order administrative wage garnishment (AWG) of your wages;
- Take (offset) your federal income tax refund or Social Security Administration payments or any other payment authorized for offset under federal law and use that amount to pay off part of your loan;
- File a lawsuit against you to collect on the loan; and
- Require you to pay collection costs, which will increase the total amount you must pay on your loan.

**CONDITIONS WHEN WE MAY REQUIRE YOU TO IMMEDIATELY REPAY THE FULL AMOUNT OF YOUR LOAN (BRR Item 18)**

We may require you to immediately repay the entire unpaid balance of your loan (this is called "acceleration") if you:

- Receive loan money, but do not begin attendance in any classes at the school that determined you were eligible to receive the loan;
- Use your loan money to pay for anything other than expenses related to your education at the school that determined you were eligible to receive the loan;
- Make a false statement that causes you to receive a loan that you are not eligible for; or
- Default on your loan (see "DEFAULTING ON YOUR LOAN").

**INFORMATION WE REPORT ABOUT YOUR LOAN (BRR Item 19)**

We will report information about your loan to nationwide consumer reporting agencies (credit bureaus) and the National Student Loan Data System (NSLDS) on a regular basis. This information will include the disbursement dates, amount, and repayment status of your loan (for example, whether you are current or delinquent in making payments). If you default on a loan, we will report this to nationwide consumer reporting agencies. Your loan will be identified as an education loan. Schools may access information in NSLDS for specific purposes that we authorize.

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

**IMPORTANT NOTICES**

**GRAMM-LEACH-BLILEY ACT NOTICE**

The Gramm-Leach-Bliley Act (Public Law 106-102) requires that lenders provide certain information to their customers regarding the collection and use of nonpublic personal information.

We disclose nonpublic personal information to third parties only as necessary to process and service your loan and as permitted by the Privacy Act of 1974. See the Privacy Act Notice below. We do not sell or otherwise make available any information about you to any third parties for marketing purposes.

We protect the security and confidentiality of nonpublic personal information by implementing the following policies and practices. All physical access to the sites where nonpublic personal information is maintained is controlled and monitored by security personnel. Our computer systems offer a high degree of resistance to tampering and circumvention. These systems limit data access to our staff and contract staff on a "need-to-know" basis, and control individual users' ability to access and alter records within the systems. All users of these systems are given a unique user ID with personal identifiers. All interactions by individual users with the systems are recorded.

**PRIVACY ACT NOTICE**

The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you:

The authority for collecting the requested information from and about you is §451 *et seq.* of the Higher Education Act (HEA) of 1965, as amended (20 U.S.C. 1087a *et seq.*) and the authorities for collecting and using your Social Security Number (SSN) are §484(a)(4) of the HEA (20 U.S.C. 1091(a)(4)) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate.

The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, to permit the servicing of your loan(s), and, if it becomes necessary, to locate you and to collect and report on your loan(s) if your loan(s) become delinquent or in default. We also use your SSN as an account identifier and to permit you to access your account information electronically.

The information in your file may be disclosed, on a case-by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loan(s), to enforce the terms of the loan(s), to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state

agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment status, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies.

In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

**FINANCIAL PRIVACY ACT NOTICE**

Under the Right to Financial Privacy Act of 1978 (12 U.S.C. 3401-3421), ED will have access to financial records in your student loan file maintained in compliance with the administration of the Direct Loan Program, and also to the financial records of any account at a financial institution used to disburse Direct Loan funds to you.

**PAPERWORK REDUCTION NOTICE**

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless the collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0007. Public reporting burden for this collection of information is estimated to average 30 minutes (0.5 hours) per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain a benefit in accordance with 34 CFR 685.201. If you have comments or concerns regarding the status of your individual submission of this form, write to:

U.S. Department of Education
Federal Student Aid Information Center
4255 W HWY 90
Monticello, KY 42633

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

## William D. Ford Federal Direct Loan Program
### Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement

**ABOUT THE BORROWER'S RIGHTS AND RESPONSIBILITIES STATEMENT (BRR)**

This BRR provides additional information about the terms and conditions of the loans you receive under the accompanying Master Promissory Note (MPN) for Direct Subsidized Loans and Direct Unsubsidized Loans. Please keep this BRR for your records. You may request another copy of the BRR at any time by contacting your loan servicer. You can also obtain a complete copy of the MPN that you signed, including the BRR, on StudentAid.gov.

Throughout this BRR, the words "we," "us," and "our" refer to the U.S. Department of Education or our servicers. The word "loan" refers to one or more loans made under the accompanying MPN.

**1. LAWS THAT APPLY TO THIS MPN AND OTHER LEGAL INFORMATION**

The terms and conditions of loans made under this MPN are determined by the Higher Education Act of 1965, as amended (the HEA), and other federal laws and regulations. We refer to these laws and regulations as "the Act" throughout this BRR. Under applicable state law (unless federal law preempts a state law), you may have certain borrower rights, remedies, and defenses in addition to those stated in the MPN and this BRR.

Any notice we are required to send you related to a loan made under this MPN, even if you do not receive the notice, will be effective if it is sent by first-class mail to the most recent address that we have for you, sent by electronic means to an email address you have provided, or sent by any other method of notification that is permitted or required by the Act. You must immediately notify your servicer of a change in your contact information or status (see BRR Item 14).

If we do not enforce a term of this MPN, that does not waive our right to enforce that term or any other term in the future. No term of this MPN may be modified or waived, unless we do so in writing. If any term of this MPN is determined to be unenforceable, the remaining terms remain in force.

