## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN FEDERATION OF
TEACHERS,

*Plaintiff*,

v.

U.S. DEPARTMENT OF EDUCATION, *et al.*,

*Defendants*.

No. 1:25-cv-802-RBW

## DEFENDANTS' MEMORANDUM IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER
## OR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................3

I.   Statutory and Regulatory Background................................................................................3

    A.   Income-Driven Repayment Plans Under the Higher Education Act .....................3

    B.   The 2023 IDR Rule .................................................................................................5

II.  Factual Background............................................................................................................6

    A.   The *Missouri* Litigation Against the 2023 IDR Rule.............................................6

    B.   The Department's Response to the Eighth Circuit's February 18, 2025, Ruling.....................................................................................................................8

    C.   This Proceeding .....................................................................................................9

LEGAL STANDARDS.........................................................................................................10

ARGUMENT ........................................................................................................................11

I.   Plaintiff is not likely to succeed on the merits of its claims ...........................................11

    A.   Plaintiff has not shown a substantial likelihood of standing. ..............................11

    B.   Plaintiff is not likely to succeed on its § 706(1) claim........................................17

    C.   Plaintiff is not likely to succeed on its § 706(2) claim........................................21

    D.   A delay in processing is reasonable in light of the Eighth Circuit's *Missouri* decision. .................................................................................................23

II.  Plaintiff does not establish any irreparable harm warranting extraordinary relief...........24

III. The balance of equities and public interest weigh against injunctive relief. ...................28

CONCLUSION......................................................................................................................32

# TABLE OF AUTHORITIES

## Cases

*Al-Aulaqi v. Obama,*
  727 F. Supp. 2d 1 (D.D.C. 2010) ..................................................................................... 15

*Al-Fayed v. CIA,*
  254 F.3d 300 (D.C. Cir. 2001) ....................................................................................... 10

*Allina Health Servs. v. Sebelius,*
  756 F. Supp. 2d 61 (D.D.C. 2010) ................................................................................. 30

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.,*
  946 F.3d 615 (D.C. Cir. 2020) ....................................................................................... 16

*Am. Bioscience, Inc. v. Thompson,*
  269 F.3d 1077 (D.C. Cir. 2001) ..................................................................................... 22

*Ass'n of Battery Recyclers, Inc. v. EPA,*
  208 F.3d 1047 (D.C. Cir. 2000) ..................................................................................... 22

*\*Bennett v. Spear,*
  520 U.S. 154 (1997) ....................................................................................................... 23

*Beshir v. Holder,*
  10 F. Supp. 3d 165 (D.D.C. 2014) ................................................................................. 20

*Biden v. Missouri,*
  145 S. Ct. 109 (2024) ....................................................................................................... 6

*Bowen v. Massachusetts,*
  487 U.S. 879 (1988) ....................................................................................................... 21

*Cal. Ass'n of Priv. Postsecondary Schs. v. Devos,*
  344 F. Supp. 3d 158 (D.D.C. 2018) ............................................................................... 29

*\*California v. Texas,*
  593 U.S. 659 (2021) ................................................................................................. 12, 14

*\*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006) ....................................................................................... 25

*\*Cigar Ass'n of Am. v. FDA,*
  No. 1:16-cv-01460, 2020 WL 5231335 (D.D.C. Sept. 2, 2020) ............................... 30, 32

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Homeland Sec.,*
  387 F. Supp. 3d 33 (D.D.C. 2019) ................................................................................. 20

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ................................................................................ 12, 15, 27

Ctr. for Biological Diversity v. Kempthorne,
   498 F. Supp. 2d 293 (D.D.C. 2007) ................................................................22

Ctr. for Biological Diversity v. Ross,
   480 F. Supp. 3d 236 (D.D.C. 2020) ................................................................32

*Ctr. for Biological Diversity v. Zinke,*
   260 F. Supp. 3d 11 (D.D.C. 2017) ...........................................................*passim*

Ctr. for Sustainable Econ. v. Jewell,
   779 F.3d 588 (D.C. Cir. 2015) ......................................................................12

Dep't of Educ. v. California,
   No. 24A910, --- S. Ct. ----, 2025 WL 1008354 (Apr. 4, 2025) ...........................28

Dorfmann v. Boozer,
   414 F.2d 1168 (D.C. Cir. 1969) .....................................................................11

Dotson v. District of Columbia,
   No. 24-1864, 2024 WL 5046282 (D.D.C. Dec. 9, 2024) ...................................25

El Paso Nat. Gas Co. v. United States,
   750 F.3d 863 (D.C. Cir. 2014) ......................................................................20

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,*
   878 F.3d 371 (D.C. Cir. 2017) ...............................................................11, 17, 28

Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.,
   928 F.3d 95 (D.C. Cir. 2019) .......................................................................12

Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.,
   28 F.3d 1268 (D.C. Cir. 1994) ......................................................................26

*FDA v. All. for Hippocratic Med.,*
   602 U.S. 367 (2024) ...........................................................................*passim*

Franklin v. Massachusetts,
   505 U.S. 788 (1992) ...................................................................................23

Gomez v. Trump,
   485 F. Supp. 3d 145 (D.D.C. 2020) ...............................................................10

Hanson v. District of Columbia,
   120 F.4th 223 (D.C. Cir. 2024) .....................................................................10

*Humane Soc'y of U.S. v. Babbitt*,
  46 F.3d 93 (D.C. Cir. 1995) ........................................................................15

*Int'l Acad. of Oral Med. & Toxicology v. FDA*,
  195 F. Supp. 3d 243 (D.D.C. 2016) ...........................................................27

*Kim v. FINRA*,
  698 F. Supp. 3d 147 (D.D.C. 2023) ...........................................................33

*Kondapally v. USCIS*,
  No. 20-cv-00920, 2020 WL 5061735 (D.D.C. Aug. 27, 2020) ...............11

*League of Women Voters of the United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ..............................................................26, 27

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) .....................................................................................18

*Magruder v. Cap. One, Nat'l Ass'n*,
  540 F. Supp. 3d 1 (D.D.C. 2021) ...............................................................15

*MediNatura, Inc. v. FDA.*,
  998 F.3d 931 (D.C. Cir. 2021) ..........................................................10, 29

*Missouri v. Biden*,
  112 F.4th 531 (8th Cir. 2024) ......................................................................6

*Missouri v. Biden*,
  738 F. Supp. 3d 1113 (E.D. Mo. 2024) .......................................................6

*Missouri v. Trump*,
  128 F. 4th 979 (8th Cir. 2025) ............................................................*passim*

*Mylan Pharms., Inc. v. Shalala*,
  81 F. Supp. 2d 30 (D.D.C. 2000) ...............................................................11

*Nat'l Council of Agric. Emps. v. U.S. Dep't of Lab.*,
  No. 22-3569, 2023 WL 2043149 (D.D.C. Feb. 16, 2023) ........................27

*Nat'l Treasury Emps. Union v. United States*,
  101 F.3d 1423 (D.C. Cir. 1996) .................................................................27

*Nken v. Holder*,
  556 U.S. 418 (2009) .....................................................................................10

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ............................................................... 18, 19, 20, 21

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
    810 F.3d 631 (9th Cir. 2015) ...................................................................................17

*Pursuing America's Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) .................................................................................10

*Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of Am. v. USDA*,
    573 F. Supp. 3d 324 (D.D.C. 2021) .........................................................................28

*Reliable Auto. Sprinkler Co, Inc. v. Consumer Product Safety Comm'n*,
    324 F.3d 726 (D.C. Cir. 2003) .................................................................................22

*Richardson v. Morris*,
    409 U.S. 464 (1973) .................................................................................................21

*Schmidt v. Shah*,
    696 F. Supp. 2d 44 (D.D.C. 2010) ..........................................................................21

*Sierra Club v. EPA*,
    955 F.3d 56 (D.C. Cir. 2020) ...................................................................................24

*Spicer v. Biden*,
    575 F. Supp. 3d 93 (D.D.C. 2021) ...........................................................................10

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) .................................................................................................17

*TransUnion v. Ramirez*,
    594 U.S. 413 (2021) .................................................................................................12

*Travelers United, Inc. v. Hyatt Hotels Corp.*,
    No. 23-2776, 2025 WL 27162 (D.D.C. Jan. 3, 2025) ..............................................16

*U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*,
    No. 1:25-cv-00465, 2025 WL 763738 (D.D.C. Mar. 11, 2025) ..............................21

*United States v. Texas*,
    599 U.S. 670 (2023) .................................................................................................12

*Vetterli v. U. S. Dist. Ct. for Cent. Dist. of California*,
    435 U.S. 1304 (1978) ...............................................................................................31

*Viasat, Inc. v. FCC*,
    47 F.4th 769 (D.C. Cir. 2022) ..................................................................................13

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) .................................................................................................30

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ...............................................................................................12

*\*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ....................................................................... 10, 30, 32, 33

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ................................................................................25

