**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

American Federation of Teachers,              Civil Action No. 1:25-cv-00802-RBW
555 New Jersey Ave. N.W.
Washington, DC 20001-2079

                Lisa Naugle
c/o Berger Montague, PC                       **FIRST AMENDED CLASS
1001 G Street, N.W., Suite 400 East           ACTION COMPLAINT**
Washington, DC 20001

Plaintiff Philip Whitley
c/o Berger Montague, PC
1001 G Street, N.W., Suite 400 East
Washington, DC 20001

Sandy Cashman
c/o Berger Montague, PC
1001 G Street, N.W., Suite 400 East
Washington, DC 20001

Kiva Iverson
c/o Berger Montague, PC
1001 G Street, N.W., Suite 400 East
Washington, DC 20001

Rachel Dubreuil
c/o Berger Montague, PC
1001 G Street, N.W., Suite 400 East
Washington, DC 20001

Theodore Wegner
c/o Berger Montague, PC
1001 G Street, N.W., Suite 400 East
Washington, DC 20001

                Plaintiffs,

v.

U.S. Department of Education,
400 Maryland Avenue, SW
Washington, DC 20202

1

Linda McMahon, in her official
capacity as Secretary of Education,
400 Maryland Avenue, SW
Washington, DC 20202

       Defendants.

---

**COMPLAINT**

**————PRELIMINARY STATEMENT————**

1.      The U.S.United States government, through the U.S.United States Department of Education (ED or ("the Department),."), is the country's largest creditor of student loans. Today, there are nearly 43 million federal student loan borrowers, with approximately $1.62 trillion outstanding in debt.

2.      Congress designed thisthe federal student loan program to expand access to higher education and increase economic mobility regardless of one's financial station. To that end, when designing and modifying the federal student loan system, Congress provided clear and specific directives to the Department so that millions of Americans could repay their loans without being hindered by the debt. Specifically, Congress directed EDthe Department to offer income-driven repayment (("IDR")") plans that tie a borrower's monthly payment to their income and provide debt cancellation after a prescribed period of time.

3.      Notwithstanding this clear Congressional command, the Department withheld IDR plans and their benefits from millions of borrowers. Although the Department has chosen to shut downnominally restored these plans, in practice more than a million borrowers still do not have access to all income-driven repayment plans. Northeir Congressionally mandated benefits.  The

Department has ~~the Department~~not indicated when it will ~~if ever, resurrect~~ grant complete access to the programs.

4.      The same is true of the Department's administration of the Public Service Loan Forgiveness ("PSLF") program. Public service workers who have satisfied all requirements to have their loans cancelled under the federal program are being deprived this right to promptly have their debt forgiven.

~~3.~~5.      The result: borrowers are and have been unable to access affordable monthly payment plans, some borrowers are being and have been thrust into default on their debt, and some ~~public service workers~~ borrowers are being denied their right to have their loans cancelled through IDR or PSLF. For those borrowers who have satisfied the statutory ~~right to lower their monthly payment and earn~~requirements to have their debts cancelled but whose loans the Department has not cancelled, they are trapped in a debt that legally they should no longer owe. This debt continues to appear on credit ~~towards Public Service Loan Forgiveness (PSLF).~~reports restricting borrowers' ability to access credit to purchase homes, cars, and other necessities, and with looming tax consequences if action is not taken swiftly. These borrowers must also make payments on a debt that should no longer exist for fear of becoming delinquent, or agree to be placed in a forbearance with no clear end date.

~~4.~~6.      This is not occurring in a vacuum for student loan borrowers. It comes in the context of the President repeatedly announcing his plans to close the Department of Education, which was created by an Act of Congress. And, it is on the heels of the recent equally-unlawful actions to gut critical student loan protections ~~from~~that had, until recently, been provided by the Consumer Financial Protection Bureau. ~~This shutdown, which creates significant confusion for borrowers,~~

~~therefore comes at a time when the official government offices meant to assist borrowers with their loans are being shuttered.~~

7.     Although the Department began to process pending IDR applications after this case was filed, the slow rate of processing and the lack of transparency with respect to whether processed applications are being correctly approved or denied do not meaningfully address the reality that borrowers are still being denied their statutory rights to affordable payment plans and to debt cancellation. As of July 31, 2025, there are 1,386,406 pending applications, but the Department's processing rate and the rate of new applications being filed results in only an average net decrease of 87,823 applications per month. At this rate, borrowers may have to wait years to receive the benefits that Congress directed should be provided to them.

8.     For borrowers who have met their statutory requirements to have their debts cancelled pursuant to IDR but whose cancellation the Department is withholding also face a form of fiscal cliff: pursuant to the American Recovery Plan Act, for loans not cancelled on or before December 31, 2025, the cancelled amount will be considered taxable income for federal income tax purposes. If the Department does not process their cancellations before this deadline, these borrowers will literally pay for the government's inaction.

~~5.~~9.     The burden of this misconduct is already being felt by Plaintiff~~,~~ the American Federation of Teachers (~~("AFT~~),~~."),~~ and its 1.8 million members. A significant number of AFT's ~~membership has~~members have student debt, ~~is~~are working in public service, and ~~has~~have sought or will try to seek access to an IDR plan. ~~Dr. Picolya Robinson incurred student loan debt to pursue her lifelong dream of becoming a psychologist and working in public service. As a single mother of two, the weight of this debt has brought considerable financial strain and emotional stress, overshadowing her professional achievements and impacting her personal life. Dr. Robinson was~~

4

~~enrolled in an affordable payment plan and on track to qualify for PSLF until her repayment plan~~

~~was abruptly enjoined by the 8th Circuit. Dr. Robinson needs to enroll in a different plan in order~~

~~to ensure that these months of employment count towards PSLF but can no longer do so as a result~~

~~of the Department's decision to shut down all of the IDR plans. And, for its part,~~ AFT's resources

have been and will continue to be diverted to address the confusion caused by the Department's

decision to leave millions of borrowers in ~~this~~ IDR limbo.

10.    The Department's unlawful activity is especially harmful for Named Plaintiffs, who

are long-term borrowers and public service workers entitled to have their debts cancelled through

the IDR and PSLF programs. Plaintiffs Naugle, Whitley, Cashman, and Iverson have more than

satisfied the requirements to have their debts cancelled through IDR, whereas Plaintiffs Dubreuil

and Wegner have met the requirements to have their debts cancelled through PSLF. Due to the

Department's unlawful withholding of these statutory rights, Named Plaintiffs and the millions of

borrowers whom they represent are being trapped in debt, and many will face enormous tax

liability if the Department does not follow the law and cancel their loans before January 1, 2026.

~~6.~~11.    At bottom, these borrowers simply want to pay back their student loans according

to the terms that Congress, and their contracts, provide. Therefore, AFT, on its own behalf and on

behalf of its members, ~~brings~~and Named Plaintiffs bring this lawsuit to compel the Department to

abide by Congress's command and provide borrowers with the ability to re-pay their loans through

the affordable, income-driven repayment plans to which they are entitled, and to cancel their debts

when they have satisfied all applicable requirements for those plans and for the PSLF program.

**JURISDICTION AND VENUE**

7.12.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331, the Mandamus Act, 28 U.S.C. § 1361, the Administrative Procedure Act ("APA"), 5

U.S.C. §§ 701-706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

8.13.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because

Plaintiff'sPlaintiff AFT's headquarters is in D.C., because Defendants reside in D.C. and because

a substantial part of the events giving rise to these claims occurred in this District.