**NOTE: Amendments to the Act may change the terms of this MPN. Any amendment to the Act that changes the terms of this MPN will be applied to your loans in accordance with the effective date of the amendment. Depending on the effective date of the amendment, amendments to the Act may modify or remove a benefit that existed at the time that you signed this MPN.**

**2. THE WILLIAM D. FORD FEDERAL DIRECT LOAN PROGRAM**

The Direct Loan Program (formally known as the William D. Ford Federal Direct Loan Program) includes the following types of loans, known collectively as "Direct Loans":

- Direct Subsidized Loans (formally known as Federal Direct Stafford/Ford Loans)
- Direct Unsubsidized Loans (formally known as Federal Direct Unsubsidized Stafford/Ford Loans)
- Direct PLUS Loans (formally known as Federal Direct PLUS Loans)
- Direct Consolidation Loans (formally known as Federal Direct Consolidation Loans)

Direct Loans are made by the U.S. Department of Education. We contract with servicers to process Direct Loan payments, deferment and forbearance requests, and other transactions, and to answer questions about Direct Loans. We will provide you with information about how to contact us or our servicers after your school notifies us that the first disbursement of your loan has been made. It is important to keep in contact with your servicer.

If we transfer one or all of your loans to a new servicer, we will notify you of who your new servicer is, how to contact your new servicer, and when your loans will be transferred. A transfer of the servicing of your loan does not affect any of your rights and responsibilities under that loan. You can find the name of your servicer in the National Student Loan Data System (NSLDS) (see BRR Item 19).

**3. DIRECT SUBSIDIZED LOANS AND DIRECT UNSUBSIDIZED LOANS**

Direct Subsidized Loans and Direct Unsubsidized Loans are made to students to help pay for the cost of education beyond high school.

Direct Subsidized Loans are available only to undergraduate students. Direct Unsubsidized Loans are available to both undergraduate students and graduate or professional students.

To receive a Direct Subsidized Loan, you must have financial need. Except as explained in BRR Item 8, we do not charge interest on Direct Subsidized Loans while you are in school on at least a half-time basis, during the grace period, during deferment periods, and during certain periods of repayment under the Revised Pay As You Earn Repayment Plan (REPAYE Plan), the Pay As You Earn Repayment Plan (PAYE Plan), and the Income-Based Repayment Plan (IBR Plan).

You can receive a Direct Unsubsidized Loan without showing that you have financial need. Except during certain periods of repayment under the REPAYE Plan, we charge interest on Direct Unsubsidized Loans during all periods. For more information on periods when we charge interest, see BRR Item 8.

**4. TIME LIMITATION ON DIRECT SUBSIDIZED LOAN ELIGIBILITY FOR FIRST-TIME BORROWERS ON OR AFTER JULY 1, 2013**

If you are a first-time borrower on or after July 1, 2013, there is a limit on the maximum period of time (measured in academic years) that you can receive Direct Subsidized Loans.

You are a first-time borrower on or after July 1, 2013 if you had no outstanding balance on a Direct Loan or on a Federal Family Education Loan Program (FFEL Program) loan on July 1, 2013, or if you have no outstanding balance on a Direct Loan or FFEL program loan on the date you obtain a Direct Loan after July 1, 2013.

In general, if you are a first-time borrower on or after July 1, 2013 you may not receive Direct Subsidized Loans for more than 150% of the published length of your program of study. This is called your "maximum eligibility period." For example, if you are enrolled in a 4-year bachelor's degree program, the maximum period for which you can receive Direct Subsidized Loans is 6 years (150% of 4 years is 6 years).

Your maximum eligibility period is based on the published length of the program in which you are currently enrolled. This means that your maximum eligibility period can change if you change programs. If you receive Direct Subsidized Loans for one program and then change to a different program, the period of time for which you received Direct Subsidized Loans for the earlier program will generally count against your new maximum eligibility period.

After you have received Direct Subsidized Loans for your maximum eligibility period, you are no longer eligible to receive additional Direct Subsidized Loans, and if you are enrolled in school, you may become responsible for paying interest on your Direct Subsidized Loans. You may continue to receive Direct Unsubsidized Loans.

With certain exceptions as provided under the Act (for example, if you graduate from your program of study before or at the time you receive Direct Subsidized Loans for your maximum eligibility period), we will charge interest on your Direct Subsidized Loans during all periods if you—

- Continue to be enrolled in any undergraduate program after you have received Direct Subsidized Loans for your maximum eligibility period, or

11/2019

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

**William D. Ford Federal Direct Loan Program**
**Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement**

- Enroll in another undergraduate program that is the same length as or shorter than your previous program.

If either of the above events occurs, we will charge interest during all periods, beginning on the date of the enrollment that causes you to become responsible for paying the interest. You will become responsible for paying all of the interest that accrues on your Direct Subsidized Loans based solely on your enrollment as described above, regardless of whether you apply for, request, or receive federal student financial aid. We will notify you if you become responsible for paying all of the interest that accrues on your Direct Subsidized Loans.

Additional information about the limitation on Direct Subsidized Loan eligibility for first-time borrowers on or after July 1, 2013 will be provided to you during entrance counseling (see BRR Item 12). You may also obtain additional information from your school's financial aid office, or at StudentAid.gov.

**5. USE OF THE MPN TO MAKE MORE THAN ONE LOAN**

You may receive more than one loan under this MPN over a period of up to 10 years to pay for your educational costs, as long as the school you are attending is authorized to use the MPN in this way and chooses to do so. At any school, you can receive more than one loan for the same academic year under this MPN.

If your school is not authorized to use the MPN for multiple loans or chooses not to do so, or if you do not want to receive more than one loan under this MPN, you must sign a new MPN each time you receive a loan for a new academic year. If you do not want to receive more than one loan under this MPN, you must notify your school or your servicer in writing.

If the school you are attending is authorized to use the MPN for multiple loans and chooses to do so, no additional loans will be made under this MPN after the earliest of the following dates:

- The date we or your school receive your written notice that you do not want to receive any additional loans under the MPN;
- One year after the date you sign the MPN or the date we receive the MPN, if no loan disbursements have been made under the MPN; or
- Ten years after the date you sign the MPN or the date we receive the MPN.