*Yaghoubnezhad v. Stufft*,
  734 F. Supp. 3d 87 (D.D.C. 2024) ......................................................................21, 22

**Statutes**

5 U.S.C. § 551(13) .............................................................................................19

5 U.S.C. § 706 ............................................................................................*passim*

20 U.S.C. § 1070 *et seq.* ......................................................................................3

20 U.S.C. §§ 1087a-1087j ......................................................................................3

20 U.S.C. § 1087e ........................................................................... 3, 4, 18, 19

20 U.S.C. § 1089(c)(1) ..........................................................................................6

20 U.S.C. § 1098e .......................................................................... 3, 4, 18, 19

**Aministrative & Executive Materials**

34 C.F.R. § 682.209 ..............................................................................................3

34 C.F.R. § 685.208 ..............................................................................................3

34 C.F.R. § 685.209 ..............................................................................................3

34 C.F.R. § 685.209(*l*) .......................................................................................20

34 C.F.R. § 685.219(g)(6) ....................................................................................29

*Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program*,
  77 Fed. Reg. 66,088 (Nov. 1, 2012) ..................................................................3, 4

*Improving Education Outcomes by Empowering Parents, States, and Communities*, Exec. Order No. 14,242,
  90 Fed. Reg. 13,679 (Mar. 20, 2025) ................................................................23

*Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program,*
88 Fed. Reg. 43820 (July 10, 2023) ...................................................................................5

*Income Contingent Repayment Plan Options,*
89 Fed. Reg. 90221 (Nov. 15, 2024) .................................................................................7

*Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program,*
80 Fed. Reg. 67,204 (Oct. 30, 2015) .................................................................................4

*William D. Ford Federal Direct Loan Program,*
59 Fed. Reg. 61,664 (Dec. 1, 1994) ..............................................................................3, 4

## **Other Authorities**

11A Wright & Miller, Federal Practice & Procedure § 2948.1 (3d ed. 2024) ....................25, 26

U.S. Dep't of Education, *Demonstration for Income-Driven Repayment (IDR) Plan Request,*
https://perma.cc/4BCP-R2SZ?type=image ........................................................................8

U.S. Dep't of Educ., *IDR Plan Court Actions: Impact on Borrowers,*
https://perma.cc/ENP8-S2XH (last updated Mar. 26, 2025) .............................................13

U.S. Dep't of Education, *Income-Driven Repayment (IDR) Plan Request,*
https://perma.cc/P8ER-TNN4?type=image ........................................................................8

## INTRODUCTION

Many recent cases in this District involve a challenge to some nascent policy initiative of the new Administration.  This case is not one of them.

Instead, in this case, Plaintiff American Federation of Teachers brings a collateral attack on the Department of Education's effort to ensure its compliance with a different court's forth-coming preliminary injunction, concerning a policy initiative of the previous administration.  That injunction, which will be issued by the United States District Court for the Eastern District of Missouri at the direction of the Eighth Circuit, will preclude the Department from implementing in any respect a rule issued in 2023 that, in one way or another, affected all the Department's income-driven student loan repayment plans.  To fully comply with the forthcoming injunction and to minimize borrower confusion in the interim, the Department found it necessary to tempo-rarily remove applications for its income-driven student loan repayment plans and to instruct stu-dent loan servicers to pause the processing of such applications, so that those applications and related processing systems could be updated to conform to the Eighth Circuit's holding.  And these measures have proven temporary indeed—applications are already available again.

Remarkably, Plaintiff has construed Defendants' steps towards injunction compliance as a "shutdown" of all income-driven repayment plans.  So construed, Plaintiff alleges that Defendant's "shutdown" decision violates the Administrative Procedure Act, either as agency action unlawfully withheld, or as an arbitrary-and-capricious decision.  Plaintiff now asks this Court to enter a tem-porary restraining order or preliminary injunction requiring Defendants to reopen applications for income-driven repayment plans, to rush their servicers to restart the processing of those applica-tions, and to forgo any debt collection actions until the other requirements of the requested order are met.

In all events, Plaintiff fails to satisfy any of the criteria for the extraordinary relief it seeks. To be clear, the Department fully intends to continue offering income-driven repayment plans on terms authorized by Congress and permitted by the courts. Indeed, updated online and paper applications for income-driven repayment plans have already been published, and the Department anticipates that its servicers will restart their processing of those applications no later than May 10, 2025. In this context, it cannot be said that Plaintiff or its members are irreparably (or even meaningfully) harmed by the temporary unavailability of income-driven repayment plans, much less that this period of adjustment amounts to an unlawful withholding of those plans. Many of the purported injuries Plaintiff traces to Defendants' action here in fact date back months ago to the prior administration's action placing a substantial number of borrowers into forbearance in order to comply with a previous, narrower injunction. And Plaintiff's vague request for judicial oversight of servicers' processing rates is not the sort of discrete legal obligation with which courts may compel compliance. Even if Plaintiff's claim for relief from a delay in processing were judicially cognizable, that temporary delay is reasonable to ensure compliance with the Eighth Circuit's decision in *Missouri v. Trump*, 128 F. 4th 979 (8th Cir. 2025). And for related reasons, Plaintiff cannot show that injunctive relief is necessary to redress any irreparable injury to itself or its members, or that any injunction would be in the public interest.

Because the temporary removal of applications for income-driven student loan repayment plans and a related pause on the processing of such applications is an appropriate response to ensure compliance with another court's injunction, and because Plaintiff and its members will suffer no meaningful harm that outweighs the public interest in swift and orderly compliance with that injunction, the Court should deny Plaintiff's motion for extraordinary injunctive relief.

## BACKGROUND

### I.    Statutory and Regulatory Background

#### A.    Income-Driven Repayment Plans Under the Higher Education Act

The Department of Education administers federal student financial aid programs under Title IV of the Higher Education Act of 1965, 20 U.S.C. § 1070 *et seq*.  Those programs include the William D. Ford Federal Direct Loan Program (Direct Loans), *id*. §§ 1087a-1087j, under which the federal government lends money directly to student borrowers.

As amended, the Higher Education Act requires the Secretary to give borrowers the choice of a variety of plans to repay their Federal Direct Loans.  *See* 20 U.S.C. § 1087e(d)(1).  The various repayment plan options dictate the schedule, overall number, and dollar amount of a borrower's loan payments.  *See* 20 U.S.C. §§ 1087e(e)(7), 1098e(b)(7); 34 C.F.R. §§ 682.209, 685.208, 685.209.  The default option, known as the Standard Repayment Plan, sets a fixed monthly payment calculated to repay the loan over a 10-year period.  For borrowers with large loan balances, the monthly payments required for full repayment on this default option can be quite high.  To address this issue, Congress and the Department have created various income-driven repayment ("IDR") plans that tie monthly payments to a percentage of the borrower's discretionary income. *See* 20 U.S.C. §§ 1087e(e), 1098e; 34 C.F.R. §§ 685.208, 685.209.

One type of IDR plan is an income-contingent repayment ("ICR") plan, "with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years."  20 U.S.C. § 1087e(d)(1)(D).  Since 1993, the Secretary has offered several different ICR plans.  The Secretary created the original ICR plan in 1994. *See William D. Ford Federal Direct Loan Program*, 59 Fed. Reg. 61,664 (Dec. 1, 1994).  In 2012, the Secretary created a new ICR plan, known as the Pay As You Earn ("PAYE") plan. *See Federal Perkins Loan Program, Federal Family Education Loan Program, and William*

*D. Ford Federal Direct Loan Program*, 77 Fed. Reg. 66,088 (Nov. 1, 2012). And in 2015, the Secretary created another new ICR plan, known as the Revised Pay As You Earn ("REPAYE") plan. *See Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program*, 80 Fed. Reg. 67,204 (Oct. 30, 2015). Under each of these plans, the Department generally forgave outstanding loan balances (principal plus interest) at the end of the prescribed period of repayment. *See* 80 Fed. Reg. at 67,209; 77 Fed. Reg. at 66,114; 59 Fed. Reg. at 61,666.

In 2007, Congress amended the Higher Education Act to direct the Department of Education to offer another type of IDR plan, called an income-based repayment ("IBR") plan. *See* 20 U.S.C. §§ 1087e(d)(1)(E), 1098e. Similar to the ICR plans, IBR plans base a borrower's payment amount on the borrower's income. But IBR plans differ from ICR plans in key respects, including that they are available to borrowers with different types of loans (not just Direct Loans, as in ICR) and are subject to statutory limitations that Congress did not impose on ICR. *See, e.g.*, 20 U.S.C. § 1098e(a)(3)(B), (b)(7)(B), (e).

Congress also has created the Public Service Loan Forgiveness ("PSLF") program. *See* 20 U.S.C. § 1087e(m). Under that program, the Department must cancel the remaining student-loan balance for eligible borrowers who make 120 monthly payments while employed in a public service job. *Id*. PSLF-qualifying payments may be made under multiple repayment plans, including both ICR and IBR plans. *Id*. § 1087e(m)(1)(A)(iv). In general, any month in which a borrower makes the required payment (including an approved IDR payment of $0) counts toward forgiveness, as does any month in which a borrower is granted an economic hardship deferment. But months do not count toward forgiveness where the borrower fails to make a required payment,

receives a deferment for a reason other than economic hardship, or is placed in certain types of forbearance—a temporary, discretionary cessation of the borrower's obligation to make payments.