## PARTIES

9.14.   Plaintiff AFT is a membership organization representing 1.8 million pre-K through

12th-grade teachers, early childhood educators, paraprofessionals, and other school-related

personnel; higher education faculty and professional staff; federal, state, and local government

employees; and nurses and other healthcare professionals.

10.15.  AFT's headquarters is in Washington, D.C. Its 1.8 million members belong to more

than 3000 locals across all fifty U.S. states.

11.16.  AFT's mission is to promote fairness, democracy, economic opportunity, and high-

quality public education, healthcare, and public services for students, their families and

communities. It meets this mission by ensuring its members receive fair pay and benefits for their

critical work, and by fighting for safe working conditions that also benefit students, patients, and

all those who use public services. Helping children and students, and ensuring the economic

security and dignity of AFT's members and their families, is at the core of this mission.

12.17.  As part of this work, AFT takes a leading role in fighting for the financial stability

of public service, education, and health care workers, particularly when it comes to the increasingly

crippling costs of education.

13.18.  Many of AFT's members have student loan debt and 75% of AFT's members work in roles that require a higher education degree and are eligible for PSLF.

14.19.  Thousands of AFT's members have previous access and/or are eligible for the Income-Based Repayment Plan, the Income-Contingent Repayment Plan, the Pay as You Earn Plan, and the Revised Pay as You Earn Plan, each defined and described below.

15.20.  However, according to a survey of AFT members who struggle financially, 8 in 10 say student debt is a "major burden," and it is a major driver of financial difficulties as compared to any other debt.[1] The result: 78% of these members report that they or someone in their household has previously fallen behind on making debt payments, and one in three have had their debts go into default.

16.21.  AFT is required by its mission to provide its members with assistance and accurate information on student loan repayment and PSLF—which is made all the more difficult by the Department's misconduct, as well as the Trump Administration's firing of the Consumer Financial Protection Bureau's Student Loan Ombudsman, the removal of the complaint function on studentaidStudentAid.gov, and the firing of nearly all of the staff at federal student aid dedicated to resolving student loan borrower complaints.

17.22.  Under the leadership of AFT President Randi Weingarten, AFT has spent, and continues to spend, tens of thousands of dollars on debt clinics to educate members to better navigate their repayment options, and it has diverted more than two thousand hours of valuable staff time that would otherwise have been spent focused on issues like collective bargaining; retirement security; healthcare; student learning conditions; and educators', public employees' and

---

[1]    https://www.aft.org/sites/default/files/media/2018/ppt_aft_member_debt_hart2018.pdf https://www.aft.org/sites/default/files/media/2018/ppt_aft_member_debt_hart2018.pdf.

health care workers' working conditions. Since the Department shut down access to IDR plans, AFT staff have had to redraft clinic curriculum and have diverted significant additional staff time to answering member questions. The AFT, including holding 11 student debt clinic webinars with approximately 420 registrants. AFT staff have had to significantly update its debt clinic curriculum twice since April 2025 to reflect the many changes to the availability of IDR and PSLF. The AFT is committed to expanding economic security programs for members and was developing a new financial literacy clinic curriculum to help members. The program development has been delayed due to the actions of the Department and the new demand from members with student debt. The AFT was preparing to end a multi-year contract with a tech company called Summer which provided direct services to members with student debt. Due to the uncertainty and lack of communication from the Department, the union has had to reallocate resources and extend the contract through June 2026.

18.23.   The relief sought in this complaint would inure to the benefit of thousands of AFT members who are actually injured by the Department's violations of the statutes requiring that income-driven repayment plans be available with applications processed in a timely manner, that borrowers who have satisfied the income-driven repayment plans' requirements for debt cancellation have their loans cancelled after 20 or 25 years, and that borrowers who work in public service and have satisfied the PSLF requirements can have their loans cancelled after 10 years.

24.    Plaintiff Lisa Naugle is a natural person who resides, and at all relevant times to this action has resided, in Colorado Springs, Colorado. Plaintiff Naugle owes approximately $198,000 in federal student loan debt, which she has been paying for over 25 years without delinquency or default. According to her account on StudentAid.gov, she has been eligible to have

her loans cancelled through the IDR program since May 2025, but the Department has not cancelled her loans.

25.    Plaintiff Philip Whitley is a natural person who resides, and at all relevant times to this action has resided, in the Province of Nouvelle-Aquitaine, France. Plaintiff Whitley owes approximately $756,605 in federal student loan debt, which he has been paying for over 25 years without delinquency or default. According to a letter that Plaintiff Whitley received from the Department's Office of Federal Student Aid in or around February 2025, he had already satisfied the requirements to have his loans cancelled through the IDR program, but the Department has not cancelled his loans.

26.    Plaintiff Sandy Cashman is a natural person who resides, and at all relevant times to this action has resided, in Olympia, Washington. Plaintiff Cashman owes approximately $115,000 in federal student loan debt, which she has been paying for over 20 years without delinquency or default. In or around July 2025, a representative of the Department at the Office of Federal Student Aid informed Plaintiff Cashman that she had satisfied her repayment obligations and that her loans were eligible to be cancelled through the IDR program, but the Department has not cancelled her loans. Plaintiff Cashman is a member of the AFT.

27.    Plaintiff Kiva Iverson is a natural person who resides, and at all relevant times to this action has resided, in Culver City, California. Plaintiff Iverson owes approximately $252,659 in federal student loan debt, which she has been paying for over 25 years without delinquency or default. In or around the Spring or early Summer of 2025, a representative of the Department at the Office of Federal Student Aid advised Plaintiff Iverson to apply for the Income Based Repayment (IBR) plan from the Income Contingent Repayment (ICR) plan because she had already accrued 324 months of the 300 necessary qualifying payments to have her loans cancelled

through IBR. She applied in July 2025 but her application was denied in August 2025 on the grounds that she does not have a "partial financial hardship," which has not been a requirement for the IBR plan since the enactment of the One Big Beautiful Bill Act. The Department therefore improperly denied her access to a payment plan for which she is eligible and is withholding loan cancellation. Plaintiff Iverson is a member of the AFT.

28.     Plaintiff Rachel Dubreuil is a natural person who resides, and at all relevant times to this action has resided, in Westbrook, Connecticut. Plaintiff Dubreuil owes approximately $87,000 in federal student loan debt, which she has been paying for over 10 years without delinquency or default while pursuing PSLF. By July 2024, she had accrued 115 of the 120 necessary qualifying payments for PSLF, and was on track to reach 120 payments for most of her loans by November 2024. The Department placed Plaintiff Dubreuil's loans, along with the loans of millions of other borrowers, into an involuntary forbearance in July 2024, during which time she was unable to accrue more credit toward PSLF. Beginning in December 2024, and then again in January and April 2025, Plaintiff Dubreuil submitted PSLF Buyback applications to recoup these months in forbearance for PSLF. The Department has not processed her applications. She also applied for the IBR plan in January 2025, and was approved in July 2025, but she has not been able to make payments on the plan due to an error between the Department and its student loan servicer, and so was placed in another forbearance. The Department is therefore withholding Plaintiff Dubreuil's statutory right to cancellation through PSLF and to accrue more PSLF credit through the IBR plan. Plaintiff Dubreuil is a member of the AFT.