**6. AMOUNT YOU MAY BORROW**

The charts that follow show the maximum amounts of Direct Subsidized Loans and Direct Unsubsidized Loans that you may borrow for a single academic year (annual loan limits), and the maximum amounts that you may borrow in total for undergraduate and graduate study (aggregate loan limits). The actual amount you are eligible to borrow for an academic year may be less than the maximum annual amounts shown in the charts.

If you are enrolled in a program that is less than a full academic year in length, or if the remaining portion of the program you are enrolled in is less than a full academic year in length, the annual loan limits may be lower than those shown in the chart.

If you are enrolled in certain graduate level health professions programs, you may qualify for higher annual and aggregate limits on Direct Unsubsidized Loans.

Your school will determine the actual loan amount you are eligible to receive based on your academic level, dependency status, and other factors such as:

- Your cost of attendance;
- Your Expected Family Contribution;
- Other financial aid you receive; and

- Your remaining eligibility under the annual or aggregate loan limits.

The amount of Direct Subsidized Loans and Direct Unsubsidized Loans you are eligible to receive may increase or decrease based on changes in your financial circumstances. Your school will notify you of any changes in your eligibility.

**ANNUAL LOAN LIMITS**

| Dependent Undergraduate Students (unless your parent is unable to obtain a Direct PLUS Loan) | |
| --- | --- |
| First Year Total | $5,500 (not more than $3,500 can be subsidized) |
| Second Year Total | $6,500 (not more than $4,500 can be subsidized) |
| Third Year & Beyond (Total Each Year) | $7,500 (not more than $5,500 can be subsidized) |
| Independent Undergraduate Students (and dependent students, if your parent is unable to obtain a Direct PLUS Loan) | |
| First Year Total | $9,500 (not more than $3,500 can be subsidized) |
| Second Year Total | $10,500 (not more than $4,500 can be subsidized) |
| Third Year & Beyond (Total Each Year) | $12,500 (not more than $5,500 can be subsidized) |
| Graduate and Professional Students | |
| Total Amount (Each Year) | $20,500 (unsubsidized only) |

**AGGREGATE LOAN LIMITS**

| Dependent Undergraduate Students (unless your parent is unable to obtain a Direct PLUS Loan) | |
| --- | --- |
| Total Amount Cumulative | $31,000 (not more than $23,000 can be subsidized) |
| Independent Undergraduate Students (and dependent students, if your parent is unable to obtain a Direct PLUS Loan) | |
| Total Amount Cumulative | $57,500 (not more than $23,000 can be subsidized) |
| Graduate and Professional Students | |
| Total Amount Cumulative | $138,500 (not more than $65,500 can be subsidized; includes subsidized and unsubsidized loans received for undergraduate study) |

**7. INTEREST RATE**

The interest rate on Direct Subsidized Loans and Direct Unsubsidized Loans is a fixed rate (meaning that the rate for each loan you receive will never change). The rate is determined according to a formula specified in the Act, and is calculated each year. When the rate is calculated, it applies to all Direct Subsidized Loans and Direct Unsubsidized Loans that have a first disbursement date during the period beginning on July 1 of one year and ending on June 30 of the following year. If you receive more than one loan under this MPN, each loan may have a different fixed interest rate,

11/2019

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

**William D. Ford Federal Direct Loan Program**
**Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement**

depending on when the loan is first disbursed, and whether you are an undergraduate student or a graduate or professional student when the loan is made.

The interest rate for any loan you receive under this MPN cannot be more than the maximum rate set by the Act. The maximum interest rate for Direct Subsidized Loans and Direct Unsubsidized Loans made to undergraduate students is 8.25%. The maximum interest rate for Direct Unsubsidized Loans made to graduate or professional students is 9.5%. We will notify you of the interest rate for each loan you receive in a disclosure statement that we send to you.

**Servicemembers Civil Relief Act**

**If you are in military service, you may qualify for a lower interest rate on your loans.**

Under the Servicemembers Civil Relief Act, the interest rate on loans you received before you began your military service may be limited to 6% during your military service. We will determine if you are eligible for this benefit based on information from the U.S. Department of Defense. If you are eligible and have qualifying loans with an interest rate greater than 6%, we will automatically reduce the interest rate on those loans to 6% during your military service. If you think you qualify for the 6% interest rate but have not received it, contact your servicer.

**Interest rate reduction for automatic withdrawal of payments**

You will receive a 0.25% reduction in the interest rate on your loan if you choose to repay the loan under the automatic withdrawal option. Under the automatic withdrawal option, we automatically deduct your monthly loan payment from your checking or savings account. In addition to lowering your interest rate, automatic withdrawal ensures that your payments are made on time. We will provide you with information about the automatic withdrawal option.

**8. PERIODS WHEN WE CHARGE INTEREST**

In general, we do not charge interest on Direct Subsidized Loans during certain periods, but we charge interest on Direct Unsubsidized Loans during all periods, as explained below.

**Direct Subsidized Loans**

We **charge interest** on Direct Subsidized Loans—

- During most periods when you are repaying your loans;
- During forbearance periods; and
- During all periods, if you become responsible for paying all interest on your Direct Subsidized Loans (see BRR Item 4).

We **do not charge interest** on Direct Subsidized Loans—

- While you are enrolled in school at least half-time;
- During your grace period;
- During deferment periods;
- During some periods of repayment under the REPAYE, PAYE, and IBR plans; and
- During periods of active duty military service that qualify you for the no accrual of interest benefit for active duty service members (see below).

**Direct Unsubsidized Loans**

We **charge interest** on Direct Unsubsidized Loans, starting on the date of the first disbursement—

- While you are enrolled in school at least half-time;
- During your grace period;
- During most periods when you are repaying your loans;

- During most deferment periods; and
- During forbearance periods.