## B.    The 2023 IDR Rule

In July 2023, the Department published a rule that made numerous changes to the IDR plans offered under the Higher Education Act. *See Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program*, 88 Fed. Reg. 43820 (July 10, 2023) (hereinafter, "the 2023 IDR Rule"). Among other significant changes, the 2023 IDR Rule amended the pre-existing REPAYE plan by altering the monthly payment formulas for enrolled borrowers, waiving interest in certain circumstances, and providing for a shortened timeline to loan forgiveness. The 2023 IDR Rule provided that this amended version of the REPAYE plan would be referred to as the Saving on a Valuable Education ("SAVE") plan. *Id.* at 43,822.

The 2023 IDR Rule also made various changes that apply to IDR plans other than REPAYE and SAVE plans. For example, it credited certain periods of deferment or forbearance toward the time needed to obtain loan forgiveness under both ICR and IBR plans. *See* 88 Fed. Reg. at 43,903. It allowed certain delinquent borrowers to be automatically enrolled in an IDR plan. *See id.* at 43,904. It allowed borrowers to authorize the Department to use federal tax information to auto-matically recertify their income. *See id.* at 43,865. It amended the definition of "family size" used for all IDR plans so as to exclude spouses when a borrower is married and files a separate tax return. *See id.* at 43,821. And it altered the treatment of spousal information across all IDR plans. *See id.* at 43,856. The 2023 IDR Rule also ended new enrollments in the two older ICR plans (*i.e.*, the original ICR plan and PAYE), but it did not require borrowers currently on those plans to switch. Thus, "a borrower already enrolled in PAYE [was] able to continue repaying under that plan." *Id.* at 43,836.

The Higher Education Act generally requires that final regulations for federal student-financial-aid programs go into effect on July 1 of the following year. *See* 20 U.S.C. § 1089(c)(1). The Higher Education Act also confers on the Secretary discretion to designate certain provisions for early implementation. *Id*. § 1089(c)(2). The Secretary exercised that early-implementation authority with respect to several provisions in the 2023 IDR Rule.

## II.    Factual Background

### A.    The *Missouri* Litigation Against the 2023 IDR Rule

In April 2024, a group of states challenged the 2023 IDR Rule before the United States District Court for the Eastern District of Missouri, asserting that various provisions of the rule, particularly those concerning loan forgiveness, were in excess of statutory authority and were arbitrary and capricious. *See* Complaint, *Missouri v. Biden*, 738 F. Supp. 3d 1113 (E.D. Mo. 2024) (4:24-cv-00520-JAR), ECF No. 1. The plaintiff states sought a preliminary injunction against the 2023 IDR Rule, and on June 24, 2024, the district court granted their motion in part, enjoining the rule's loan forgiveness provisions while leaving the remaining provisions in effect. *See Missouri v. Biden*, 738 F. Supp. 3d 1113 (E.D. Mo. 2024). Following the district court's ruling, the Department reverted to the pre-existing loan forgiveness provisions under the REPAYE plan, in order to comply with the district court's order. *See Missouri v. Biden*, 112 F.4th 531, 535, 538 (8th Cir. 2024).

After both parties appealed the district court's ruling, the plaintiff states moved for an injunction pending appeal. The Eighth Circuit granted that motion on August 9, 2024, precluding the Department "from any further forgiveness of principal or interest," including under the prior REPAYE plan, "from not charging borrowers accrued interest, and from further implementing

SAVE's payment-threshold provisions." *Id.* at 538.  The Supreme Court later denied the Department's application to vacate the Eighth Circuit's injunction pending appeal.  *See Biden v. Missouri*, 145 S. Ct. 109 (2024).

As a result of the injunction pending appeal, the Department was initially unable to offer an income-contingent repayment plan.  *See Income Contingent Repayment Plan Options*, 89 Fed. Reg. 90221, 90223–24 (Nov. 15, 2024) ("The Department . . . is not currently able to offer borrowers a version of the SAVE plan that reflects the terms of the 2015 REPAYE plan that was in place prior to the issuance of the IDR final rule and is now in effect due to the Eighth Circuit's injunction.").  Accordingly, on July 19, the Department moved to place all borrowers who had previously enrolled in the SAVE plan into forbearance.  *See id*. at 90223.  The months these borrowers have spent in forbearance, including under the prior administration, do not count as months of eligible payment for PSLF purposes.  *See* Pl.'s Mot., ECF No. 10, at 8 n.7.  And from July to October 2024, the online IDR application was unavailable, until it was reopened with an option solely to apply to the IBR plan.  *See* Pl.'s Mot., at 8.  In an interim final rule that, as of January 15, 2025, reversed the sunsetting of the ICR and PAYE plans, the Department noted that developing an injunction-compliant version of the SAVE plan would "require[] additional coding and development work across major systems and contractors in the Federal student loan system" that could not be completed until "well into 2025."  89 Fed. Reg. at 90224.

On February 18, 2025, the Eighth Circuit issued its decision on the merits of the parties' appeals concerning the 2023 IDR Rule.  *See Missouri v. Trump*, 128 F.4th 979 (8th Cir. 2025).  In substance, the Eighth Circuit affirmed the entry of a preliminary injunction against the 2023 IDR Rule, finding that the plaintiff states were likely to succeed on their claim that Congress did not

authorize loan forgiveness under ICR plans. *See id.* at 996. But the Eighth Circuit further con-

cluded that the district court had "erred by not preliminarily enjoining the entire rule and the res-

urrected REPAYE forgiveness." *Id.* at 997. In the Eighth Circuit's view, there was "strong evi-

dence the regulation would not have been promulgated in the absence of a forgiveness provision"

that the court had found was likely unlawful, and so "[e]njoining forgiveness necessitate[d] en-

joining the entire rule." *Id* at 998. Absent further order of the court, the mandate will issue this

Friday, April 11. *See* Fed. R. App. P. 41(b).

### B.    The Department's Response to the Eighth Circuit's February 18, 2025, Rul-ing

To prepare to comply with the broadened preliminary injunction that the Eighth Circuit

instructed should be issued on remand, the Department determined it was necessary to revise both

the online and paper versions of the applications used for all IDR plans. *See* Declaration of Acting

Under Secretary James Bergeron, Ex. A, ¶ 8 ("Bergeron Decl."). The same online IDR application,

with an interactive digital interface, is used for all IDR plans and for borrowers recertifying their

income. As a result, enjoined provisions of the 2023 IDR Rule, including those related to the

REPAYE and SAVE plans, were inextricably intertwined with any application submitted only for

the IBR, PAYE, and original ICR plans. *See id.* ¶¶ 8, 10. Similarly, following the Eighth Circuit's

decision, the paper application contained references to now-unavailable plans—SAVE and RE-

PAYE—as well as requests for information that related to enjoined changes made by the 2023 IDR

Rule. *See id.* ¶¶ 8–9. Accordingly, these applications were temporarily unavailable while the

Department updated them, including the underlying code for the online IDR application, between

February 26 and March 26, 2025. *See id.*; *see also* Defs.' Notice of Availability of Income-Driven

Repayment Plan Appl., ECF No. 17. Since March 26, 2025, borrowers have been able to apply

for IDR and submit income recertifications. *See* Bergeron Decl. ¶ 12; *see also* U.S. Dep't of

Education, *Income-Driven Repayment (IDR) Plan Request*, https://perma.cc/P8ER-TNN4?type=image (providing link to apply for an IDR plan and for loan consolidation); U.S. Dep't of Education, *Demonstration for Income-Driven Repayment (IDR) Plan Request,* https://perma.cc/4BCP-R2SZ?type=image (demonstration tool showing online application allows for the selection of IBR, ICR, and PAYE plans).

To ensure proper compliance with the Eighth Circuit's ruling, the Department also instructed its contracted servicers to pause the processing of IDR applications while the online and paper applications were being updated and while they updated the processing rules in their respective systems. *See* Bergeron Decl. ¶¶ 17–18. Under their contracts with the Department, these servicers must follow a strict, multi-step Software Development Lifecycle when updating their internal procedures and processing rules, to ensure against mistakes and faulty programming. *See id.* At present, the Department expects that its servicers will implement the necessary processing changes by May 10, 2025, at which point servicers will restart processing of IDR applications and income recertifications. *See id.* ¶¶ 18–19.