29.     Plaintiff Theodore Wegner is a natural person who resides, and at all relevant times to this action has resided, in District of Columbia. Plaintiff Wegner owes approximately $104,000 in federal student loan debt, which he has been paying for over 10 years without delinquency or

default while pursuing PSLF. His records on StudentAid.gov show that he has 113 of the 120 necessary qualifying payments for PSLF, and was on track to reach 120 payments for his loans by around January 2025. The Department placed Plaintiff Wegner's loans, along with the loans of millions of other borrowers, into an involuntary forbearance in July 2024, during which time he was unable to accrue more credit toward PSLF. In February 2025, and then again in July 2025, Plaintiff Wegner submitted PSLF Buyback applications to recoup these months in forbearance for PSLF. The Department has not processed his applications. He also applied for the IBR plan in February 2025, but the Department has not processed his application. The Department is therefore withholding Plaintiff Wegner's statutory right to cancellation through PSLF and to accrue more PSLF credit through the IBR plan.

19.30.  Defendant United States Department of Education is a federal agency with its principal place of business at 400 Maryland Avenue SW, Washington, D.C. Defendant is responsible for administering federal student loan and grant programs in the United States.

20.31.  Defendant Linda McMahon is the Secretary of Education (Secretary). Plaintiff sues Plaintiffs sue Secretary McMahon in her official capacity. Secretary McMahon is charged with the supervision and management of all decisions and actions of the United States Department of Education, and so all allegations in this complaint against the Department of Education are made against her.

## BACKGROUND

### *Income-Driven Repayment Plans*

21.32.  In 1965, Congress enacted the Higher Education Act (HEA) because "every citizen is entitled to an education to meet his or her full potential *without financial barriers*." 20 U.S.C. § 1221-1(2) (emphasis added). In other words, Congress aimed to "increase educational

opportunities" and help students access the "benefits of postsecondary education." *Biden v. Nebraska*, 143 S. Ct. 2355, 2362 (2023).

~~22.~~33.  In 1994, Congress amended the HEA and created the William D. Ford Federal Direct Loan Program. This program increased the government's ability to directly lend money to students. As a result, the student loan system shifted from one mostly involving private lenders to one in which the U.S. government became the primary creditor of student loans.

~~23.~~34.  To ensure that student loans bolstered—rather than hampered–economic opportunity, Congress provided the Secretary with a clear directive: offer students various loan repayment options, including some that tether the borrower's monthly payment to their income. Such plans are known as income-driven repayment plans.

~~24.~~35.  Specifically, Congress enacted two statutory provisions requiring income-driven repayment plans.

~~25.~~36.  First, Congress requires the Secretary to offer "Income-Based Repayment" plans ("IBR"). *See* 20 U.S.C. § 1098e.

~~26.~~37.  The IBR statute provides an "income-based" affordable repayment plan for federal student loan borrowers for whom paying their full loans would be a financial hardship. Congress created the IBR to respond to the rising costs of college, a corresponding increase in student loan debt, and the increasing number of borrowers defaulting.

~~27.~~38.  Congress used mandatory language when setting out the Secretary's requirement to offer an IBR plan, saying: the "Secretary shall carry out a program under which a borrower . . . who has a partial financial hardship . . . may elect, during any period the borrower has the partial financial hardship, to have the borrower's aggregate monthly payment for all such loans not exceed" a payment formula set by statute. 20 U.S.C. § 1098e(b). To ensure that borrowers would

not remain indebted forever, Congress provided that the Secretary must cancel a borrower's outstanding principal and interest due if they have ever elected to participate in IBR and once they have made qualifying payments for a period not to exceed 25 years. *See* 20 U.S.C. § 1098e(b)(7). The HEA provides five types of payments, including payments pursuant to the IBR plan, that count as qualifying payments for the purpose of qualifying for debt cancellation. *Id.*

28.39.  The Department has similarly acknowledged that it has a mandatory duty to offer IBR to borrowers. 88 Fed. Reg. 43,820, 43,837 (Department "do[es] not believe that sunsetting the IBR plan is permitted by section 493C(b) of the HEA which authorized the IBR plan.").

40.    The One Big Beautiful Bill upon enactment ended any requirement that borrowers have to demonstrate a partial financial hardship to access IBR. Pub. L. 119-21, 139 Stat. 72, 348, 356 (July 4, 2025).

29.41.  Second, Congress requires the Secretary to create and implement an "Income-Contingent" repayment plan ("ICR").

30.    ~~The ICR statute has been around since 1994, while the IBR statute was enacted in 2007. Congress created this second program to respond to the rising costs of college, a corresponding increase in student loan debt, and the increasing number of borrowers defaulting.~~

42.    The ICR statute was passed in 1993.

31.43.  The ICR statute mandates that "The Secretary shall offer a borrower of a loan . . . an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower." 20 U.S.C. § 1087e(d)(1)(D).

32.44.  The Department has also acknowledged its mandatory obligation to offer ICR to direct loan borrowers. *See* 90 Fed. Reg. 3695 (Jan. 15, 2025) (explaining that certain changes were being made to meet the "Department's statutory obligation under the HEA to offer borrowers an

income-contingent repayment plan."). Like the IBR statute, the ICR statute provides that the payment term for ICR shall not exceed 25 years. 20 U.S.C. § 1087e(d)(1)(D).

33.45. Over time, the Secretary has crafted four different options to effectuate these statutory directives.

34.46. Each payment plan has different characteristics that vary meaningfully with respect to the calculation of monthly payments, the length of the repayment term (and if/when the loans are forgiven after a certain amount of time in repayment), and the amount of discretionary income that factors into the equation.

35.47. Implementing the commands of the IBR statute, the Secretary created the Income-Based Repayment Plan.

36.48. And implementing the commands of the ICR statute, the Secretary created three plans: the Income-Contingent Repayment Plan (ICR Plan), the Pay As You Earn plan (PAYE Plan), and the Revised Pay As Your Earn plan (REPAYE Plan, later, as described below, renamed the SAVE Plan). Pursuant to the One Big Beautiful Bill Act, for existing borrowers, the ICR, PAYE, and SAVE plans will sunset and no longer be available as of July 1, 2028, whereas the IBR plan will remain available indefinitely. *See* Pub. L. No. 119-21 at sec. 82001 *et seq.*

37.49. In addition to its statutory and regulatory obligations, ~~ED~~the Department has contractual obligations to ensure that borrowers can access these plans.

38.50. When a borrower first takes out a student loan, they sign a legally enforceable promissory note with the Department of Education.

39.51. In addition to identifying the borrower's obligations, the contract identifies the borrower's rights under the contract.

40.52.  These rights include the ability to repay the loans under one of these different income-driven repayment plans.

41.53.  Indeed, the contract includes an entire section on the different plans, and crystalizes that "[u]nder an income-driven repayment plan, your required monthly payment amount is based on your income and family size, instead of being based on your loan debt, interest rate, and repayment period, as under a traditional repayment plan."

54.  Although theThe four statutorily -mandated IDR plans have not operated perfectly, they have been a lifeline in preventing student loan borrowers from default. This saves borrowers from the punitive impacts of such a default, including the potential seizure of tax refunds, wages, or government benefits.

55.  When a borrower satisfies the statutory repayment obligations under an IDR plan, Congress provided that their loans should be automatically cancelled, with no further action by the borrower. *See* 20 U.S.C. § 1098(e)(b)(7).