You will pay more interest on a Direct Unsubsidized Loan than on a Direct Subsidized Loan.

We **do not charge** interest on Direct Unsubsidized Loans—

- During some periods of repayment under the REPAYE Plan;
- During periods of active duty military service that qualify you for the no accrual of interest benefit for active duty service members (see below); and
- During periods of deferment for cancer treatment (see BRR Item 20).

**No accrual of interest benefit for active duty service members**

We do not charge interest on any type of Direct Loan Program loan first disbursed on or after October 1, 2008 during periods while you are on qualifying active military duty in an area of hostilities where your service qualifies you for special pay (for up to 60 months).

**Interest capitalization**

If you do not pay the interest as it accrues on either a Direct Subsidized Loan or a Direct Unsubsidized Loan, we will add the accrued interest to the unpaid principal balance of your loan. This is called "capitalization." Capitalization increases the principal amount you owe on the loan and the total amount of interest you will pay. We capitalize unpaid interest when your grace period ends and when you start making payments again after periods of deferment or forbearance. We may also capitalize unpaid interest that has accrued since the first disbursement of a Direct Unsubsidized Loan when you enter repayment for the first time.

The chart below shows the difference in the total amount you would repay if you pay the interest as it accrues during a 12-month deferment or forbearance period, compared to the amount you would repay if you do not pay the interest and it is capitalized at the end of the deferment or forbearance period. The example illustrated in the chart assumes the following—

- You owed $30,000 in Direct Unsubsidized Loans when your loans entered repayment at the end of the 6-month grace period;
- The interest rate on your loans is 6%;
- You are repaying your loans under the Standard Repayment Plan; and
- You received a 12-month deferment or forbearance that began on the day after your grace period ended.

|  | If you pay the interest as it accrues… | If you do not pay the interest and it is capitalized… |
|---|---|---|
| Loan principal amount owed at beginning of deferment or forbearance | $30,000 | $30,000 |
| Interest for 12 months at an annual interest rate of 6% | $1,800 (paid as accrued) | $1,800 (unpaid and capitalized) |
| Loan principal amount to be repaid at end of deferment or forbearance | $30,000 | $31,800 |
| Monthly payment | $333 | $353 |
| Number of payments | 120 | 120 |
| Total repaid | $41,767* | $42,365 |

*The total repaid includes $1,800 in interest that was repaid as it accrued during the 12-month deferment or forbearance period.

*11/2019*

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

**William D. Ford Federal Direct Loan Program**
**Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement**

In this example, you would pay $20 less per month and $598 less altogether if you pay the interest as it accrues during the 12-month deferment or forbearance period.

**Federal income tax deduction for student loan interest payments**

You may be able to claim a federal income tax deduction for interest payments you make on Direct Loans. For further information, refer to IRS Publication 970, available at https://irs.gov/publications/p970.

**9. LOAN FEE**

For each Direct Subsidized Loan or Direct Unsubsidized Loan you receive under this MPN, we charge a loan fee that is a percentage of the amount you initially borrowed. The loan fee will be subtracted from each disbursement of your loan. This means that the actual disbursement amount you receive will be less than the disbursement amount you must repay. However, you are required to pay the full amount of the loan, including the amount that was taken for the loan fee.

The amount of the loan fee may be different for different loans you receive under the MPN, depending on when the loans are first disbursed. The specific loan fee you are charged will be shown on a disclosure statement that we will send to you.

**10. LATE CHARGES AND COLLECTION COSTS**

If you do not make any part of a payment within 30 days after it is due, we may require you to pay a late charge. This charge will not be more than 6% of each late payment. We may also require you to pay other charges and fees involved in collecting your loan.

**11. YOUR RIGHT TO CANCEL ALL OR PART OF A LOAN**

Before your loan money is disbursed, you may cancel all or part of your loan at any time by notifying your school. After your loan money is disbursed, there are two ways to cancel all or part of your loan:

- **Within certain timeframes you may notify your school that you want to cancel all or part of your loan.** The timeframes for notifying your school are different depending on whether your school requires you to confirm in writing the types and amounts of loans you want to receive. These timeframes range from 14 days to 30 days after your school notifies you of your right to cancel all or part of your loan. Your school will tell you the specific cancellation timeframe that applies to you. If you tell the school that you want to cancel all or part of your loan within the applicable timeframe, your school is required to process your cancellation request.

  If you ask your school to cancel all or part of your loan outside the applicable timeframe, your school may process your cancellation request, but it is not required to do so.

- **You may return all or part of your loan to us.** Within 120 days of the date your school disbursed your loan money, you may cancel all or part of your loan by returning all or part of the loan money to us. Contact your servicer for instructions on how and where to return your loan money.

You do not have to pay interest or the loan fee on the part of your loan that is cancelled or returned within the timeframes described above. We will adjust your loan amount to eliminate any interest and loan fee that applies to the amount of the loan that is cancelled or returned.

**12. HOW YOU WILL RECEIVE YOUR LOAN MONEY**

Generally, your school will disburse (pay out) your loan money in more than one installment. Each installment is called a disbursement.

If your school uses academic terms (for example, semesters or quarters), it will usually make a loan disbursement at the beginning of each academic term.

If your school does not use academic terms or does not have academic terms that meet certain requirements, it will generally pay out your loan in at least two disbursements, one at the beginning of the period of study for which you are receiving the loan, and one at the midpoint of that period of study. Your school determines the schedule for disbursing your loan money in accordance with the Act.

In most cases, if the Direct Subsidized Loan or Direct Unsubsidized Loan that you are receiving is your first student loan under the Direct Loan Program, you must complete entrance counseling before your school can make the first disbursement of your loan. Your school will tell you if entrance counseling is required, and will provide instructions for completing entrance counseling.

Your school may disburse your loan money by crediting it to your account at the school, or may give some or all of it to you directly by check or other means. We will notify you in writing each time the school disburses part of your loan money.