### C. This Proceeding

Plaintiff American Federation of Teachers filed this lawsuit on March 18, 2025, almost three weeks after the Department announced that it had begun working to comply with the Eighth Circuit's ruling in *Missouri*. *See* Compl., ECF No. 1. The complaint alleges that "the Department has chosen to shut down access to all income-driven repayment plans," *id.* ¶ 2, and that doing so constitutes an "[u]nlawful [w]ithholding of [a]gency [a]ction", *id.* at 16 (emphasis omitted) (citing 5 U.S.C. § 706(1)), or alternatively, an arbitrary and capricious agency action, *id.* at 17 (citing 5 U.S.C. § 706(2)(A)).

Nearly one week after filing suit, Plaintiff filed a motion for a temporary restraining order or preliminary injunction. *See* Pl.'s Mot. Plaintiff asks the Court to enter an order requiring Defendants to restore "access to income-driven repayment plans." *Id.* at 3.[1] In the alternative, Plaintiff "asks the Court to order the defendants to halt all collections on borrowers and ensure that this time can count towards Public Service Loan Forgiveness until the defendants can satisfy its income-driven repayment plan obligations again." *Id.*

## LEGAL STANDARDS

"Motions for temporary restraining orders and preliminary injunctions are analyzed using the same standards." *Gomez v. Trump*, 485 F. Supp. 3d 145, 168 (D.D.C. 2020); *see also Al-Fayed v. CIA*, 254 F.3d 300, 303 n.2 (D.C. Cir. 2001) (treating requests for such relief as "essentially equivalent"). No matter how they are styled, these forms of relief are "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

To obtain such extraordinary relief, a plaintiff "must show (1) 'he is likely to succeed on the merits,' (2) 'he is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in his favor,' and (4) issuing 'an injunction is in the public interest.'" *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (quoting *Winter*, 555 U.S. at 20). "The balance of the equities weighs the harm to [the moving party] if there is no injunction against the harm to the [opposing party] if there is." *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). "If the government is the party sought to be enjoined, the public interest and balance of equities factors merge." *MediNatura, Inc. v. FDA.*, 998 F.3d 931, 945 (D.C. Cir. 2021)

---

[1] Plaintiff's proposed order suggests that they understand "access to income-driven repayment plans" principally to mean the provision of "a paper, pdf, and online application to the [IBR] [p]lan and at least one income-contingent repayment plan" within seven days. Pl.'s Proposed Order, ECF No. 10-7, at 1. The proposed order also contains a provision for ensuring "that applications are processed in [a] timely manner." *Id.*

(citing *Nken v. Holder*, 556 U.S. 418, 435 (2009). "The plaintiff bears the burdens of production and persuasion with respect to each" of the four injunctive-relief factors. *Spicer v. Biden*, 575 F. Supp. 3d 93, 96 (D.D.C. 2021) (cleaned up).

In addition, mandatory injunctions that "would change the status quo" are disfavored as "an even more extraordinary remedy" than the typical preliminary injunction, "especially when directed at the United States Government." *Kondapally v. USCIS*, No. 20-cv-00920, 2020 WL 5061735, at *3 (D.D.C. Aug. 27, 2020) (citations omitted); *see also Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000) ("In this Circuit, 'the power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised.'" (quoting *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969))). "Plaintiffs seeking this type of relief . . . face 'an additional hurdle' when proving their entitlement to relief," and courts "exercise extreme caution in assessing" such motions. *Kondapally*, 2020 WL 5061735, at *3 (citation omitted). "As a rule, when a mandatory preliminary injunction is requested, the district court should deny such relief unless the facts and law clearly favor the moving party." *Id.* (cleaned up).

**ARGUMENT**

Plaintiff does not succeed on any of the factors required to obtain injunctive relief. Accordingly, the Court should deny Plaintiff's motion.

**I.    Plaintiff is not likely to succeed on the merits of its claims.**

**A.    Plaintiff has not shown a substantial likelihood of standing.**

Plaintiff must show a "substantial likelihood of standing" to be entitled to emergency injunctive relief. *See, e.g.*, *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (citation omitted). It has not done so.

**1.** Plaintiff first puts forth a theory of associational standing, Pl.'s Mot. at 16, which requires it to show that

- 11 -

> (1) at least one of [its] members has standing to sue in her or his own right, (2) the
> interests the association seeks to protect are germane to its purpose, and (3) neither
> the claim asserted nor the relief requested requires the participation of an individual
> member in the lawsuit.

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 101 (D.C. Cir. 2019) (citation omitted).

Plaintiff's claim to associational standing founders on the first requirement.[2]

Standing demands injury-in-fact—"actual or imminent, not speculative" harm, "meaning

that the injury must have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic*

*Med.*, 602 U.S. 367, 381 (2024). If the injury has not come to pass, it must be "certainly impend-

ing"; "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568

U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (alterations omit-

ted). The injury must also be "concrete—that is, real, and not abstract," *TransUnion v. Ramirez*,

594 U.S. 413, 424 (2021) (citations omitted), and have "a close relationship to harms traditionally

recognized as providing a basis for lawsuits in American courts," *id.* at 425; *see also United States*

*v. Texas*, 599 U.S. 670, 676-77 (2023). Standing also requires that an injury-in-fact be caused by,

or traceable to, the conduct she complains is unlawful, and (a "flip side[] of the same coin" as

causation, *All. for Hippocratic Med.*, 602 U.S. at 380 (citation omitted)), would be redressed by a

favorable judicial order. *California v. Texas*, 593 U.S. 659, 668-80 (2021).

None of the five member[3] declarants is experiencing or facing actual or imminent injury.

The first, Ms. Sabens, is enrolled in an IBR plan, but claims that she cannot afford the monthly

---

[2] It is also not at all clear that student-loan administration is "germane" to Plaintiff's purpose, as associational standing requires. *See Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015). The germaneness requirement prevents "litigious organizations from forcing the federal courts to resolve numerous issues as to which the organizations themselves enjoy little expertise." *Id.* (citation omitted). Even if Plaintiff has, at the broadest level, an interest in "ensuring the economic security and dignity" of its members, Decl. of Sarah Tammelleo ¶ 4, ECF No. 10-6, it offers little reason to believe it has particular expertise in federal student loans (apart from a vague reference to playing a "leading role in fighting for the financial stability of public service," *id.* ¶ 5).

[3] For ease of reference, Defendants refer to Dr. Baetz, Ms. Dubreuil, Ms. Mason, Dr. McCall-Robinson, and Ms. Sabens collectively as "members." Plaintiff has not offered evidence, however, that Dr. Baetz or Ms. Sabens are,

payments she will soon be required to make following the expiration of a deferment. Sabens Decl. ¶ 10-11, ECF No. 10-5. And because the online IDR application was unavailable when she made her declaration, Ms. Sabens says, she could not update her income to lower her payments. *Id.* ¶ 11. But Ms. Sabens' payment amount is attributable to a failure to update her income before the online application was temporarily paused. *See id.* ¶ 7–10 (describing changes in Ms. Sabens' source and amount of income); *All. for Hippocratic Med.*, 602 U.S. at 394. In any event, Ms. Sabens may now update her income using the now-available application. *See* Bergeron Decl. ¶¶ 12–13. And once Ms. Sabens submits such an application, she will be put in processing forbearance (and then, if necessary, administrative forbearance) until her application is processed and a new payment amount is established, *see id.* ¶ 20, nullifying any injury, self-inflicted or otherwise.

The other four members allege that they are injured by not being enrolled in the IDR plans for which they claim they would like to apply. Those four are enrolled in the now-enjoined SAVE Plan. *See* Baetz Decl. ¶¶ 8-9, ECF No. 10-1; Dubreuil Decl. ¶¶ 9, 11, , ECF No. 10-2; Mason Decl. ¶¶ 9-10, ECF No. 10-3; McCall-Robinson Decl. ¶ 8, ECF No. 10-4. That means their loans have been placed in forbearance while the Department takes steps to calculate payment amounts in a manner consistent with injunctions entered in other litigation. *See* U.S. Dep't of Educ., *IDR Plan Court Actions: Impact on Borrowers*, https://perma.cc/ENP8-S2XH (last updated Mar. 26, 2025). In that forbearance status, they are not required to make payments. *Id.* In other words, it is strange that these members claim injury from their current situation—they would seem to be in an even better position than they might be without forbearance.

---

in fact, actual members of its organization, *see generally* Baetz Decl., ECF No. 10-1  & Sabens Decl., justifying the exclusion of their allegations from the Court's consideration. *See Viasat, Inc. v. FCC*, 47 F.4th 769, 781-82 (D.C. Cir. 2022).

Many of the members' describe how they have incurred high loan balances that affect their finances. Baetz Decl. ¶ 3; Dubreuil Decl. ¶ 4; Mason Decl. ¶ 5; McCall-Robinson Decl. ¶¶ 4-5; Sabens Decl. ¶ 5. But many of the financial concerns the members describe—e.g., an inability to purchase a home, Baetz Decl. ¶ 15; McCall-Robinson Decl. ¶¶ 15-16, obtain a more generous life insurance policy, Dubreuil Decl. ¶ 16, or move to a new country, McCall-Robinson Decl. ¶¶ 15, 17—relate to numerous other factors that affect individuals' budgets, including decisions regarding careers, marriage, children, and where to live, all of which are independent of the repayment plan members are enrolled. Standing cannot rest on self-inflicted injuries, *All. for Hippocratic Med.*, 602 U.S. at 394, or injuries only tenuously connected, if at all, to the conduct a plaintiff complains of, *id.* at 383 ("The causation requirement also rules out attenuated links[.]"). Viewed another way, whether a judicial order to "timely" process the members' applications, *see* Proposed Order at 1, would affect their ability to move, travel, or buy insurance is speculative. The third standing prong, redressability, is therefore also missing.