56.  Prior to March 2021, when borrowers satisfied the statutory requirements for loan cancellation under one of the IDR plans, namely enrollment in an IDR plan for 20 or 25 years, the cancelled amount was typically treated as taxable income.  *See* 26 U.S.C. § 108(e)(1). However, in March 2021, through the American Rescue Plan Act of 2021, Congress provided that no federal student loan cancellation shall be a taxable event for federal income tax purposes for discharges occurring after December 31, 2020, and before January 1, 2026.  26 U.S.C. § 108(f)(5).  Borrowers who satisfy the requirements for loan cancellation through the end of 2025 are entitled by statute to this tax treatment, the consequences of which are extremely significant for individuals.

42.57.  Although historically it was difficult for borrowers to track their progress toward debt cancellation under the IDR plans, the Biden Administration introduced a tracker on

borrowers' StudentAid.gov accounts that shows them their number of qualifying payments they have accrued and the number of qualifying remaining until their loans are eligible for cancellation.

### *Public Service Loan Forgiveness*

43.58.  In addition to providing borrowers with access to IDR plans, Congress also requires the Secretary to discharge a borrower's student debt in certain circumstances.

44.59.  Most notably, federal law provides loan cancellation for public service workers who have worked for ten years in eligible public service jobs while making eligible payments on their loans. 20 U.S.C. § 1087e(m)(1).

45.60.  The PSLF statute states: that the Secretary of Education "shall cancel the balance of interest and principal due . . . on any eligible Federal Direct Loan" for a borrower who "has made 120" eligible "monthly payments on the eligible Federal Direct Loan after October 1, 2007" and "has been employed in a public service job during the period in which the borrower ma[de] each of the 120 payments." 20 U.S.C. § 1087e(m)(1).

46.61.  To be eligible for PSLF, a borrower must be enrolled in a standard repayment plan (in which case the borrower pays the entire debt off over a period of ten years), or one of the income-driven repayment plans.

47.62.  The Secretary has issued implementing regulations for the PSLF statute which further requires the Secretary to provide loan discharges to borrowers who have satisfied the eligibility criteria.

48.63.  Just as with IDR, the borrower's initial master promissory note informs borrowers of their PSLF rights, telling borrowers that "Under this program, we will forgive the remaining balance due on your Direct Loans after you have made 120 payments (after October 1, 2007) on

those loans under certain repayment plans while you are employed full-time by a qualifying employer."²

49.64. Again, while PSLF has not operated without issues, itPSLF has been key in allowing individuals to serve their communities and the public without fear that their student loan debt will drive them into poverty.

## FACTUAL ALLEGATIONS

### *The Prior Administration Issues a New IDR Rule, but States Sue to Block the Effort*

50.65. On July 10, 2023, the Department of Education issued a final rule to improve its REPAYE plan.

51.66. In the Rule, the Department renamed the "REPAYE Plan" the "SAVE Plan," and made changes so that it would be the best option for the bulk of student loan borrowers. *See* Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43,820.

52.67. In an effort to simplify borrowers' options, the Rule also sunsetted enrollment in the ICR and PAYE Plans.

53.68. Certain provisions of the Rule were designated for early implementation and went into effect in 2023. *See* 88 Fed. Reg. 43,820; 88 Fed. Reg. 72,685.

54.69. As a result, millions of student loan borrowers, including thousands of public service workers, enrolled in the SAVE Plan in 2023 and the first half of 2024.

55.70. Though the SAVE Plan was designed to help millions of borrowers, in April 2024, a group of states sued the Department to challenge the Rule in the U.S. District Court for the Eastern District of Missouri.

---

² With the exception of the change in eligibility for medical residency, the One Big Beautiful Bill did not change the requirements for Public Service Loan Forgiveness.

56.71.  The states' lawsuit does not challenge the IBR statute or regulations, nor does the lawsuit challenge the PSLF statute or regulations. The lawsuit also does not challenge the legality of the ICR Plan or the PAYE Plan.

57.72.  On June 24, 2024, the U.S. District Court for the Eastern District of Missouri preliminarily enjoined the Department from providing loan forgiveness under the SAVE Rule.

58.73.  On July 18, 2024, the Eighth Circuit Court of Appeals granted the states' emergency motion for an administrative stay prohibiting the Department from implementing the new Rule, and on August 9, 2024, the Eighth Circuit Court of Appeals enjoined portions of the SAVE Plan pending appeal.

59.74.  On February 18, 2025, the Eighth Circuit Court of Appeals issued its opinion. It agreed with the District Courtdistrict court and concluded the states would likely succeed in showing that the forgiveness provisions of the SAVE Rule were invalid. It found the provision un-severable from the rest of the Rule and therefore affirmed the injunction.

60.75.  The Eighth Circuit also opined on the forgiveness provisions of the pre-2023 version of the REPAYE rule. It said that the forgiveness provisions of the prior REPAYE rule were likely invalid. It did not otherwise speak to the rest of the pre-2023 REPAYE plan, nor preclude EDthe Department from utilizing it in the future.

61.76.  The Eighth Circuit's decisions do not impact the IBR statute, regulations, or ED'sthe Department's contractual obligations with respect to IBR.

62.77.  The Eighth Circuit's decisions do not impact the PSLF statute, regulations, or ED'sthe Department's contractual obligations with respect to PSLF.

78.    The Eighth Circuit also did not enjoin the Department from using the ICR plan or the PAYE plan.

63.79.  On April 14, 2025, the U.S. District Court for the Eastern District of Missouri modified its preliminary injunction to conform with the Eighth Circuit's February order, and did not enjoin or touch on the IBR statute, the PSLF, or the ICR and PAYE plans.

### *During the Litigation, the Prior Administration Provides Borrowers with Access to IDR to Meet its Statutory Obligation*

64.80.  In the face of this litigation, the prior Administration took a number of steps in 2024 and January 2025 to adhere to the court order and offer borrowers the repayment plans mandated by statute, regulation, and contract.

65.81.  On July 19, 2024, the day after the Eighth Circuit granted an emergency stay, the Department placed all borrowers who had been making payments in the SAVE Plan into a forbearance (i.e., a status during which the Department delays the borrower's obligation to make monthly payments). The) (the "SAVE litigation forbearance"). Unlike most other forbearances, the Department does not count provided that loans would not accrue interest while in this special SAVE litigation forbearance, but also that months during this forbearance would not count as months of eligible payment for IDR or PSLF purposes.

66.82.  From July to October 2024, the Department ensured borrowers could apply for IBR using a paper or PDF application form.

67.83.  On October 2, 2024, the Department of Education re-opened its online IBR application.

68.84.  The Department also recognized its obligation to offer a plan under the ICR statute, and that the Eighth Circuit did not preclude it from doing so.

69.85.  On November 15, 2024, the Department of Education issued an Interim Final Rule to ensure that it was "in compliance with the statutory requirement to offer an income-contingent repayment plan to borrowers."

70.86.  Under this Rule, the Department reversed its sunsetting of the ICR and PAYE plans, allowing borrowers to enroll in ICR or PAYE until July 1, 2027.

71.87.  On January 15, 2025, the Department finalized its Rule allowing borrowers to enroll in ICR or PAYE until July 1, 2027.

72.88.  As a result, as of 11:59 a.m. on January 20, 2025, EDthe Department offered borrowers enrollment in plans under both the IBR and ICR statutes.

### On February 26, 2025, The Current Administration HaltsHalted Access to IDR Plans

73.89.  Under the current legal landscape, the Department of Education can offer three IDR plans and still comply with the Eighth Circuit's decisions: the IBR plan, the ICR plan, and the PAYE plan. It can also utilize the bulk of the prior REPAYE plan.