If your school credits your loan money to your account and the amount credited is more than the amount of your tuition and fees, room and board, and other authorized charges, the excess amount is called a credit balance. Unless you authorize your school to hold the credit balance for you, your school must give you the credit balance within 14 days after the credit balance occurred or 14 days after classes began, whichever is later.

**13. USE OF YOUR LOAN MONEY**

You may use the loan money you receive only to pay for your authorized educational expenses for attendance at the school that determined you were eligible to receive the loan. Authorized expenses include the following:

- Tuition
- Room
- Board
- Institutional fees
- Books
- Supplies
- Equipment
- Dependent care expenses
- Transportation
- Commuting expenses
- Rental or purchase of a personal computer
- Loan fees
- Other documented, authorized costs

**14. INFORMATION YOU MUST REPORT TO US AFTER YOU RECEIVE YOUR LOAN**

You must notify your servicer and/or the financial aid office at your school about certain changes.

While you are still in school, you must notify your school's financial aid office if you:

- Change your address or telephone number;
- Change your name (for example, maiden name to married name);
- Do not enroll at least half-time for the period of study that your loan is intended to pay for;
- Do not enroll at the school that determined you were eligible to receive your loan;
- Stop attending school or drop below half-time enrollment;
- Transfer from one school to another school; or

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

**William D. Ford Federal Direct Loan Program**
**Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement**

- Graduate.

At any time after you receive your loan, you must notify your servicer if you:

- Change your address or telephone number;
- Change your name (for example, maiden name to married name); or
- Have any other change in status that would affect your loan (for example, if you receive a deferment while you are unemployed, but you find a job and therefore no longer meet the eligibility requirements for the deferment).

### 15. GRACE PERIOD

You do not need to begin making payments on your loan until 6 months after you stop attending school or drop below half-time enrollment. This 6-month period is called your grace period.

If you are a member of a reserve component of the U.S. Armed Forces and you are called to active duty for more than 30 days while you are enrolled in school on at least a half-time basis or during your grace period, the period of your active duty service and the time necessary for you to re-enroll in school after your active duty ends (up to a maximum of three years) are not counted as part of your grace period. We can provide more information about this benefit.

### 16. REPAYING YOUR LOAN

The repayment period for each Direct Subsidized Loan and Direct Unsubsidized Loan that you receive begins on the day after your grace period ends. We will notify you of the date your first payment is due.

You must make payments on your loan even if you do not receive a bill or repayment notice.

You must repay the principal amount of your loan, plus any interest charged on the loan in accordance with the Act. The principal amount that you owe, and are required to repay, is the total of all loan disbursements that are made (except for any disbursements that you reduce or cancel), plus any unpaid interest that is capitalized and added to the principal balance, as authorized under the Act.

You must generally repay all of your Direct Loans under the same repayment plan.

There are two types of repayment plans: traditional repayment plans and income-driven repayment plans. We will ask you to choose a repayment plan before your loans enter repayment. If you do not choose a repayment plan, we will place you on the Standard Repayment Plan, which may require you to make a higher monthly payment than other repayment plans.

If you choose a repayment plan that reduces your monthly payment amount by extending the period of time you have to repay your loans or by basing your payment on your income, you will likely pay more in interest over time than you would pay on another repayment plan.

#### TRADITIONAL REPAYMENT PLANS

Under a traditional repayment plan, your required monthly payment amount is based on the loan amount that you owe, the interest rate on your loans, and the length of the repayment period.

#### Standard Repayment Plan

Under the Standard Repayment Plan, you will make fixed monthly payments and repay your loan in full within 10 years (not including periods of deferment or forbearance) from the date the loan entered repayment. Your payments must be at least $50 a month, and will be more, if necessary, to repay the loan within the required time period.

#### Graduated Repayment Plan

Under the Graduated Repayment Plan, you will make lower payments at first, and your payments will gradually increase over time. You will repay your loan in full within 10 years (not including periods of deferment or forbearance) from the date the loan entered repayment. Your scheduled monthly payment must at least be equal to the amount of interest that accrues each month. No single scheduled payment will be more than three times greater than any other payment.

#### Extended Repayment Plan

You are eligible for the Extended Repayment Plan only if **(1)** you have an outstanding balance on Direct Loans that exceeds $30,000, and **(2)** you did not have an outstanding balance on a Direct Loan as of October 7, 1998 or on the date you obtained a Direct Loan on or after October 7, 1998.

Under this plan, you will repay your loan in full over a period not to exceed 25 years (not including periods of deferment or forbearance) from the date the loan entered repayment. You may choose to make fixed monthly payments or graduated monthly payments that start out lower and gradually increase over time. If you make fixed monthly payments, your payments must be at least $50 a month and will be more, if necessary, to repay the loan within the required time period. If you make graduated payments, your scheduled monthly payment must at least be equal to the amount of interest that accrues each month. No single scheduled payment under the graduated option will be more than three times greater than any other payment.

#### INCOME DRIVEN REPAYMENT PLANS

Under an income-driven repayment plan, your required monthly payment amount is based on your income and family size, instead of being based on your loan debt, interest rate, and repayment period, as under a traditional repayment plan. Changes in your income or family size will result in changes to your monthly payment amount. If you choose an income-driven plan, you must certify your family size and provide documentation of your income (and, if you are married, your spouse's income) each year so that we can recalculate your payment amount.

Your required monthly payment amount under an income-driven repayment plan is generally a percentage of your discretionary income. For all of the income-driven repayment plans except for the Income-Contingent Repayment Plan, discretionary income is defined as the difference between your adjusted gross income and 150% of the poverty guideline amount for your state of residence and family size, divided by 12. For the Income-Contingent Repayment Plan, discretionary income is defined as the difference between your adjusted gross income and the poverty guideline amount for your state of residence and family size, divided by 12.