Another consequence of the high loan debt that the members allege—emotional harm—is not legally cognizable, in addition to suffering from the causation and redressability defects identified above. *See* Pl.'s Mot. at 13 (citing stress), 14-15 (citing a feeling of being "stuck in limbo"), 15 (citing "worr[y]"), 15-16 (citing "crushing weight"), 16 ("panic attacks"); Baetz Decl. ¶ 15; Dubreuil Decl. ¶ 15; Mason Decl. ¶¶ 17-18; McCall-Robinson Decl. ¶¶ 15, 18; Sabens Decl. ¶ 16. However reasonable or "deeply felt," "free-standing 'emotional harm . . . cannot suffice for injury-in-fact for standing purposes.'" *Magruder v. Cap. One, Nat'l Ass'n*, 540 F. Supp. 3d 1, 8 (D.D.C. 2021) (quoting *Humane Soc'y of U.S. v. Babbitt*, 46 F.3d 93, 98 (D.C. Cir. 1995)). Faced with an allegation of emotional harm, a court must look to whether the plaintiff has shown "the infringement of some legally protected . . . or judicially cognizable interest . . . that is either recognized at

common law or specifically recognized as such by the Congress." *Id.* (quoting *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 25 (D.D.C. 2010)). And Plaintiff cites no case, nor are Defendants familiar with one, in which alleged emotional harm stemming from the Department of Education's processing of repayment-plan applications sufficed for standing.

Plaintiff's members compound their traceability and redressability problems by alleging an inability to save for future events, like retirement and their children's education. *See* Baetz Decl. ¶ 15; Dubreuil Decl. ¶ 16; Mason Decl. ¶ 16; McCall-Robinson Decl. ¶ 18. Whether the members will be able to afford to retire (at some unspecified point) or finance college education is not only the result of many causes, *see supra*, but also the result of a "speculative chain of possibilities," that does not suffice to establish standing. *Clapper*, 568 U.S. at 410.

**2.** Plaintiff has also failed to show a substantial likelihood of organizational standing, its second theory. To prevail, Plaintiff must show that it satisfies "the usual standards for injury in fact, causation, and redressability that apply to individuals." *All. for Hippocratic Med.*, 602 U.S. at 393-94. In a narrow class of cases, the Supreme Court and D.C. Circuit have upheld invocations of organizational standing by entities that alleged that allegedly unlawful action compelled them to expend additional resources on their "core business activities." *Id.* at 395. Crucially, however, the Supreme Court just last year admonished that an organization may not "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action," *id.* at 394, and explained that mere diversion of resources does not establish standing, *id.* at 395.

Plaintiff's theory is that the temporary unavailability of the IDR application forced it to spend funds on debt clinics and advising members, funds that otherwise would have supported the organization's other priorities. *See* Pl.'s Mot. at 12. It is implausible, however, that the temporary

(month-long) unavailability of the IDR application was so disruptive as to cause a "'concrete and demonstrable injury to the organization's activities." *Travelers United, Inc. v. Hyatt Hotels Corp.*, 2025 WL 27162, at *7 (D.D.C. Jan. 3, 2025) (quoting *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020)).  Plaintiff's own evidence establishes that it has offered debt clinics to its members since at least August 2016.  Tammelleo Decl. ¶ 10.  Presumably, Plaintiff has also offered student-loan-related advice to its members for approximately the same amount of time and will continue to do so.  *Id.* ¶ 17.  The expenditures Plaintiff points to, in other words, are unremarkable in the context of the organization's existing practice—not caused by the Stop Work Order challenged in this lawsuit, as Article III demands.  *See All. for Hippocratic Med.*, 602 U.S. at 380.

Plaintiff attempts to sidestep this reality by claiming that Ms. Tammelleo has spent "approximately 80 hours . . . supervising staff, updating clinic materials, supporting member-activist trainers in understanding the new material, and supporting borrowers who are trying to understand how to navigate the system."  Tammelleo Decl. ¶ 23.  To the extent that is so, Plaintiff has not adequately shown that its efforts were a "result" of the challenged conduct, rather than a self-inflicted attempt to manufacture standing.  *See All. for Hippocratic Med.*, 602 U.S. at 394; *see also Elec. Priv. Info. Ctr.*, 878 F.3d at 379 & n.7 (requiring a plaintiff to show, in the context of a preliminary injunction motion and "under the heightened standard for evaluating a motion for summary judgment," a "direct causal link between the defendants' inaction and [the plaintiff's] own expenditures" explained the plaintiff's alleged injury rather than a "self-inflicted budgetary choice").

Even if the Court concludes that Plaintiff has stated an organizational injury, that injury is now moot, because IDR applications are again available.  *See* Defs.' Notice of Availability of

Income-Driven Repayment Plan Application, ECF No. 17. Plaintiff has requested prospective injunctive relief, *see* Proposed Order at 1, but at most has alleged what is now past injury, which does not suffice. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

**B.    Plaintiff is not likely to succeed on its § 706(1) claim.**

The first of Plaintiff's two APA claims alleges that the Department of Education has "unlawfully withheld" access to IBR and ICR plans.[4] Pl.'s Mot. at 18-19. "[O]nly certain types of agency failures" to act are remediable under § 706(1) of the APA. *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 20 (D.D.C. 2017) (Jackson, J.) (emphasis omitted) (analyzing an unreasonable-delay claim). To prevail, the plaintiff must establish that the "agency failed to take a *discrete* agency action" that is required by law. *Id.* That limitation arises directly from the APA's textual requirement that a plaintiff challenge "agency action," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (describing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990)); *see also id.* at 62 (analyzing the APA definition of "agency action"), and "precludes broad programmatic attacks," *Ctr. for Biological Diversity*, 260 F. Supp. 3d at 20 (quoting *Norton*, 542 U.S. at 64 (ellipsis omitted)).

The Higher Education Act provides that the Secretary of Education "shall carry out a program" including certain income-based repayment and loan forgiveness criteria, 20 U.S.C. § 1098e(b), as well as that the Secretary "shall offer a borrower . . . a variety of plans for [loan] repayment," including "an income contingent repayment plan," *id.* § 1087e(d)(1)(D). In Plaintiff's

---

[4] The APA cause of action on which Plaintiff relies, 5 U.S.C. § 706(1), also permits judicial review of agency action "unreasonably delayed." Although Plaintiff's motion is not entirely clear on the point, the complaint makes clear that Plaintiff relies solely on an "unlawful withholding" theory. *See* Compl. ¶¶ 92-98; *cf.* Pl.'s Mot. at 19 n.3 (expressly disclaiming reliance on the *TRAC* factors that govern unreasonable delay claims in the D.C. Circuit); *see Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (adopting, and citing cases standing for, the rule that "there must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint"). Additionally, because Plaintiff does not advance in its motion the complaint's theory that the Department has unlawfully withheld PSLF forgiveness, *see* Compl. ¶ 95, Defendants do not address it here.

telling, these statutes impose on the Secretary "a statutory . . . obligation to provide access to" IBR and ICR plans. Pl.'s Mot. at 18. But even if that is true, "provid[ing] access" to IBR and ICR plans is nowhere close to a sufficiently discrete duty as might permit judicial review under the APA.

Tellingly, Plaintiff's motion does not state with specificity the act it would like Defendants to be ordered to take. Plaintiff occasionally implies that the existence of live IBR and ICR applications satisfies the Department's statutory duty. *See* Pl.'s Mot. at 9 ("[T]he defendants issued a Stop Work Order, directing all loan servicers to stop accepting and processing income-driven repayment applications." (footnote omitted)); *id.* at 11 ("If [borrowers] are not already in an income-driven repayment plan, they cannot get into an income-driven repayment plan."); *id.* at 19 ("[T]he defendants have breached their legal obligation by shutting off all access to income-driven repayment plans[.]"); *see also* Compl. ¶¶ 96-98 (tying Plaintiff's 706(1) claim to the Stop Work Order). But that is clearly not Plaintiff's only concern. Applications for IBR and ICR repayment are once again live, *see* Defs.' Notice, but Plaintiff has not withdrawn its motion or dismissed this suit.