74.90.  Indeed, the Eighth Circuit specifically distinguished the IBR statute and IBR plan when discussing the purported problems with the Department's new Rule.

75.91.  Nonetheless, the Department is now following the President's command. Onon February 26, 2025, the current Administration issued a Stop Work Order, directing all loan servicers to stop accepting and processing income-driven repayment applications.

76.92.  The Stop Work Order shutsshut down income-driven repayment options down for at least three monthsborrowers seeking to enroll or switch plans, but doesdid not specify when, if ever, they willwould be reinstated.

77.93.  The Department's action also precludesprecluded borrowers from recertifying their income so that they cancould remain in an income-driven repayment plan.

78.94.  The Department's action appliesapplied to all online and paper applications.

79.95.  The Department also put a notice on its website confirming this decision, though it blamed the Eighth Circuit, saying: "Application Unavailable. A federal court issued an injunction preventing the U.S. Department of Education from implementing the Saving on a Valuable Education (SAVE) Plan and parts of other income-driven repayment (IDR) plans. As a result, the IDR and online loan consolidation applications are temporarily unavailable."

80.96.  In other words, despite its obligation to ensure borrowers' access to IBR and ICR plans, and despite its ability to do so notwithstanding the Eighth Circuit's decisions, the Department has halted borrowers' ability to enroll in these programs.

### *The Department Begins Processing IDR Applications, But Borrowers Are Still Deprived IDR Plans*

97.    On March 18, 2025, AFT initiated this action against the Department to restore access to IDR for millions of borrowers.

98.    The Department announced that it would restore the IDR application by March 26, 2025, and that it would begin processing applications by May 10, 2025.

99.    Pursuant to a status conference held April 17, 2025, the Court ordered that the Department shall file a minimum of three monthly status reports, commencing May 15, 2025, in which it would provide the total outstanding number of pending IDR applications as of the end of the prior calendar month as well as the number of IDR applications processed during the prior calendar month. (ECF No. 34.)

100.    The Department's *Decision Harms*status reports revealed that between April and July, the backlog of pending IDR applications dropped by only 263,468, from 1,649,874 to

1,386,406.[3] (ECF Nos. 36-39.) The data show an average net decrease each month of only 87,823 applications, and do not show a breakdown of approved or denied applications.

101.    On or around July 18, 2025, it was reported that the Department would summarily deny pending IDR applications from borrowers who requested to be placed in the plan that would result in the lowest monthly payment. The approved form in use prior to March 26, 2025, not just allowed, but recommended that borrowers select the option that would result in the lowest monthly payment. The terms and conditions articulated the way that the Department would place eligible borrowers in a plan, should multiple repayment plans provide the same payment amount.[4] According to reports, an estimated 460,000 borrowers will have their application rejected and will have to apply for IDR again and select a specific plan. Although this will likely result in a significant decrease in the number of pending IDR applications, it does not reflect the true processing rate demonstrated by the monthly status reports.

102.    During this lengthy processing time, borrowers are deprived their rights to be enrolled in an IDR plan. Even if a borrower is ultimately deemed ineligible for the plan for which they applied, the months waiting for a determination is lost time during which they could have enrolled in a plan for which they are eligible and made meaningful progress toward repaying their loan.

---

[3] The Department's first monthly report in May 2025, which reflected the number of applications processed and pending for the month of April, stated that there were 1,985,726 applications pending. (ECF No. 36.) In the subsequent report, filed in June, the Department clarified that its previous report had overstated the number of pending applications by 335,852. (ECF No. 37.) It explained that this was "due to an error by one of the Department of Education's student-loan servicers in reporting data to the Department of Education." *Id.* The Department did not explain further what caused the error or provide whether precautions were taken by the Department or its student loan servicers to ensure no additional mistakes would be made.

[4] In relevant part, the form stated: "If more than one of the plans that I selected provides the same initial payment amount, or if my loan holder is determining which of the income-driven plans I qualify for, that my loan holder use the following order in choosing my plan: SAVE (if my repayment period is 20 years), PAYE, SAVE (if my repayment period is 25 years), IBR, and then ICR."

103.    The time spent waiting for their applications to be processed harms borrowers, both because this time does not count toward certain statutory loan cancellation programs, and in that it allows interest to accrue at a time when borrowers have no monthly payment, increasing their overall debt and keeping them in debt longer.

104.    When a borrower applies for IDR, their loans are placed in an initial administrative processing forbearance for up to 60 days. During this time, their loans continue to accrue interest and the months count toward PSLF, even though no payment is due, although these months do not count toward IDR. After this initial 60 day administrative processing forbearance, however, borrowers whose IDR applications are still pending are placed in the special SAVE litigation forbearance. Months that pass while borrowers are in a SAVE litigation forbearance also do not count toward cancellation under either PSLF or IDR.

105.    When the Department first announced the SAVE litigation forbearance, it explained that loans in the forbearance would not accrue interest, in recognition of the fact that borrowers' loans were placed into the forbearance due to no fault of their own. In January 2025, the Department told borrowers, "You will be in this forbearance until servicers are able to accurately calculate monthly payments, which FSA expects servicers to be able to do no earlier than September 2025."[5]  On July 9, 2025, however, the Department announced that it was changing this policy, and began to charge interest on these loans beginning August 1, 2025. In its press release announcing this change, the Department wrongly stated that it was required to charge interest for these borrowers because of the Eighth Circuit's order in February, and that the Department lacked the authority to waive interest for these borrowers. This policy change makes the Department's slow processing rate even more harmful for borrowers with pending applications.

---

[5] Email dated Jan. 16, 2025, from U.S. Department of Education to borrowers, "Update on the Saving on a Valuable Education Plan," available at https://perma.cc/FS7M-EJG4.

### *The Department Continues to Withhold IDR and PSLF Debt Cancellation*

106.    In addition to depriving borrowers of their right to affordable payment options under IDR by delaying the processing of their applications, the Department is withholding loan cancellation from borrowers who qualify to have their loans cancelled under the HEA.

107.    The IDR plans all provide for debt cancellation after a prescribed period of time, ranging from 20 to 25 years, or 240 to 300 monthly payments. Both the enjoined and the prior regulations stated that the Department would process debt cancellation automatically.[6]

108.    Although the government had provided a tracker to help borrowers follow their progress toward cancellation under IDR, on or around April 27, 2025, the Department removed the progress tracker on borrowers' StudentAid.gov accounts, making it harder for borrowers to know when they have met the minimum requirements to have their loans cancelled and when the Department is withholding their cancellation.

109.    Although a preliminary injunction in the SAVE litigation prohibits the Department from providing IDR cancellation pursuant to the SAVE plan, nothing is preventing the Department from cancelling eligible borrowers' debts through the IBR, ICR, or PAYE plans.

110.    Despite this, as of September 2025, on its website in response to the question, "Is ED processing IDR forgiveness?" the Department's response is that, "Forgiveness as a feature of

---

[6] The IBR regulations in effect immediately prior to the finalization of the now-enjoined rules further elaborate that "[w]hen the Secretary determines that a borrower has satisfied the loan forgiveness requirements under paragraph (f) of this section on an eligible loan, the Secretary cancels the outstanding balance and accrued interest on that loan. No later than six months prior to the anticipated date that the borrower will meet the forgiveness requirements, the Secretary sends the borrower a written notice that includes . . . An explanation that the borrower is approaching the date that he or she is expected to meet the requirements to receive loan forgiveness." 34 C.F.R. 685.221(f)(5)(i) (as it was in effect on June 30, 2024). The enjoined regulations state, "The Secretary tracks a borrower's progress toward eligibility for forgiveness under paragraph (k) of this section and forgives loans that meet the criteria under paragraph (k) of this section without the need for an application or documentation from the borrower." 34 C.F.R. 685.209(l)(11).

the SAVE, PAYE, and ICR Plans is currently paused, because those plans were not created by Congress." This is false. Although there is pending litigation related to the SAVE plan, there is no lawsuit or court order addressing debt cancellation under PAYE or ICR, nor has the Department amended its regulations, which are still in force and are not affected by the states' litigation in Missouri, and which provide for debt cancellation under both plans.