#### Revised Pay As You Earn Repayment Plan (REPAYE Plan)

Under the REPAYE Plan, your monthly payment amount is generally 10% of your discretionary income.

If you are married, the income used to determine your REPAYE Plan payment amount will generally be the combined income of you and your spouse, regardless of whether you file a joint or separate federal income tax return. However, your payment amount will be reduced if your spouse also has federal student loans.

Under the REPAYE Plan, any remaining loan amount will be forgiven after you have made the equivalent of either 20 years of qualifying monthly payments over a period of at least 20 years (if all of the loans you are repaying under the plan were obtained for undergraduate study) or 25 years of qualifying payments over a period of at least 25 years (if any of the loans you are repaying under the plan were obtained for graduate or professional study). You may have to pay federal income tax on the loan amount that is forgiven.

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

**William D. Ford Federal Direct Loan Program**
**Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement**

### Pay As You Earn Repayment Plan (PAYE Plan)

Under the PAYE Plan, your monthly payment amount is generally 10% of your discretionary income, but it will never be more than the Standard Repayment Plan amount.

If you are married and file a joint federal income tax return, the income used to determine your PAYE Plan payment amount will be the combined adjusted gross income of you and your spouse, but your payment amount will be reduced if your spouse also has federal student loans.

If you are married and file a separate federal income tax return from your spouse, only your individual adjusted gross income will be used to determine your PAYE Plan payment amount.

To initially qualify for the PAYE Plan, the monthly amount you would be required to pay under this plan, based on your income and family size, must be less than the amount you would have to pay under the Standard Repayment Plan.

Under the PAYE Plan, if your loan is not repaid in full after you have made the equivalent of 20 years of qualifying monthly payments over a period of at least 20 years, any remaining loan amount will be forgiven. You may have to pay federal income tax on the loan amount that is forgiven.

### Income-Based Repayment Plan (IBR Plan)

Under the IBR Plan, your monthly payment amount is generally 15% of your discretionary income, but it will never be more than the Standard Repayment Plan amount.

If you are married and file a joint federal income tax return, the income used to determine your IBR Plan payment amount will be the combined adjusted gross income of you and your spouse, but your payment amount will be reduced if your spouse also has federal student loans.

If you are married and file a separate federal income tax return from your spouse, only your individual adjusted gross income will be used to determine your IBR Plan payment amount.

To initially qualify for the IBR Plan, the monthly amount you would be required to pay under this plan, based on your income and family size, must be less than the amount you would have to pay under the Standard Repayment Plan.

Under the IBR Plan, if your loan is not repaid in full after you have made the equivalent of 25 years of qualifying monthly payments over a period of at least 25 years, any remaining loan amount will be forgiven. You may have to pay federal income tax on the loan amount that is forgiven.

### Income Contingent Repayment Plan (ICR Plan)

Under the ICR Plan, your monthly payment amount will be **the lesser of**—

- 20% of your discretionary income, or
- A percentage of what you would repay under a Standard Repayment Plan with a 12-year repayment period.

If you are married and file a joint federal income tax return, the income used to determine your ICR Plan payment amount will be the combined adjusted gross income of you and your spouse.

If you are married and file a separate federal income tax return from your spouse, only your individual adjusted gross income will be used to determine your ICR Plan payment amount.

Until we obtain the information needed to calculate your monthly payment amount, your payment will equal the amount of interest that accrues monthly on your loan unless you request a forbearance.

Under the ICR Plan, if your loan is not repaid in full after you have made the equivalent of 25 years of qualifying monthly payments over a period of at least 25 years, any remaining loan amount will be forgiven. You may have to pay federal income tax on the loan amount that is forgiven.

### Additional repayment information

Under each plan, the number of payments may need to be adjusted to reflect capitalized interest and/or new loans made to you. We may also adjust payment dates on your loans or may grant you a forbearance (see BRR Item 20) to eliminate a past delinquency that remains even though you are making your scheduled monthly payments.

If you can show to our satisfaction that the terms and conditions of the repayment plans described above are not adequate to meet your exceptional circumstances, we may provide you with an alternative repayment plan.

You can use the Loan Simulator at StudentAid.gov/Loan-Simulator to evaluate your eligibility for the PAYE and IBR plans and to estimate your monthly and total payment amounts under all of the repayment plans. The Loan Simulator is for informational purposes only. We will make the official determination of your eligibility and payment amount.

Generally, you may change from your current repayment plan to any other repayment plan you qualify for at any time after you have begun repaying your loan.

Unless you are required to pay late charges or collection costs, when you make a payment on your loan, we apply the payment first to outstanding interest. If the payment amount is more than the amount of outstanding interest, we apply the remainder of your payment to your loan principal.

If you are required to pay late charges or collection costs, we apply your payment differently depending on your repayment plan. If you are repaying under a traditional repayment plan or the ICR Plan, we apply your payment first to late charges and collection costs, then to outstanding interest, and then to loan principal. If you are repaying under any income-driven repayment plan other than the ICR Plan, we apply your payment first to outstanding interest, then to late charges and collection costs, and then to loan principal.

You can prepay your loans (that is, make loan payments before they are due, or pay more than the amount due in a month) at any time without penalty. We apply any prepayments in accordance with the Act. Your servicer can provide more information about how prepayments are applied.

When you have repaid a loan in full, your servicer will send you a notice telling you that you have paid off your loan. You should keep this notice in a safe place.

### 17. DEFAULTING ON YOUR LOAN

Default (failing to repay your loan) is defined in detail in the Terms and Conditions section of your MPN. If you default:

- We will require you to immediately repay the entire unpaid amount of your loan (this is called "acceleration").
- We may sue you, take all or part of your federal and state tax refunds and other federal or state payments as authorized by law, and/or administratively garnish your wages so that your employer is required to send us part of your salary to pay off your loan.
- You will have to pay reasonable collection fees and costs, plus court costs and attorney fees in addition to the amount of your loan.
- You will lose eligibility for other federal student financial aid and for assistance under most federal benefit programs.
- You will lose eligibility for loan deferments, forbearances, and repayment plans.