Rather, Plaintiff's motion itself intimates that the mere availability of an application is insufficient, and that it would have the Court supervise the processing of applications. *See* Pl.'s Mot. at 10 (acknowledging a Department statement regarding the anticipated reinstatement of applications but insisting that the statement did not "speak to when the *processing* of applications would start" (emphasis in original)). Correspondingly, Plaintiff's proposed order would have Defendants, in addition to making IBR and ICR applications available, "ensure that applications are processed in timely manner" and "file weekly updates regarding the number of applications processed and the number of applications still waiting to be processed until further order of the Court." Proposed Order at 1. But "processing" is not a discrete agency action, like promulgating a rule or

issuing an order.  *See* 5 U.S.C. § 551(13).  It instead entails numerous actions required to assess a borrower's eligibility, calculate her payment amount, and communicate necessary information to servicers.  The relief Plaintiff seeks, then, is quintessentially the sort of judicial superintendence of "an agency's general mode of operations," *Ctr. for Biological Diversity*, 260 F. Supp. 3d at 27, that § 706(1) does not allow.  *See also SUWA*, 542 U.S. at 66 (the agency-action requirement "protect[s] agencies from undue judicial interference with their lawful discretion").

Nor does Plaintiff's focus on "processing" match the statutory provisions on which it relies. Those provisions instruct the Secretary to "carry out" an IBR "program" and to "offer" a borrower several repayment options, including an ICR plan.  20 U.S.C. §§ 1098e(b), 1087e(d)(1)(D).  The IBR statute's use of the term "program" mirrors the very term used by the Supreme Court in describing agency activities *not* reviewable under § 706(1).  *See SUWA*, 542 U.S. at 64 ("broad programmatic attacks" unreviewable).  And "offer[ing]" an ICR plan is not discrete action but rather involves "continuing (and thus constantly changing) operations of the [agency]."  *See Nat'l Wildlife Fed'n*, 497 U.S. at 890.  Neither statute, then, "prescribe[s] a specific action that a court can competently compel and supervise."  *Ctr. for Biological Diversity*, 260 F. Supp. 3d at 20 (citing *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 891 (D.C. Cir. 2014)); *see also SUWA*, 542 U.S. at 66 ("General deficiencies in compliance, unlike the failure to issue a ruling that was discussed in *Safeway Stores*, lack the specificity requisite for agency action."); *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 387 F. Supp. 3d 33, 49 (D.D.C. 2019) (describing *SUWA*).

Plaintiff fares no better in attempting to discern a discrete, mandatory duty in the Department's regulations.  It cites from the Department's regulations two "[a]pplication and annual recertification procedures" specific to income-driven repayment plans.  34 C.F.R. § 685.209(*l*); *see* Pl.'s

Mot. at 18-19. Those regulations, however, are explanatory for the public, not mandatory for the Department. 34 C.F.R. §§ 685.209(*l*)(4) ("After the Secretary obtains sufficient information to calculate the borrower's monthly payment amount, the Secretary calculates the borrower's payment and establishes the 12-month period during which the borrower will be obligated to make a payment in that amount."), (*l*)(5) ("The Secretary then sends to the borrower a repayment disclosure . . ."). Even if the regulations did impose a mandatory duty on the Secretary, they do not set out a timeline for processing, like Plaintiff seeks here. *See* Proposed Order at 1; *cf. Beshir v. Holder*, 10 F. Supp. 3d 165, 172 (D.D.C. 2014) (denying unreasonable delay claim where pace of adjudication was discretionary).

Defendants' purported contractual obligations fall even further outside the scope of § 706(1) relief. To start, Plaintiff's request to enforce what it purports are binding terms of the MPN is barred by sovereign immunity. *See U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025) (citing *Bowen v. Massachusetts*, 487 U.S. 879, 921 (1988) (Scalia, J., dissenting) ("It is settled that sovereign immunity bars a suit against the United States for specific performance of a contract.")). Even were it not, this Court lacks jurisdiction to hear what is, at its core, a contractual claim against the federal government. *See Schmidt v. Shah*, 696 F. Supp. 2d 44, 61 (D.D.C. 2010) (citing *Richardson v. Morris*, 409 U.S. 464, 465 (1973) (per curiam)).

Even if the Court could consider Plaintiff's MPN-based arguments on the merits under § 706(1), it fails. An agency's duty is only enforceable under § 706(1) where that duty is imposed by law. *See SUWA*, 542 U.S. at 65 ("The limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law[.]"). Plaintiff makes no argument, except by implication, that a contract may give rise to a duty enforceable under the APA

by an entity that presumably is not itself the debtor on any federal student loan.  But even if a contract did permit such a challenge, the Master Promissory Note borrowers sign when incurring federal student-loan debt does not require the Department to conduct processing in the "timely manner" that Plaintiff seeks to have the Court impose here.  Proposed Order at 1.

Plaintiff makes little effort to prove that its motion seeks to compel sufficiently discrete action.  Instead, Plaintiff rests on the principle that the Higher Education Act imposes a mandatory duty on Defendants and that Defendants have acknowledged such a duty in the past.  *See* Pl.'s Mot. at 19.  But not every obligation that binds federal government actors, even if such a duty exists in this case, is actionable under § 706(1).  *See Yaghoubnezhad v. Stufft*, 734 F. Supp. 3d 87, 99 (D.D.C. 2024).  Because Plaintiff has identified no *discrete* legal obligation to grant the relief it seeks, it has not shown a likelihood of success on its § 706(1) claim.

### C.    Plaintiff is not likely to succeed on its § 706(2) claim.

As an alternative to their unlawful withholding claim under 5 U.S.C. § 706(1), Plaintiff also invokes § 706(2), which permits a court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Once again, having failed even to state a claim to relief—here, with respect to the requirement to challenge final agency action, *see Reliable Auto. Sprinkler Co, Inc. v. Consumer Product Safety Comm'n,* 324 F.3d 726, 731 (D.C. Cir. 2003))—Plaintiff has not shown a likelihood of success.

The bulk of Plaintiff's argument on its § 706(2) claim centers on the Stop Work Order, *see* Pl.'s Mot. at 20, which temporarily suspended applications for IBR and ICR plans.  This theory, which alleges that the Stop Work Order is unlawful and irrational because the Department is purportedly obligated by law to maintain constant access to IBR and ICR plans and because it previously offered applications to those plans, *see id*. at 20-22, is little more than a repackaged version of its § 706(1) claim.  Whatever the dubious merits of this second bite at the apple, Plaintiff's

arguments have been overtaken by events:  IBR and ICR applications are again available, *see* Defs.' Notice, and thus Plaintiff's Stop Work Order-theory is moot.  *Cf. Ctr. for Biological Diversity v. Kempthorne*, 498 F. Supp. 2d 293, 296 (D.D.C. 2007).[5]

Though stopping short of saying so directly, Plaintiff also insinuates that Defendants' alleged "newly declared plan" to reassign responsibility for the federal government's student-loan portfolio from the Department of Education to the Small Business Administration, Pl.'s Mot. at 21, also qualifies as final agency action subject to review.  It does not, even if Plaintiff had standing to challenge it.  *But see supra* at 11–17.  Final agency action both (1) "marks the consummation of the agency's decisionmaking process" and (2) "determines" "rights or obligations," or else causes "legal consequences."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).  As evidence of the "plan," Plaintiff cites a March 21 statement by President Trump to the press expressing interest in transferring responsibility for federal student loans from the Department of Education to the Small Business Administration, and an Executive Order directing the Secretary of Education "to the maximum extent appropriate and permitted by law," to "take all necessary steps to facilitate the closure of the Department."  *Improving Education Outcomes by Empowering Parents, States, and Communities*, Exec. Order No. 14,242, 90 Fed. Reg. 13,679 (Mar. 20, 2025); Pl.'s Mot. at 10.  To begin, the Executive Order is the mere starting point, not "consummation," for any future closure or transfer of the Department's responsibilities.  Even if the President's

---

[5] Even if Plaintiff could show a likelihood of success on its § 706(2) claim, it is not entitled to the relief it seeks under the APA.  As noted, the Department of Education has again made IDR applications available.  All that remains of Plaintiff's requested relief, then, is a request for an order directing the Department to process applications in a "timely" manner, and to submit periodic updates on its progress.  *See* Proposed Order at 1.  But circuit precedent indicates that a mandatory injunction of this sort is not ordinarily an available remedy under the APA; instead, a prevailing plaintiff can obtain "vacatur of the agency's order.".  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (citing *Ass'n of Battery Recyclers, Inc. v. EPA*, 208 F.3d 1047, 1061 (D.C. Cir. 2000)).

statement expressing an interest in transferring responsibilities between agencies marked the "consummation" of any process, the President is not an agency under the APA, and so his actions are not reviewable in this suit. *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992). For its part, the Executive Order makes only passing reference to the Department's student loan portfolio and says nothing about reassignment of loan responsibilities. Exec. Order No. 14,242, 90 Fed. Reg. at 13,679 ("The Department of Education currently manages a student loan debt portfolio of more than $1.6 trillion."). Thus it, too, does not consummate any decisionmaking process with respect to those responsibilities. As a direct result, neither the President's statement nor the Executive Order has any "direct and appreciable" consequences for Plaintiff or its members. *See Sierra Club v. EPA*, 955 F.3d 56, 62 (D.C. Cir. 2020).