111.    The Department's answer on its website continues by acknowledging that it "can and will still process loan forgiveness for the IBR Plan," but that ". . . [c]urrently, IBR forgiveness is paused[.]"

112.    The Department is therefore refusing to provide lawful debt cancellation under the PAYE and ICR plans, and is withholding debt cancellation under IBR, which it concedes is required by law.

113.    The Department is similarly withholding loan cancellation for borrowers who have accrued at least 120 qualifying payments under the PSLF program necessary for loan cancellation, or who have pending Buyback applications that, once reviewed and granted, would result in at least 120 qualifying payments.

114.    For borrowers who continue to make qualifying payments and have qualifying employment, the Department is not processing their PSLF paperwork to reflect the correct number of qualifying months they have accrued toward the 120 months required for PSLF. For borrowers who have met or exceed the necessary 120 months, the Department is withholding their statutory right to have their loans cancelled.

115.    For borrowers who have been stuck in the SAVE litigation forbearance and seek to recuperate that time to count for PSLF using the PSLF Buyback program, the Department is not processing their Buyback applications. Pursuant to the same court order requiring the Department

to provide monthly status updates about its processing of the IDR application backlog, the Department has provided monthly status updates about the processing of the PSLF Buyback application backlog. For each month of reporting, the Department received more Buyback applications than it processed. (*See* ECF Nos. 36-39.) As of July 31, 2025, there are 72,730 pending Buyback applications. (ECF No. 39.) From May to July, the Department received an average of 10,743 new applications, but only processed an average of 2,939. (*See* ECF Nos. 36-39.) For each month during which it reported, the Department saw a net increase in the number of pending Buyback applications, and so is clearly not making meaningful progress on processing these borrowers' applications.

116.    Because borrowers can only use the Buyback process to recuperate previously ineligible months toward PSLF if those months will bring their total qualifying months to 120 months or greater, making them eligible for cancellation, i.e., those months will give them the time required to qualify for cancellation, for any eligible borrower with a pending Buyback application, the Department is depriving them of their statutory right to debt cancellation under PSLF.

*The Department's Decisions Harm Borrowers, Including AFT ~~and~~, its members ~~,~~, and Named Plaintiffs*

~~81.~~117.The Department's decision to ~~shut off~~withhold IDR and PSLF benefits is actively harming borrowers.

~~82.    Borrowers with lower earnings cannot access any IDR plans. Denied access to statutorily mandated repayment options, many are stuck on unaffordable repayment plans that they are unable to pay. Many of these borrowers will likely default on their loans as a result of the Department's decisions not to follow the statutes.~~

118.    ~~Similarly,~~Although the Department has reopened the IDR application and commenced processing applications, nearly 1.4 million applications are still pending. This

includes applications from thousands of eligible public service workers who are stuck in either the SAVE forbearance or in plans that are not PSLF-eligible. Until they are enrolled in an IDR plan or, for those who are eligible, have had their loans cancelled under IDR, borrowers are being deprived of their rights under Congress's IDR provisions.

119.    The Department is failing to process eligible borrowers' PSLF cancellations, or has left borrowers with pending Buyback applications in limbo, as that backlog grows month to month.

83.120.        Because of the Department's actions, thousands of eligible public service workers are being denied progress towards the student loan forgiveness to which they are statutorily entitled.

121.    SomeFor borrowers who are in default now lack accesshave satisfied statutory requirements to an IDR planhave their loans cancelled, through either IDR or PSLF, the Department is harming those borrowers by withholding that would, following certain steps, allow them to get back on the pathcancellation.

84.122.        These harms—withholding of re-affordable payment— options that count toward loan cancellation and the cancellation of loans that have met all statutory requirements to be cancelled—are exacerbated by two upcoming deadlines.

123.    First, beginning January 1, 2026, the provision of federal tax code that provides student loan cancellation shall not be considered a taxable event for federal income tax purposes will expire. *See* 26 U.S.C. § 108(f)(5). Although some student loan cancellation programs are specifically exempt from federal income taxes, such as PSLF, *see* 26 U.S.C. § 108(f)(1), IDR cancellation is not one of them. Therefore, any borrower who is currently eligible to have their loans cancelled under an IDR plan, such as IBR, but whose cancellation is being withheld by the

Department, risks this cancellation being taxed as federal income if the cancellation is not processed before January 1, 2026.

124.    Second, the resumption of interest accrual for borrowers whose loans are in the special SAVE litigation forbearance will result in SAVE-enrolled borrowers being charged interest that they otherwise would not be charged if the SAVE provisions were not preliminarily enjoined. For borrowers seeking to enroll in another available IDR plan and whose loans are in the SAVE litigation forbearance while their IDR application is pending, the Department's inaction to enroll borrowers in another plan exacerbates this harm because it keeps borrowers in the interest-bearing forbearance rather than placing them in a plan through which they could make monthly payments. Although borrowers could make voluntary payments to cover interest, such payments would not count as a qualifying payment for IDR or PSLF purposes and would ultimately increase the total amount they will pay over the life of their loans. Finally, for borrowers who have satisfied the requirements to have their loans cancelled under the IDR statutes but from whom the Department is illegally withholding loan cancellation, accruing interest will increase their account balance and will increase their tax liability if their loan cancellation is not processed before the January 1, 2026 tax deadline.

85.125.    AFT, and its members, and Named Plaintiffs, are a case in point. Thousands of AFT members are eligible for each and every one of the statutorily required repayment plans and cancellation rights described above. Thousands of AFT members have contractual rights to participate in each of these statutorily required repayment plans.

126.    One member, Plaintiff Naugle has dutifully paid her loans for over 25 years, but the Department is depriving her of her statutory right to have her loans cancelled through IBR. After years in the IBR plan, she switched to the SAVE plan because it offered more affordable monthly

payments, but switched back to the IBR plan in order to continue making payments toward cancellation through IDR, although the IBR plan payments were more expensive. She reached 300 qualifying payments in May 2025, but the Department has refused to cancel her loans through IBR. As a result, she has continued to make monthly payments of over $700, for fear of becoming delinquent or entering default on her loans. If her loans are not cancelled before January 1, 2026, when her loans are eventually cancelled, she will face federal income tax liability on her discharged loan amount that she would not have to pay if her loans had been promptly cancelled.

127.    Plaintiff Whitley, a retiree, borrowed approximately $110,000 in federal student loans, which has ballooned to over $750,000. According to a message that he received from Federal Student Aid in February 2025, Plaintiff Whitley had 310 qualifying payments toward cancellation under IBR. He has accrued additional time since then, putting him well beyond the 300 qualifying payments necessary to have his loans cancelled through the IBR plan. Because the Department has refused to process his cancellation, he has had to continue to make monthly payments of approximately $105 to avoid becoming delinquent or entering default. If his loans are not cancelled before January 1, 2026, when his loans are eventually cancelled, he will face federal income tax liability on his discharged loan amount that he would not have to pay if his loans had been promptly cancelled.