*11/2019*

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

**William D. Ford Federal Direct Loan Program**
**Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement**

- We will report your default to nationwide consumer reporting agencies (see BRR Item 19). This will harm your credit history and may make it difficult for you to obtain credit cards, home or car loans, or other forms of consumer credit.

If you default on your loan, you will not be charged collection costs if you respond within 60 days to the initial notice of default that we send to you, and you enter into a repayment agreement with us, including a loan rehabilitation agreement, and fulfill that agreement.

**18. CONDITIONS WHEN WE MAY REQUIRE YOU TO IMMEDIATELY REPAY THE FULL AMOUNT OF YOUR LOAN**

We may require you to immediately repay the entire unpaid amount of your loan (this is called "acceleration") if you:

- Receive loan money, but do not begin attendance in any classes at the school that determined you were eligible to receive the loan;
- Use your loan money to pay for anything other than expenses related to your education at the school that determined you were eligible to receive the loan;
- Make a false statement that causes you to receive a loan that you are not eligible to receive; or
- Default on your loan (see BRR Item 17).

**19. INFORMATION WE REPORT ABOUT YOUR LOAN**

We will report information about your loan to nationwide consumer reporting agencies (commonly known as "credit bureaus") and to the National Student Loan Data System (NSLDS) on a regular basis. This information will include the disbursement dates, amount, and repayment status of your loan (for example, whether you are current or delinquent in making payments). The information in NSLDS will also identify the servicer of your loan. Your loan will be identified as an education loan. Schools may access information in NSLDS for specific purposes that they authorize.

If you default on a loan, we will report this to nationwide consumer reporting agencies. We will notify you at least 30 days in advance that we plan to report default information to a consumer reporting agency unless you resume making payments on the loan within 30 days of the date of the notice. You will be given a chance to ask for a review of the debt before we report a default.

If a consumer reporting agency contacts us regarding objections you have raised about the accuracy or completeness of any information we have reported, we are required to provide the agency with a prompt response. We respond to objections submitted to consumer reporting agencies using the methods established by those agencies.

**20. DEFERMENT AND FORBEARANCE (POSTPONING PAYMENTS)**

**General**

If you meet certain requirements, you may receive a **deferment** that allows you to temporarily stop making payments on your loan. If you cannot make your scheduled loan payments, but do not qualify for a deferment, we may give you a **forbearance**. A forbearance allows you to temporarily stop making payments on your loan, temporarily make smaller payments, or extend the time for making payments.

**Deferment**

You may receive a deferment:

- While you are enrolled at least half-time at an eligible school;
- While you are in a full-time course of study in a graduate fellowship program;
- While you are in an approved full-time rehabilitation program for individuals with disabilities;

- While you are unemployed and seeking work (for a maximum of three years);
- While you are experiencing an economic hardship, including serving in the Peace Corps (for a maximum of three years);
- While you are serving on active duty or performing qualifying National Guard duty during a war or other military operation or national emergency and for an additional 180-day period following the demobilization date for your qualifying service;
- For a maximum of 13 months following your active duty service, if you are a current or retired member of the National Guard or reserve component of the U.S. Armed Forces and you are called or ordered to active duty while you are enrolled at least half-time at an eligible school or during your grace period; or
- For Direct Loans that were first disbursed on or after September 28, 2018, or for Direct Loans first disbursed before that date that entered repayment on or before September 28, 2018, while you are receiving treatment for cancer and for an additional 6 months after your treatment has ended.

In most cases, you will automatically receive a deferment based on your enrollment in school on at least a half-time basis based on information that we receive from the school you are attending.

If we process a deferment based on information received from your school, you will be notified of the deferment and will have the option of canceling the deferment and continuing to make payments on your loan.

For all other deferments, you (or, for a deferment based on active duty military service or National Guard duty, a representative acting on your behalf) must submit a deferment request to your servicer, along with documentation of your eligibility for the deferment.

**Forbearance**

We may give you a forbearance if you are temporarily unable to make your scheduled loan payments for reasons including, but not limited to, financial hardship and illness.

You may also receive a forbearance if:

- You are serving in a qualifying medical or dental internship or residency program;
- The total amount you owe each month for all of your federal student loans is 20% or more of your total monthly gross income (for a maximum of three years);
- You are serving in an AmeriCorps position;
- You are performing service that would qualify you for loan forgiveness under the Teacher Loan Forgiveness program (see BRR Item 21);
- You qualify for partial repayment of your loans under a student loan repayment program administered by the Department of Defense; or
- You are called to active duty in the U.S. Armed Forces.

To request a forbearance, contact your servicer.

Under certain circumstances, we may also give you a forbearance without requiring you to submit a request or documentation (for example, while we are determining your eligibility for a loan discharge, or during periods when you are affected by a local or national emergency).

**21. DISCHARGE (HAVING YOUR LOAN FORGIVEN)**

**General**

If you meet certain conditions as described below, we may discharge (forgive) some or all of your loans.

For a discharge based on your death, a family member must contact your servicer. To request a loan discharge based on one of the other conditions

*11/2019*

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

**William D. Ford Federal Direct Loan Program**
**Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement**

described below (except for a discharge due to bankruptcy), you must complete a loan discharge or forgiveness application and send it to your servicer. Your servicer can tell you how to apply.

We do not guarantee the quality of the academic programs provided by schools that participate in federal student financial aid programs. You cannot have your loan discharged solely because you do not complete the education paid for with your loan, are unable to obtain employment in the field of study for which your school provided training, or are dissatisfied with, or do not receive, the education you paid for with your loan.