### D.    A delay in processing is reasonable in light of the Eighth Circuit's *Missouri* decision.

For the reasons detailed above, Plaintiff's claims under §§ 706(1) and 706(2) suffer from fatal threshold defects that doom any chance at relief, let alone a likelihood of success in this preliminary, emergency posture. If the Court nonetheless concludes that Plaintiff's request for "timely" processing[6] of applications is cognizable under § 706(1) or (2), it should still decline to enter a temporary restraining order or preliminary injunction at this time, and allow the Department to take preparatory steps to comply with an anticipated forthcoming modified preliminary injunction in the *Missouri v. Trump* litigation. Such a delay is eminently reasonable in light of the steps required to implement changes to administration of the federal student-loan portfolio.

---

[6] As throughout the motion, much of Plaintiff's contrary argument (*see* Pl.'s Mot. at 22-23) is predicated on the now-moot claim that applications for IDR plans were not live. As a result, all that remains of Plaintiff's requested relief is an order directing "timely" processing of applications and inserting the Court into an (unwarranted and unnecessary) supervisory role in that process. *See* Proposed Order at 1.

In mid-February, the Eighth Circuit issued a decision on cross-appeals of the district court's preliminary injunction in *Missouri v. Trump*. 24-2332, 24-2351 (8th Cir.). It held that the preliminary injunction was too narrow and remanded the case to the Eastern District of Missouri with instructions to broaden the preliminary injunction to enjoin the entire "SAVE Rule" as well as the loan-forgiveness portion of an earlier rule concerning the REPAYE plan. *See Missouri*, 128 F.4th at 998. The "SAVE Rule" in question not only established the SAVE Plan, an ICR repayment plan, but included changes that affect other IDR plans, including IBR, like the treatment of spousal income in calculating payments. Bergeron Decl. ¶ 5.

As a result of the Eighth Circuit's decision, the Department of Education must undertake a time-consuming process with its loan servicers to alter the administration of IDR plans. This process involves not only technical changes to systems coding, but quality controls tests and verifications. *Id.* ¶¶ 8–9, 17–18. The need for this process has taxed the Department and servicers and will continue to do so. *Id.* ¶ 17–19.

## II. Plaintiff does not establish any irreparable harm warranting extraordinary relief.

Because Plaintiff has not shown any Article III injury, *see supra* at 11–17, it necessarily has not shown irreparable injury. But even if the Court is inclined to find that Plaintiff has alleged injuries sufficient to carry their burden to show standing at the pleadings stage, it should still conclude that Plaintiff has not established that any injury to itself or its members in this case rises to the level of an irreparable injury warranting extraordinary injunctive relief.

Notably, "the [D.C.] Circuit 'has set a high standard for irreparable injury.'" *Dotson v. District of Columbia*, 2024 WL 5046282, at *6 (D.D.C. Dec. 9, 2024) (citation omitted). The injury demonstrated by the moving party "must be both certain and great," "actual and not theoretical," and "of such imminence that there is a 'clear and present' need for equitable relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wis.*

*Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).  And the injury "must be beyond remediation," meaning that the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm."  *Id*. at 297–98 (quoting *Wis. Gas Co*., 758 F.2d at 674); *see also id.* at 297 (citation omitted) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough."); 11A Wright & Miller, Federal Practice & Procedure § 2948.1 (3d ed. 2024) ("Only when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief.").

The alleged harms Plaintiff relies on in this case do not meet the high bar for injunctive relief set by the D.C. Circuit.  First, Plaintiff points to its own organizational injuries, asserting that Defendants' actions have compelled it to "reallocate[] staff time to help members with their student loans and to revise existing student loan resources," and "spen[d] $250,000 to extend a contract with a technology company" that "provides direct services to members with student debt, to help its members navigate this uncertainty."  Pl.'s Motion, at 24 (citing Tammelleo Decl. ¶¶ 23–26).  But it is hard to see how the actions Plaintiff challenges here—rendering IDR applications temporarily unavailable and pausing servicer processing while those applications and processing systems could be updated to comply with a court order—have "'perceptibly' impaired the organization's programs."  *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (quoting *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp*., 28 F.3d 1268, 1276 (D.C. Cir. 1994)).  For one thing, Plaintiff's focus on its members' student loan issues is nothing new:  Plaintiff has operated a student debt clinic since at least 2016, *see* Tammelleo Decl. ¶ 10, and since that time "has dedicated tens of thousands of dollars and over two thousand hours of valuable staff time toward helping its members with their student loans," *id.* ¶ 13.  And as

Plaintiff acknowledges, the contract it claims to have "extend[ed]," Pl.'s Motion, at 24, was nec-

essarily one Plaintiff initially entered into well before this litigation and which it plans to extend

far beyond the anticipated length of the transitional actions at issue here, *see* Tammelleo Decl. ¶ 26

(noting contract extension runs through June 2026).

Given this context, Plaintiff's recent resource allocation decisions more plausibly respond

to the "turmoil" and "uncertainty," Pl.'s Motion, at 24, inaugurated by litigation over the SAVE

plan and the Eighth Circuit's subsequent direction to enjoin the entire 2023 IDR Rule.  *Cf. Nat'l*

*Council of Agric. Emps. v. U.S. Dep't of Lab.*, 2023 WL 2043149, at *7 (D.D.C. Feb. 16, 2023)

(considering claims of diverted resources "in the context of [the organization's] overall finances").

Defendants' steps to avoid further confusion and ensure orderly and effective compliance with the

Eighth Circuit's decision can hardly be said to have "made [Plaintiff's] activities more difficult,"

*Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996), much less to

"directly conflict with [Plaintiff's] mission," *Newby*, 838 F.3d at 8 (quoting *Nat'l Treasury Emps.*

*Union*, 101 F.3d at 1430); *see also Int'l Acad. of Oral Med. & Toxicology v. FDA*, 195 F. Supp.

3d 243, 259 (D.D.C. 2016) (rejecting claim of organizational injury where organization "ha[d] not

explained how [the challenged rule] forced it to divert or modify its activities in any meaningful

way from its standard programmatic efforts that existed before").  To the extent Plaintiff has mis-

interpreted Defendants' actions in the weeks following the Eighth Circuit's decision in *Missouri*

as indicating a broader plan to render IDR and PSLF unavailable on a permanent basis, Plaintiff's

misunderstanding does not give rise to an irreparable harm warranting injunctive relief.  *See Clap-*

*per v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (citation omitted) (plaintiffs "cannot manu-

facture standing merely by inflicting harm on themselves based on their fears of hypothetical future

harm that is not certainly impending"); *id.* ([E]xpenditure[s] based on a nonparanoid fear" are insufficient).

Plaintiff next invokes injuries to its members, who it claims "are financially harmed in a way that threatens their access to basic necessities," Pl.'s Motion, at 24, are being forced to consider bankruptcy, *see id.* at 25, and "are in distress about how to navigate major life milestones," *id.* On the record here, Plaintiff's claim is difficult to credit.[7] Of the members Plaintiff has identified, all but one were previously enrolled in the SAVE plan and so are currently in forbearance— meaning they owe no payment on their federal student loans. *See* Baetz Decl. ¶¶ 8-9; Dubreuil Decl. ¶¶ 9, 11; Mason Decl. ¶¶ 9-10; McCall-Robinson Decl. ¶ 8; Bergeron Decl. ¶ 20. Thus, the financial harms and stress Plaintiff emphasizes would not appear to stem from Defendant's reasonable steps to comply with the Eighth Circuit's ruling in *Missouri*, such as moving swiftly to update IDR applications while also using tools such as forbearance to mitigate the financial concerns of borrowers. *Cf. Dep't of Educ. v. California*, --- S. Ct. ----, 2025 WL 1008354, at *1 (Apr. 4, 2025). For other members who claim a harm from the inability to make progress towards paying off their loans, those assertions run headlong into the fact that the low monthly payment amounts they purport to seek—namely, in Ms. Sabens' case, a payment of $0, *see* Sabens Decl. ¶ 11— would do little to redress those harms in any event. In addition, the Department has directed servicers to postpone by one year "the deadline by which all borrowers who were required to certify their income and family size after the application became temporarily unavailable and are currently

---

[7] While courts in this district "disagree about whether a plaintiff-association is required to name a specific member at the pleading stage," *Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of Am. v. USDA*, 573 F. Supp. 3d 324, 334 (D.D.C. 2021), "[i]n the context of a preliminary injunction motion," a plaintiff must "show a 'substantial likelihood of standing' 'under the heightened standard for evaluating a motion for summary judgment,'" *Elec. Priv. Info. Ctr.*, 878 F.3d at 377 (citation omitted), and, at that stage, courts agree that a plaintiff-association must demonstrate that a specific member has standing, *see Ranchers-Cattlemen Action Legal Fund*, 573 F. Supp. 3d at 335.

enrolled in" an IDR plan. Bergeron Decl. ¶ 15. And for borrowers whose recertification deadlines came earlier and experienced increased monthly payments as a result, the Department will reset their monthly payment amount by May 10, 2025, and otherwise consider them to have been in a period of administrative forbearance for the period of any delinquency. *See id.* ¶ 16. So, to the extent other members' subjective fears relate to the possibility that their monthly payment amounts will change due to an inability to recertify, those fears are speculative and not founded in any imminent threat of ballooning payments.