128.    Plaintiff Sandy Cashman, an AFT member, is a retired government worker who has over $115,000 in federal student loan debt. She has persistently made payments on her loans for decades, and in July 2025 Federal Student Aid informed her that she was eligible to have her loans cancelled through IDR. She also confirmed that she had satisfied the qualifying payment requirements using Federal Student Aid's online payment calculator tool. The Department still has not cancelled her loans, forcing her to continue making monthly payments of $687. These are

unaffordable payments for Plaintiff Cashman, but she has continued to pay because of the severe consequences of becoming delinquent or entering default. Due to the Department's failure to cancel her debts as required by federal law, Plaintiff Cashman has at times had to choose between paying her student loans and paying for her medical care. If her loans are not cancelled before January 1, 2026, when her loans are eventually cancelled, she will face federal income tax liability on her discharged loan amount that she would not have to pay if her loans had been promptly cancelled.

129.    Plaintiff Iverson, an AFT member, works in a medical testing lab and has approximately $250,000 in federal student loan debt. After being advised by Federal Student Aid to apply for the IBR plan because she already had 324 qualifying payments that, once enrolled in IBR, would qualify her for debt cancellation, in July 2025 she applied for the IBR plan. Upon information and belief, she was advised to do this because, even though she is also eligible for cancellation under the ICR program plans, the Department had stopped cancelling loans under those plans. In August 2025, her application for IBR was denied on the grounds that she did not have a partial financial hardship, although that was not and is still not a requirement for IBR. This left her enrolled in the ICR plan. Because of the Department's wrongful denial, Plaintiff Iverson will have to continue making payments on a loan that legally should no longer exist. If her loans are not cancelled before January 1, 2026, when her loans are eventually cancelled, she will face federal income tax liability on her discharged loan amount that she would not have to pay if her loans had been promptly cancelled.

86.130.    Plaintiff Dubreuil, an AFT memberRachel Dubreuil, teaches high school Social Studies at a technical high school. She dedicated herself to public service as a teacher and has taught for over ten years. RachelShe was on track to have most of her loans forgiven in

November of 2024, but that progress was halted overnight. In July 2024, her loans, which had been in the SAVE plan, were placed into an administrative forbearance. As previously discussed, her time in this forbearance does not count toward PSLF. ~~Additionally,~~When she ~~has applied~~was placed in the forbearance, she had 115 of the 120 qualifying payments necessary for PSLF ~~forgiveness, but her time since July 2024 is not being credited..~~ She has also applied ~~for IDR payment plan change, and~~ three times to have her forbearance time counted ~~though a special program known as the "Buy Back~~through the "Buyback" program, but none of these applications have been processed. She also applied to switch IDR plans, so that she could continue making payments that would count toward PSLF. She applied for the IBR plan in January 2025, but her application was not processed until July 2025; if the Department had promptly processed her application, she could have accrued her remaining 5 months needed for PSLF by July. Due to an error with her account, the Department has placed her back in a forbearance, and she is still being denied the opportunity to have her loans cancelled through PSLF. The stress from this debt, and the sheer tension that it causes on her day to day, is unbearable. Her husband and she have been unable to save for retirement or contribute to their daughter's college savings fund because of this debt. Through no fault of her own, ~~Rachel~~Plaintiff Dubreuil is unable to make payments based on her income and to progress toward PSLF forgiveness, and is therefore being deprived her statutory and contractual rights. As a result, she ~~will owe her~~still owes and is paying on a debt ~~for~~that should legally no longer ~~than if she was able to enroll and progress under an IDR plan~~exist.

~~87.    Another member, Corey Mason, took out loans to become a teacher in order to fulfill a lifelong dream of helping children who were marginalized or otherwise left out. To better meet her students' needs, she ultimately earned a master's degree and a Sixth-Year Certificate. She incurred more debt to pay for both credentials. Corey has 117 of her 120 payments necessary to~~

~~have her debt cancelled under PSLF, but has been unable to earn her final months of payments, through no fault of her own. During the summer of 2024, her loans were placed into forbearance because of the SAVE plan litigation. She requested that her loans be moved into another qualifying repayment plan, but was told that that was not possible. Despite this, she continued to make voluntary payments on her loans. In November 2024, when she believed she had achieved 120 payments for PSLF, she submitted a "Buy Back" application in an effort to make her time in forbearance count toward forgiveness. As of March 2025, approximately three months later, her application has not been processed and she is still waiting for a determination. In an effort to remedy the situation, Corey has filed complaints, has resubmitted her "Buy Back" application, and has submitted a new IDR plan to remove her loans from forbearance. To the best of her knowledge, these requests have not been processed. She continues to make payments in the hope that they will eventually be counted toward PSLF, but feels as though she is stuck in limbo while ED has cut off her access to IDR plans and to debt forgiveness.~~

<u>131.</u>    ~~Critically, these members would~~<u>Plaintiff Wegner is a government employee and has approximately $104,500 in federal student loans. He has consistently made payments on his loans and has never been delinquent or in default. Plaintiff Wegner enrolled in the SAVE plan to make lower monthly payments. His records on StudentAid.gov show that he has 113 of the 120 necessary qualifying payments for PSLF, and that he was on track to reach 120 payments for his loans by around January 2025. However, in July 2024, Plaintiff Wegner was placed in the SAVE forbearance, along with millions of other borrowers, at which point he stopped receiving credit toward PSLF. In February 2025, and then again in July 2025, Plaintiff Wegner submitted PSLF Buyback applications to recoup these months in forbearance for PSLF, which should have been sufficient to qualify him for cancellation. The Department has not processed his applications. He</u>

also applied for the IBR plan in February 2025, but the Department has not processed his application. If he had been promptly enrolled in IBR, he could have made his final 7 qualifying payments by approximately September 2025, as an alternative to getting credit through the Buyback program. The Department is therefore withholding Plaintiff Wegner's statutory right to cancellation through PSLF and to accrue more PSLF credit through the IBR plan. As a result, he has been kept in debt longer than required and will have to make payments on loans that should not longer legally exist, or risk becoming delinquent or entering default.

132.    The Department's failure to cancel Named Plaintiffs' debts harms them in several ways. They must continue to make payments on loans that should legally no longer exist for fear of becoming delinquent or entering default. The loans appear on their credit reports and are a monthly expense that inhibits their abilities to pay for basic necessities and to save for the future.

~~88.~~133.    These Named Plaintiffs all have standing in their own right to sue, and their experiences are similar to those that other AFT members face.

~~89.~~134.    AFT, however, is vindicating their interests because, as highlighted above, the issues are at the heart of AFT's purpose.

~~90.~~135.    No individual member of AFT is a necessary party in this case as the claims and relief sought are challenging an unlawful government policy that is being applied in the same manner as to all individuals.

~~91.~~136.    The Department's unlawful action is also harming AFT as an organization because its resources have been, and continue to be, diverted to address the unlawful conduct, which directly impedes its ability to develop and implement additional financial literacy programs and resources that it had planned for its members. It has had to increase its efforts to assist its members with their student loans as a result of the Department's shut down of the IDR applications.

## CLASS ACTION ALLEGATIONS

137.    Pursuant to Fed. R. Civ. P. 23(b)(2), Plaintiffs seek certification of the following classes:

**IDR Application Class**
All borrowers with a pending IDR application.

**IDR Denial Class**
All borrowers who have had their IDR application denied because (1) their IBR application was denied after July 4, 2025 due to an asserted lack of a partial financial hardship or (2) the borrower elected for the lowest monthly repayment option on the Office of Management & Budget's form.