**Death, total and permanent disability, and bankruptcy**

We will discharge (forgive) your loan if:

- You die. We must receive acceptable documentation (as defined in the Act) of your death;
- You become totally and permanently disabled; or
- Your loan is discharged in bankruptcy after you have proven to the bankruptcy court that repaying the loan would cause undue hardship.

**School closure, false certification, identity theft, and unpaid refund**

We may also discharge all or a portion of your loan if:

- You could not complete a program of study because your school closed;
- Your loan eligibility was falsely certified by the school;
- A loan in your name was falsely certified as a result of a crime of identity theft; or
- The school did not pay a refund of your loan money that it was required to pay under the Act.

**Teacher Loan Forgiveness**

We may forgive a portion of eligible student loans you received under the Direct Loan Program if you teach full time for five consecutive years in certain low-income elementary or secondary schools, or for certain low-income educational service agencies, and meet certain other qualifications.

Eligible teachers of math, science, or special education may receive up to $17,500 in loan forgiveness. Other teachers may receive up to $5,000 in loan forgiveness.

**Public Service Loan Forgiveness**

A Public Service Loan Forgiveness (PSLF) program is also available. Under this program, we will forgive the remaining balance due on your Direct Loans after you have made 120 payments (after October 1, 2007) on those loans under certain repayment plans while you are employed full-time by a qualifying employer. The required 120 payments do not have to be consecutive. Qualifying repayment plans include the REPAYE Plan, the PAYE Plan, the IBR Plan, the ICR Plan, and the Standard Repayment Plan with a 10-year repayment period.

**Note:** Although the Standard Repayment Plan with a 10-year repayment period is a qualifying repayment plan for PSLF, to receive any loan forgiveness under this program you must enter the REPAYE Plan, the PAYE Plan, the IBR Plan, or the ICR Plan, and make the majority of the 120 payments under one of those plans.

**Borrower defense to repayment**

We may discharge all or a portion of your loan if your school did something or failed to do something related to your loan or to the educational services that the loan was intended to pay for.

The specific requirements to qualify for a borrower defense to repayment discharge vary depending on when you received your loan. Contact your servicer for more information.

**22. LOAN CONSOLIDATION**

A Direct Consolidation Loan Program is available that allows you to combine one or more of your eligible federal education loans into a new loan with a single monthly payment, and may allow you to extend the period of time that you have to repay your loans. This may make it easier for you to repay your loans.

If you have loans that were made under the FFEL Program, consolidating those loans into the Direct Loan Program can make them eligible for benefits that are only available for Direct Loans, such as Public Service Loan Forgiveness and certain repayment plans.

Although consolidation can provide certain benefits, it can also cause you to lose benefits on the loans that you consolidate. Contact your servicer for more information about loan consolidation and for help determining whether consolidation is a good option for you.

**END OF BORROWER'S RIGHTS AND RESPONSIBILITIES STATEMENT**

11/2019

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

## INSTRUCTIONS
## MASTER PROMISSORY NOTE FOR DIRECT SUBSIDIZED LOANS AND DIRECT UNSUBSIDIZED LOANS

### GENERAL INSTRUCTIONS AND INFORMATION

Type or print using blue or black ink. Do not use pencil. Enter all dates as month-day-year (mm-dd-yyyy). Use only numbers. Example: January 31, 2019 = 01-31-2019.

Throughout the Master Promissory Note (MPN) and the accompanying Borrower's Rights and Responsibilities Statement (BRR), the words "we," "us," "our," and "ED" refer to the U.S. Department of Education and our servicers.

### BORROWER INFORMATION

**Note:** Some of the items in this section may have been completed for you. If so, review these items carefully to make sure that the information is correct. Cross out any information that is incorrect and enter the correct information. Put your initials next to any information that you change.

**Item 1.** Enter your first name, then your middle initial and last name. Enter your **permanent address** (number, street, apartment number, or rural route number and box number, then city, state, zip code). If your mailing address is different from your permanent address, you must list **both** addresses. A temporary school address is not acceptable.

**Item 2.** Enter your nine-digit Social Security Number.

**Item 3.** Enter your date of birth.

**Item 4.** Enter the two-letter abbreviation for the state that issued your current driver's license, followed by your driver's license number. If you do not have a driver's license, enter N/A.

**Item 5.** Enter your preferred email address for receiving communications. You are not required to provide this information. If you do, we may use your email address to communicate with you. If you do not have an email address or do not wish to provide one, enter N/A.

**Item 6.** Enter the area code and telephone number at which you can most easily be reached. If you do not have a telephone, enter N/A.

### REFERENCE INFORMATION

**Items 7 and 8.** Enter the requested information for two adults with different U.S. addresses who have known you for at least three years and who will be able to help us contact you in the future if we are unable to reach you. References are used only for this purpose and are never required to repay your loan. The first reference should be a parent or legal guardian. References who live outside the United States are not acceptable. Providing an email address for a reference is optional. If you provide an email address for a reference, we may use it to communicate with the reference. If a reference does not have a telephone number or email address, or does not wish to provide an email address, enter N/A.

### SCHOOL INFORMATION

This section will be completed by the school that determines your eligibility to receive the loan.

### BORROWER REQUEST, CERTIFICATIONS, AUTHORIZATIONS, AND UNDERSTANDINGS

**Top of Page 2.** Enter your name and Social Security Number.

**Items 12, 13, 14, and 15.** Read these items carefully.

### PROMISES

**Items 16, 17, 18, and 19.** Read these items carefully.

**Items 20 and 21.** Sign your full legal name, in blue or black ink, and enter the date you signed this MPN.

By signing this MPN, you **(1)** acknowledge that you have read, understand, and agree to the terms and conditions of the MPN, including the Borrower Request, Certifications, Authorizations, and Understandings and the accompanying BRR; and **(2)** agree to repay in full all loans made under this MPN according to the terms and conditions of the MPN.

*11/2019*