Finally, Plaintiff asserts that some of its members seeking credit towards PSLF "have no recourse, absent an injunction, to gain credit." Pl.'s Motion, at 25. But each of those members are in a period of forbearance, and the Buyback provision in the PSLF regulations, 34 C.F.R. § 685.219(g)(6), provides those borrowers a path to obtain credit towards PSLF for that period. Given this, Plaintiff cannot plausibly assert that its members "have no way to ever rectify the issue absent an injunction." Pl.'s Mot. at 25; *see also* Bergeron Decl. ¶ 22 (stating that borrowers with 120 months of qualifying employment can avail themselves of the Buyback provision to cover periods of administrative forbearance). At minimum, any uncertainty on this point is not so significant as to warrant preliminary injunctive relief to override the government's effort to ensure compliance with its obligations under a court order. *See Cal. Ass'n of Priv. Postsecondary Schs. v. Devos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) ("A prospective injury that is sufficient to establish standing . . . does not necessarily satisfy the more demanding burden of demonstrating irreparable injury.").

## III. The balance of equities and public interest weigh against injunctive relief.

Plaintiff's motion also fails because the balance of the equities and the public interest— factors that, as discussed *supra* at 10–11, merge when a plaintiff seeks an injunction against the government, *see MediNatura*, 998 F.3d at 945—tilt decisively in Defendants' favor here.

To meet its burden on these factors, Plaintiff simply declares that "there is no public interest in the continuation of the defendants' unlawful hold on [IDR] programs." Pl.'s Mot. at 26; *see also id.* (stating that "[t]he public has a strong interest in restoring access to these congressionally mandated programs while the Government cannot possibly claim any harm from cessation of an unlawful shutdown" of IDR programs). But Plaintiff's conclusory proclamation fails twice over. First, it wrongly collapses the equities into the merits. *See Winter*, 555 U.S. at 32 (explaining that a preliminary injunction "does not follow from success on the merits as a matter of course"); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) (citation omitted) ("The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."); *Allina Health Servs. v. Sebelius*, 756 F. Supp. 2d 61, 70 (D.D.C. 2010) (citation omitted) ("It is also true that a court will not reflexively issue an injunction just because a movant has shown there to be a violation of the law."). Second, it mischaracterizes the governmental action and interests at issue: This case concerns not an "unlawful shutdown," Pl.'s Mot. at 26, but instead a temporary pause in certain operations in order to ensure orderly and effective compliance with a court order, *see* Bergeron Decl. ¶¶ 8–11.

Defendants (and the public) have a compelling interest in ensuring prompt compliance with the forthcoming injunction required by the Eighth Circuit. *See Missouri*, 128 F.4th at 997 ("[W]e conclude the entire SAVE Rule must be preliminarily enjoined."); *see also Cigar Ass'n of Am. v. FDA*, 2020 WL 5231335, at *1 (D.D.C. Sept. 2, 2020) (concluding that "the public's interest in enforcing [another court's] remedial order," in conjunction with other factors, "counsel[ed] strongly against injunctive relief"). As explained in the declaration of Acting Under Secretary Bergeron, to ensure prompt compliance with that court order, Defendants needed to amend various

aspects of the online and paper IDR applications. *See* Bergeron Decl. ¶ 8–9. Similarly, Defendants' contracted student loan servicers have been required to reprogram their systems for processing IDR applications and borrowers' income certifications. *See id.* ¶ 17–19. As Defendants implement these necessary changes, Defendants have an independent interest in ensuring that, following these changes, the updated IDR applications and income certifications are processed in an orderly, efficient, and accurate manner. *See id.* ¶ 17.

The injunctive relief Plaintiff requests from this Court—to the extent that Plaintiff's request has not already been mooted by Defendants' publication of the updated IDR applications—would dramatically undermine these important public interests. As detailed in its proposed order, Plaintiff essentially would have the Court require Defendants to rush their servicers to restart processing of IDR applications and involve itself in managing the rate of servicers' processing on a weekly basis.[8] *See* Pl.'s Proposed Order, at 1. Such an injunction threatens to throw a wrench in Defendants' ongoing efforts to restart processing of IDR applications in an orderly and responsible manner, raising the risks that, without proper vetting and quality assurance, servicers make mistakes in processing applications or convey inaccurate information to borrowers. Errors of this sort, as Defendants' IDR programs undergo significant adjustments following the Eighth Circuit's ruling in *Missouri*, would only inflict greater uncertainty and confusion on borrowers participating in and seeking to participate in income-driven repayment plans.[9] *See Winter*, 555 U.S. at 24 (citation

---

[8] Plaintiff's proposed order leaves the degree of haste uncertain, vaguely directing Defendants to "ensure that applications are processed in [a] timely manner" and report to the Court about processing on a weekly basis. Pl.'s Proposed Order, at 1. That imprecision provides an independent basis for rejecting Plaintiff's motion. *See Vetterli v. U.S. Dist. Ct. for the Cent. Dist. of Calif.*, 435 U.S. 1304, 1307 (1978) (Rehnquist, J.) (in chambers) ("The obligations imposed by an injunction must be clear and well-defined.").

[9] In fact, some of Plaintiff's counsel previously acknowledged the weight of these very interests in urging the Eighth Circuit to reverse (rather than, as it ultimately did, expand) the injunction entered against the SAVE rule. *See* Brief of Amicus Curiae Student Borrower Protection Center in Support of Appellants, *Missouri v. Biden*, Nos. 24-2332, 24-2351, 2024 WL 4045295, at *22 (8th Cir. Aug. 26, 2024) (acknowledging challenges as servicers work "to understand and implement [programmatic] changes" and emphasizing the benefit of "measured implementation"); *see*

omitted) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."). It would be improper for the Court to interject itself and risk such substantial harms to the public interest, particularly given Defendants' commitment to ensure borrowers' ability to access IDR plans as soon as reasonably possible. *See Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 253 (D.D.C. 2020) (citation omitted) ("Where an ongoing 'regulatory process offers an alternative means of ensuring statutory compliance without the burden of an injunction,' 'the public interest favors a less intrusive role' for a court considering injunctive relief.").

Against these weighty interests and concerns, the speculative allegations of injury, status quo expenses, and fleeting inconvenience that Plaintiff proffers do not balance the ledger. Plaintiff's alleged organizational injuries reflect pre-existing efforts to support Plaintiff's members with student loans that are not tied in any meaningful respect to Defendants' updates to IDR applications and processing. *See supra* at 25–26. Similarly, the bulk of Plaintiff's declarant members' complaints relate to the status quo ante—the stress associated with debt they have maintained for many years, concern about the potential for larger monthly payments at some point in the future, and a general desire to be relieved of longstanding debt as soon as possible. To the extent that the Court is more inclined to credit Plaintiff's allegations, it should be reassured that Plaintiff's members have other avenues other than an injunction to obtain prompt relief from their alleged injuries. *See*

---

*also id.* *25 ("[T]he federal government has a compelling interest in preserving the stability, efficiency, and regularity of the federal loan repayment system."). This, along with Plaintiff's emphasis on a comparison of the relative harms alleged by the plaintiffs in *Missouri* and the harms Plaintiff alleges here, *see* Pl.'s Mot. at 25–26, further confirms that Plaintiff's claims in this action are an improper collateral attack on the *Missouri* injunction. *See Cigar Ass'n of Am.*, 2020 WL 5231335, at *1 (noting that "collateral relief from another court's order is generally unwarranted" and that "[a]bstaining from such collateral relief is particularly apt" where the plaintiff "had ample opportunity to participate in the [prior] litigation").

Bergeron Decl. ¶¶ 20–22 (describing available forbearance periods and the PSLF buyback provision).  Given the mismatch between Plaintiff's allegations of harm and Defendants' and the public's strong interests in the orderly and effective operation of IDR plans in a manner that complies with the forthcoming injunction in *Missouri*, "consideration of these factors alone requires denial of the requested injunctive relief."  *Winter*, 555 U.S. at 23; *see also Kim v. FINRA*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases . . . involving constitutional claims.").

## CONCLUSION

For the reasons above, the Court should deny Plaintiff's request for extraordinary injunctive relief.

Dated:  April 8, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Cody T. Knapp*
CODY T. KNAPP
Trial Attorney (NY #5715438)
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L St. NW
Washington, D.C. 20005
Telephone: (202) 532-5663
Facsimile: (202) 616-8470
E-mail: cody.t.knapp@usdoj.gov

*Counsel for Defendants*