**IBR Cancellation Class**
All borrowers who have made the required payments for loan cancellation under the IBR program but have not yet received cancellation.

**ICR Cancellation Class**
All borrowers who have made the required payments for loan cancellation under the ICR or PAYE plans but have not yet received cancellation.

**PSLF Forgiveness Class**
All borrowers who have satisfied the public service requirements of PSLF but whose loans have not been forgiven because the Department has not processed their Buyback applications.

138.    **Numerosity:**  The Classes are sufficiently numerous.  There are over a million people with pending IDR applications, hundreds of thousands of people whose IDR applications are or will soon be wrongfully denied; and thousands of people who are awaiting for loan cancellations, including over 72,000 borrowers with pending Buyback applications.

139.    **Commonality:**  There are numerous common questions of law and fact that can be answered with common evidence, including, but not limited to:

a.    Whether the Department's failure to enroll borrowers in Congressionally required IDR plans violates the Administrative Procedure Act;

b.    Whether the Department's failure to provide for statutorily required loan cancellation through IDR plans violates the Administrative Procedure Act;

c.    Whether the Department's failure to provide for statutorily required loan cancellation through PSLF violates the Administrative Procedure Act; and

d.    The proper scope of injunctive relief.

140.    **Typicality and Adequacy:** Plaintiffs' claims and injuries are typical of those of the Classes. Plaintiffs and their counsel have no conflicts with the Classes and will adequately represent the Classes.

141.    Certification is appropriate under Fed. R. Civ. P. 23(b)(2) because the Department has acted or refused to act on grounds that apply generally to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.

## CAUSES OF ACTION

## <u>FIRST CAUSE OF ACTION</u>

*Unlawful Withholding of Agency Action in Violation of the*

*Administrative Procedure Act, 5 U.S.C. § 706(1)*

142.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

~~92.~~143.    The APA authorizes this Court to "compel agency action" that has been "unlawfully withheld." 5 U.S.C. § 706(1).

93.144.          As alleged above, the Secretary has a mandatory statutory, regulatory, and contractual duty to offer borrowers access to an IBR repayment plan., including processing and enrolling borrowers in this plan and cancelling eligible loans pursuant to this plan.

94.145.          As alleged above, the Secretary has a mandatory statutory, regulatory, and contractual duty to offer borrowers access to an ICR repayment plan-based repayment plan, including processing and enrolling borrowers in these plans and cancelling eligible loans pursuant to these plans.

95.146.          As alleged above, the Secretary has a mandatory statutory, regulatory, and contractual duty to cancel the balance of any borrower who has made 120 PSLF-qualifying payments, including by processing borrowers' PSLF Buyback applications.

96.     Following the Stop Work Order, Defendants are unlawfully preventing borrowers from accessing anythe IBR program.

147.    Followingprogram's full benefits, including from receiving the Stop Work Order, benefit of loan cancellation.

97.148.          Defendants are unlawfully preventing borrowers from accessing anythe ICR programprograms' full benefits, including from receiving the benefit of loan cancellation.

98.149.          Following the Stop Work Order, Defendants ireare unlawfully withholding PSLF forgiveness.

## SECOND CAUSE OF ACTION

*Arbitrary and Capricious Agency Action in Violation of the Administrative Procedure Act,* ~~5~~

~~*U.S.C. § 706(2)(A)*~~

*5 U.S.C. § 706(2)(A)*

150.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

99.151.        The APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

100.152.        The Department's decision to halt access to all IDRloan cancellation under the IBR, PAYE, and ICR plans constitutes a final agency action under the APA.

101.153.        Defendants have acted in a manner that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law by, among other actions:

a.    The Department's abrupt and unjustified halting of the IBR, ICR, and ICR plansPAYE plans' cancellation is inconsistent with the governing statute and regulation.

b.    The Department's abrupt and unjustified halting of IBR, ICR, and ICR plansPAYE plans' cancellation is inconsistent with its contractual obligations.

c.    The Department's abrupt and unjustified halting of the IBR, ICR, and ICR planPAYE plans is not mandated by the Eighth Circuit's decision, is without any rational basis, and is arbitrary and capricious.

d.    The Department's hold on PSLF relief is inconsistent with the governing statute and regulation.

e.    The Department's hold on PSLF relief is inconsistent with its contractual obligations.

f.    The Department's hold on PSLF relief is not mandated by the Eighth Circuit's decision, is without any rational basis, and is arbitrary and capricious.

**PRAYER FOR RELIEF**

PlaintiffPlaintiffs respectfully requestsrequest that this Court:

A.     Declare that the Department is unlawfully withholding the IBR and ICR ~~programs~~programs' full benefits, including debt cancellation;

B.     Declare that the Department is unlawfully withholding PSLF program in contravention of law;

D.     Certify the Classes under Rule 23(b)(2);

E.     Issue preliminary and permanent injunctive relief preventing the Department from collecting from borrowers who are eligible for income-driven repayment until it satisfies its statutory, regulatory, and contractual obligations under the HEA's IBR, ICR, and PSLF provisions.

F.     Issue preliminary and permanent injunctive relief preventing the Department from charging interest on loans that are enrolled in the SAVE plan until the litigation related to that plan is resolved.

G.     Issue preliminary and permanent injunctive relief compelling the Department to comply with its statutory, regulatory, and contractual obligations, by:

    i.   Complying with the IBR statute by restoring ~~an~~the full IBR plan benefits and granting IBR loan cancellation to eligible borrowers before January 1, 2026, and on a rolling basis thereafter;

    ii.   Complying with the ICR statute by restoring an ICR ~~plan~~and PAYE plan benefits and granting ICR and PAYE loan cancellation to eligible borrowers before January 1, 2026, and on a rolling basis thereafter;

    iii.   Complying with the PSLF statute by restoring public service workers' ability to obtain credit toward PSLF forgiveness and timely granting PSLF forgiveness to those borrowers, including by processing their PSLF Buyback applications.

H.    Award attorneys' fees as authorized by law; and

I.    Grant such further relief as may be just and proper.

Date: ~~March 18~~September 9, 2025                    /s/ ~~Julie Selesnick~~John G. Albanese

_____

Julie Selesnick, DC Bar No. 485558
F. Paul Bland*
BERGER MONTAGUE PC
1001 G Street, NW
Suite 400 East
Washington, DC 20001
T. 202.221.5279
F. 215.875.4604
jselesnick@~~bm.net~~bergermontague.com

_____

————pbland@bergermontague.com

E. Michelle Drake*
John G. Albanese*
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T. 612.594.5999
F. 612.584.4470
emdrake@bergermontague.com
jalbanese@bergermontague.com

Persis Yu, DC Bar # 90014714
STUDENT  BORROWER  PROTECTION
CENTER (a fiscally sponsored project of the
Shared Ascent Fund)
1025 Connecticut Ave NW, #717
(202) 618-1328
persis@protectborrowers.org

R. T. Winston Berkman-Breen, NY Bar No. 5559372
Khandice Lofton*
STUDENT BORROWER PROTECTION CENTER (a fiscally sponsored project of the Shared Ascent Fund)
40 Rector Street, 9th Floor
New York, NY 10006
winston@protectborrowers.org

_____

———khandice@protectborrowers.org

*pro hac vice
Attorneys for ~~Plaintiff~~Plaintiffs