## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

American Federation of Teachers, *et al*.

      Plaintiffs,

v.

U.S. Department of Education, and
Linda McMahon, in her official
capacity as Secretary of Education,

      Defendants.

Civil Action No. 1:25-cv-00802-RBW

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

Pursuant to Local Civil Rule 65.1(c), plaintiff American Federation of Teachers ("AFT") on behalf of itself and its members, and individual plaintiffs Lise Naugle, Sandy Cashman, Philip Whitley, and Kiva Iverson, on behalf of themselves and the classes set forth in the contemporaneously filed motion for class certification, hereby move for a preliminary injunction, to remain in effect until such time as the Court can further consider the merits of the Plaintiffs' claims, enjoining the defendants Secretary of Education Linda McMahon, and the United States Department of Education from stopping statutorily required loan cancellation and processing of Public Service Loan Forgiveness.

As set forth in more detail in the accompanying memorandum, the defendants have failed to provide for Congressionally required income driven repayment programs, including loan cancellation. The defendants' actions should be enjoined under the Administrative Procedures Act because it is in excess of the defendants' authority and is arbitrary and capricious. The individual plaintiffs, the putative class members, AFT, and its members, will suffer imminent and irreparable injury should the unlawful shutdown of the plans be permitted to continue.

1

Pursuant to Local Civil Rule 7(f), the plaintiffs hereby request oral argument be held on this Motion.

Respectfully submitted,

Date:   September 16, 2025

/s/ John G. Albanese

Julie Selesnick, DC Bar No. 485558
F. Paul Bland*
BERGER MONTAGUE PC
1001 G Street, NW
Suite 400 East
Washington, DC 20001
T. 202.221.5279
F. 215.875.4604
jselesnick@bergermontague.com
pbland@bergermontague.com

E. Michelle Drake*
John G. Albanese*
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T. 612.594.5999
F. 612.584.4470
emdrake@bergermontague.com
jalbanese@bergermontague.com

Persis Yu, DC Bar # 90014714
STUDENT BORROWER PROTECTION
CENTER (a fiscally sponsored project of the
Shared Ascent Fund)
1025 Connecticut Ave NW, #717
(202) 618-1328
persis@protectborrowers.org

R. T. Winston Berkman-Breen, NY Bar No.
5559372
Khandice Lofton*
STUDENT BORROWER PROTECTION
CENTER (a fiscally sponsored project of the
Shared Ascent Fund)
40 Rector Street, 9th Floor
New York, NY 10006
winston@protectborrowers.org

khandice@protectborrowers.org

*pro hac vice*
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

American Federation of Teachers, *et al*.,

      Plaintiffs,

v.

U.S. Department of Education; Linda McMahon,
in her official capacity as Secretary of Education,

      Defendants.

Civil Action No. 1:25-cv-00802-RBW

---

**STATEMENT OF POINTS AND AUTHORITIES**
**IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION**

---

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 1

II.  BACKGROUND ............................................................................................... 3

   A.  Congress requires the defendants to create and provide borrowers access to income-driven repayment plans. ............................................................................................ 3

   B.  Congress creates the Public Service Loan Forgiveness Program. ...................................... 5

   C.  The Biden Administration attempts to revise the income-contingent repayment plans and litigation ensues. ................................................................................................ 7

   D.  The Trump Administration shuts down access to all income-driven repayment plans, orders closure of the Department of Education, and declares that the Small Business Administration will handle student loans. ........................................................................ 9

   E.  The Department Continues to Withhold IDR and PSLF Debt Cancellation ................... 13

   F.  The Department's decisions harm borrowers, including AFT, its members, and named plaintiffs ........................................................................................................... 15

III.  DISCUSSION ................................................................................................ 23

   A.  The plaintiffs have Article III standing. ............................................................ 23

   B.  Immediate injunctive relief is appropriate. ....................................................... 24

      a.  The plaintiffs are likely to succeed on their claims because the defendants are failing to meet their statutory and contractual obligations. .................................................. 25

         1.  Under the Administrative Procedure Act, this Court is likely to compel the Agency to meaningfully offer an income-driven repayment plan, including loan cancellation, under § 706(1). .......................................................................... 25

         2.  The defendants' action is also unlawful under § 706(2) because it is inconsistent with the statute, regulation, and contract, and is without a rational basis............. 28

         3.  The Eighth Circuit's decision is not a valid reason for halting all loan cancellation. ....................................................................................... 29

      b.  The defendants' misconduct is causing the named plaintiffs, AFT and its members irreparable harm. .......................................................................................... 30

      c.  The public interest and balance of equities warrant an injunction.............................. 32

IV.  CONCLUSION................................................................................................ 33

i

# TABLE OF AUTHORITIES

## Cases

*Action NC v. Strach*, 216 F. Supp. 3d 597 (M.D.N.C. 2016) .................................................... 30

*AFGE, AFL-CIO, Local 1929 v. Fed. Labor Rels. Auth.*, 961 F.3d 452 (D.C. Cir. 2020) ............ 29

*Anglers Conservation Network v. Pritzker*, 809 F.3d 664 (D.C. Cir. 2016) ................................ 26

*Bennett v. Spear*, 520 U.S. 154 (1997) ...................................................................................... 28

*Biden v. Nebraska*, 600 U.S. 477 (2023) ................................................................................ 2, 29

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020) .................................................................. 32

*Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018) ...................................... 31

*Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11 (D.D.C. 2017) ................................. 26

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ....................... 24

*City of Atlanta v. Metro. Atlanta Rapid. Auth.*, 636 F.2d 1084 (5th Cir. 1981) .......................... 33

*Dep't of Commerce v. New York*, 588 U.S. 752 (2019) ............................................................... 30

*Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905 (D.C. Cir. 2015) ........................................ 24

*Golden v. Kelsey-Hayes Co.*, 73 F.3d 648 (6th Cir. 1996) ......................................................... 31

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ............................................. 24

*Ind. State Conf. of the NAACP v. Lawson*, 326 F. Supp. 3d 646 (S.D. Ind. 2018) ...................... 30

*League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ............................................... 30

*Lopez v. Davis*, 531 U.S. 230 (2001) ........................................................................................ 26

*Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343 (6th Cir. 2024) .................................... 7

*Missouri v. Biden*, 738 F. Supp. 3d 1113 (E.D. Mo. 2024) .......................................................... 8

*Missouri v. Trump*, 128 F.4th 979 (8th Cir. 2025) ...................................................... 8, 9, 31, 32

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .. 29

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239 (LLA), 2025 WL 597959

(D.D.C. Feb. 25, 2025) .................................................................................................. 25, 28

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239 (LLA), 2025 WL 368852

(D.D.C. Feb. 3, 2025) ........................................................................................................... 28

*Natural Res. Def. Council, Inc. v. Moorton*, 337 F. Supp. 167 (D.D.C. 1971) ...................... 33

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ......................................................... 26

*Open Cmtys. Alliance v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) .............................. 32, 33

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500 (D.C. Cir. 2016) ............. 32

*Simms v. District of Columbia*, 872 F. Supp. 2d 90 (D.D.C. 2012) ....................................... 33

*Tanner-Brown v. Haaland*, 105 F.4th 437 (D.C. Cir. 2024) .................................................. 24

*United Steelworkers of Am., AFL-CIO v. Textron, Inc.*, 836 F.2d 6 (1st Cir. 1987) ................ 31

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669 (D.C. Cir. 1985) ........................ 30

**Rules & Statutes**

5 U.S.C. § 706, *et seq.* ......................................................................................... 25, 26, 27, 28

20 U.S.C. § 1221-1 ..................................................................................................................... 2

20 U.S.C. § 1087a ........................................................................................................ 2, 4, 6, 26

20 U.S.C. § 1098e .................................................................................................... 3, 4, 5, 26, 27

20 U.S.C. § 1082, *et seq.* ............................................................................................................ 5

26 U.S.C. § 108(e)(1) ........................................................................................................... 5, 16

34 C.F.R. § 685, *et seq.* ........................................................................................... 3, 4, 8, 13, 26

Pub. L. 119-21, 139 Stat. 72, 348 (July 4, 2025) ...................................................................... 3

88 Fed. Reg. 43820 .......................................................................................................... 3, 7, 27

89 Fed. Reg. 90221 (Nov. 15, 2024) ..................................................................................... 9, 10

90 Fed. Reg. 3695 ............................................................................................ 4, 10, 27

Fed. R. Civ. P. 65 .................................................................................................... 33

**Other Authority**

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 112 (2012)

............................................................................................................................ 26

*A Snapshot of Federal Student Loans*, Cong. Res. Servs. (last updated Feb. 19, 2025) ................ 2

Michael C. Bender & Dana Goldstein, *Education Department Fires 1,300 Workers, Gutting Its*

*Staff*, N.Y. Times (Mar. 11, 2025) ........................................................................ 23

Tara Siegel Bernard, *Student Loan Borrowers Blocked From Affordable Repayment Plans*, N.Y.

Times (Feb. 28, 2025 ............................................................................................ 10

Jessica Blake, *Applications for Some Student Loan Repayment Plans Frozen*, Inside higher Ed

(Feb. 26, 2025) .................................................................................................... 10

Rebecca Carballo, *460K student loan borrowers to be denied repayment plan*, Politico, July 18,

2025 .................................................................................................................... 11

Katherine Knott, *Student Loan Watchdog on the Chopping* Block, Inside Higher Ed (Feb. 18,

2025) .................................................................................................................. 23

Adam S. Minsky, *Trump Administration Suspends 4 Student Loan Payment Plans—Here's What*

*Borrowers Should Know*, Forbes (Mar. 3, 2025) ...................................................... 10

## I.    INTRODUCTION

The American Federation of Teachers ("AFT") filed this case when the Department of Education and Secretary of Education ("the defendants" or "the Department") unlawfully shut down all access to all income-driven repayment (or "IDR") plans for student loan borrowers seeking to enroll. Shortly after the AFT filed a motion for a temporary restraining order and/or preliminary injunction, the defendants restored access to the applications. But by the time applications were restored, there was already a backlog of over one million income driven repayment applications pending. There was also a backlog of tens of thousands of applications for a "buyback" under the Public Service Loan Forgiveness program, thereby denying eligible public service workers statutorily required loan forgiveness. Since then, there have been massive layoffs at the Department of Education, and unsurprisingly, the pace of processing applications has been terribly slow, functionally depriving borrowers of access to these Congressionally mandated programs.

Further, the defendants have unlawfully put a pause on all loan cancellation programs through the IDR plans, thus depriving borrowers who have made all the required repayment of their rights to have their loans cancelled. This unwarranted and unlawful withholding of borrowers' rights has real and significant consequences if not immediately rectified. On January 1, 2026, loan cancellation under the IDR program will be counted as taxable income to borrowers, whereas if loans are cancelled this year, the cancellation will not count has taxable income. It is common for loan balances subject to cancellation to far exceed $100,000. And even for the Public Service Loan Forgiveness program (where taxation is not an issue), borrowers who are entitled to forgiveness now continue to have to put their lives on hold while they wait indefinitely for their loans to be forgiven.

Congress designed the federal student loan system to "increase educational opportunities" and to help students access the "benefits of postsecondary education," "without financial barriers." *Biden v. Nebraska*, 600 U.S. 477, 483–84 (2023); 20 U.S.C. § 1221-1. As part of this effort, it created, in 1994, a federal Direct Loan program that provided the defendants with authority to lend money directly to students. *See* 20 U.S.C. §§ 1087a, *et seq.* The result: the federal government today is the largest creditor of student loans, with approximately 43 million borrowers and $1.6 trillion in outstanding debt.[1]

Plaintiff AFT, along with many of its 1.8 million members, the individual plaintiffs, and the putative class members for the classes set forth in the plaintiffs' contemporaneously filed motion for class certification, are harmed by the government's withholding of their statutory loan rights. The individual plaintiffs, AFT members, and putative class members—who work critical jobs in education, healthcare, and in federal, state, and local government roles—are burdened with high levels of student debt but are being deprived of their rights to enter into income-driven repayment plans and/or having their debts timely cancelled or forgiven.

Ultimately, the defendants are ignoring their legal obligations at the expense of working-class Americans. The individual plaintiffs seek preliminary injunctive relief for themselves and for all similarly situated borrowers, as set forth in the motion for class certification, to ensure they are not harmed while the defendants deprive them of their statutory rights. AFT additionally seeks the same relief for its members, and also seeks processing for its members of PSLF buyback applications.[2]

---

[1] *A Snapshot of Federal Student Loans*, Cong. Res. Servs. (last updated Feb. 19, 2025), *available at* https://www.congress.gov/crs-product/IF10158.

[2] The day after the First Amended Complaint was filed in this case, the defendants processed Plaintiffs Wegner and Dubreuil's PSLF buyback applications. The the plaintiffs will seek classwide relief related to PSLF buybacks once another appropriate class representative has been found. For now, the plaintiffs seek preliminary injunctive relief related to PSLF buybacks for AFT's members.

## II.    BACKGROUND

### A.  Congress requires the defendants to create and provide borrowers access to income-driven repayment plans.

As part of the federal student loan program, Congress enacted two separate but related provisions requiring the Secretary of Education to offer repayment options that tie a borrower's monthly payment to their income. Each payment plan has different characteristics that vary meaningfully with respect to the calculation of monthly payments, the length of the repayment term (and if/when the loans are forgiven after a certain amount of time in repayment), and the amount of discretionary income that factors into the equation. The plans created by these statutes are broadly referred to as income-driven repayment plans or IDR.

First, since 2007, Congress has required the Secretary to offer to federal student loan borrowers "Income-Based Repayment" options. 20 U.S.C. § 1098e. Congress directed: the "Secretary shall carry out a program under which [] a borrower . . . who has a partial financial hardship . . . may elect," during any period the borrower has the partial financial hardship, "to have the borrower's aggregate monthly payment for all such loans not exceed" a payment formula set by statute. 20 U.S.C. § 1098e(b). The One Big Beautiful Bill Act upon enactment ended any requirement that borrowers have to demonstrate a partial financial hardship to access Income Based Repayment. Pub. L. 119-21, 139 Stat. 72, 348, 356 (July 4, 2025). The Department has acknowledged that it has a mandatory duty to offer an Income-Based Repayment plan to borrowers. 88 Fed. Reg. 43,820, 43,837 (Department "do[es] not believe that sunsetting the IBR plan is permitted by section 493C(b) of the [Higher Education Act] which authorized the IBR plan.").

Using this statute, the Department of Education created a plan called the Income-Based Repayment Plan (IBR). 34 C.F.R. § 685.209(a). To ensure that borrowers would not remain

indebted forever, Congress provided that the Secretary must cancel a borrower's outstanding principal and interest due if they have ever elected to participate in Income-Based Repayment and once they have made qualifying payments for a period not to exceed 25 years. *See* 20 U.S.C. § 1098e(b)(7).

Separately, Congress, since 1994, has also required the Secretary of the Department of Education to offer at least one Income-Contingent Repayment plan ("ICR") pursuant to an Income Contingent Repayment provision authority. The ICR provision mandates that "the Secretary shall offer a borrower of a loan . . . an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower." 20 U.S.C. § 1087e(d)(1)(D). Using this statute, the Secretary created three plans: the Income-Contingent Repayment Plan (ICR Plan), the Pay As You Earn Plan (PAYE Plan), and the Revised Pay As Your Earn Plan (REPAYE Plan, later, as described below, renamed the Saving on a Valuable Education or SAVE Plan). 34 C.F.R. § 685.209(a). The Department has also acknowledged its mandatory obligation to offer ICR to direct loan borrowers. *See* 90 Fed. Reg. 3695 (Jan. 15, 2025) (explaining that certain changes were being made to meet the "Department's statutory obligation under the [Higher Education Act] to offer borrowers an income-contingent repayment plan."). Like the Income-Based Repayment statute, the Income-Contingent Repayment statute provides that the payment term for borrowers in an income-contingent repayment plan shall not exceed 25 years. 20 U.S.C. § 1087e(d)(1)(D). Therefore, as with the IBR plan, the Secretary cancels a borrower's remaining loan balance under the ICR, PAYE, and REPAYE/SAVE plans once the borrower has satisfied the applicable time requirement. *See* 34 C.F.R. § 685.209(k).

In addition to these statutory and regulatory provisions, Congress instructed the Secretary of the Department of Education to ground borrowers' obligations and rights in contract. *See* 20

U.S.C. § 1082(m)(1)(D). The Department of Education, in turn, developed a Master Promissory Note that expressly provides that student loan borrowers may apply to repay their loans under one of these different income-driven repayment plans. Indeed, the contract includes an entire section describing the different plans, and states that "[u]nder an income-driven repayment plan, your required monthly payment amount is based on your income and family size, instead of being based on your loan debt, interest rate, and repayment period, as under a traditional repayment plan."[3]

When a borrower satisfies the statutory repayment obligations under an IDR plan, Congress provided that their loans should be automatically cancelled, with no further action by the borrower. *See* 20 U.S.C. § 1098(e)(b)(7).

Prior to March 2021, when borrowers satisfied the statutory requirements for loan cancellation under one of the IDR plans, namely enrollment in an IDR plan for 20 or 25 years, the cancelled amount was typically treated as taxable income. *See* 26 U.S.C. § 108(e)(1). However, in March 2021, through the American Rescue Plan Act of 2021, Congress provided that no federal student loan cancellation shall be a taxable event for federal income tax purposes for discharges occurring after December 31, 2020, and before January 1, 2026. 26 U.S.C. § 108(f)(5). Borrowers who satisfy the requirements for loan cancellation through the end of 2025 are entitled by statute to this tax treatment, the consequences of which are extremely significant for individuals.

### B. Congress creates the Public Service Loan Forgiveness Program.

In addition to providing borrowers with access to income-driven repayment plans, Congress required the Secretary to discharge a borrower's student debt in certain other circumstances. Most notably, federal law provides loan cancellation for public service workers

---

[3] Master Promissory Note (MPN), at 10 (*available at* https://studentaid.gov/sites/default/files/Sub_Unsub_MPN_508-en-us.pdf, attached hereto as Exhibit 1.

who have worked for ten years in eligible public service jobs while making eligible payments on their loans. *See* 20 U.S.C. § 1087e(m)(1).

The statute states that the Secretary of Education "shall cancel the balance of interest and principal due . . . on any eligible Federal Direct Loan" for a borrower who "has made 120" "monthly payments on the eligible Federal Direct Loan after October 1, 2007" and "has been employed in a public service job during the period in which the borrower ma[de] each of the 120 payments." 20 U.S.C. § 1087e(m)(1)(A) & (B).

To be eligible for Public Service Loan Forgiveness, a borrower must be enrolled in a standard repayment plan (in which case the borrower pays the entire debt off over a period of ten years), or one of the income-driven repayment plans. Because a Public Service Loan Forgiveness borrower would never benefit from Public Service Loan Forgiveness if they were in the ten-year standard repayment plan (since they would pay off the entirety of the loan over the ten-year period), and public service salaries are generally lower than private sector counterparts, Public Service Loan Forgiveness borrowers typically enroll in one of the income-driven repayment plans. Notably, the ten-year standard plan is not available to borrowers who consolidated their loans— i.e., taking out a new federal student loan to refinance and combine one or several existing federal student loans—and for these borrowers, income-driven repayment plans are the only eligible repayment plans.

The Secretary has issued implementing regulations for the Public Service Loan Forgiveness statute that further requires the Secretary to provide loan discharges to borrowers who have satisfied the eligibility criteria. Just as with income-driven repayment plans, the borrowers' initial MPN informs them of their Public Service Repayment Plan rights: "Under this program, we will forgive the remaining balance due on your Direct Loans after you have made 120 payments

(after October 1, 2007) on those loans under certain repayment plans while you are employed full-time by a qualifying employer."[4]

###    C.    The Biden Administration attempts to revise the income-contingent repayment plans and litigation ensues.

Income-driven repayment plans, and Public Service Loan Forgiveness have served as critical lifelines to student loan borrowers. The income-driven repayment plans ensure that borrowers can repay their loans in amounts they can afford and thus avoid the negative and punitive impacts of a default (such as wage garnishment, tax offset, and negative credit reporting). Similarly, Public Service Loan Forgiveness allows borrowers to serve their communities without fear of being unable to pay back their student loan debt. But these programs have not been without their flaws, and so the prior Administration took steps to reform both programs. *See Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343, 347–49 (6th Cir. 2024) (discussing history with these programs).

Relevant here, on July 10, 2023, the Department of Education issued a final rule to improve its income-contingent repayment program—specifically the REPAYE plan. *See* Improving Income Driven Repayment for the William D. Ford Fed. Direct Loan Program and the Fed. Family Ed. Loan (FFEL) Program, 88 Fed. Reg. 43820 (July 10, 2023). In the Rule, the Department renamed the REPAYE plan to the "SAVE" plan, and made a number of changes to the program to make it the best option for the bulk of student loan borrowers. These changes included lowering a borrower's monthly payment amount to account for the skyrocketing costs of education and shortening, for some borrowers, the period of time that borrowers would remain in the plan before their loans were forgiven was shortened. The Department also wanted to simplify borrowers' options, and so it sunsetted enrollment in the other two income-contingent repayment plans (the

---

[4] *Id*. at 13.

ICR plan and PAYE plan); as long as at least one income-contingent repayment plan was available, the Department remained compliant with the statute's mandate. It kept the IBR plan in place given the statutory requirement for at least one income-based repayment plan.

Certain provisions of the Rule were designated for early implementation and went into effect in 2023. *See* 34 C.F.R. §§ 682, 685. As a result, millions of student loan borrowers, including thousands of public service workers, enrolled in the SAVE plan in 2023 and the first half of 2024. But, as borrowers began receiving the benefits of this plan, in April 2024, a group of states sued the Department in the U.S. District Court for the Eastern District of Missouri. The lawsuit focused on SAVE; it did not challenge the other income-contingent repayment plans (the ICR plan and the PAYE plan), nor did it focus on the IBR plan.

The district court entered a preliminary injunction blocking the loan forgiveness aspect of the SAVE plan, and then the case went on appeal to the Eighth Circuit. *See Missouri v. Biden*, 738 F. Supp. 3d 1113, 1123 (E.D. Mo. 2024); *Missouri v. Trump*, 128 F.4th 979, 985 (8th Cir. 2025). On February 18, 2025, the Eighth Circuit found that the forgiveness provisions of the SAVE plan were likely invalid. 128 F.4th at 991–96. Because, in the Eighth Circuit's view, the provisions were interconnected with the rest of the rule, the court expanded the injunction to all aspects of the SAVE plan. *Id.* at 997–98. The Eighth Circuit also opined on the forgiveness provisions of the pre-2023 version of the SAVE plan, the REPAYE plan, concluding that the forgiveness provisions of the REPAYE plan were likely invalid. *Id.*

The Eighth Circuit decision did not speak to the other income-contingent repayment plans (the ICR and PAYE plans), the income-based repayment statute and IBR plan, or Public Service Loan Forgiveness, nor did it preclude the defendants from utilizing them in the future. In fact, it used the existence of forgiveness through Public Service Loan Forgiveness and the IBR statute to

reach its decision, saying "if Congress had given [the forgiveness] power through ICR, creating IBR and requiring low-income borrowers to make payments for twenty or twenty-five years to obtain forgiveness [through that plan] would have been unnecessary. The separate program for loan forgiveness in ten years for public service employees would similarly be superfluous." *Id.* at 995.

On April 14, 2025, the U.S. District Court for the Eastern District of Missouri modified its preliminary injunction to conform with the Eighth Circuit's February order, and did not enjoin or touch on the IBR statute, the PSLF, or the ICR and PAYE plans. *Missouri v. Biden*, No. 4:24-cv-520-JAR (E.D. Mo. Apr. 14, 2025). As a result of the litigation and injunctions, since approximately July 2024, borrowers enrolled in the SAVE plan have been involuntarily placed in a special forbearance.

### D. The Trump Administration shuts down access to all income-driven repayment plans, orders closure of the Department of Education, and declares that the Small Business Administration will handle student loans.

As the litigation regarding the SAVE plan moved forward in 2024, the Biden Administration took steps to fulfill its legal obligation to provide borrowers with access to income-driven repayment plans.[5] From July to October 2024, the Department ensured borrowers could apply for the IBR plan using a paper or PDF application form, and on October 2, 2024, the Department of Education re-opened its online application to apply to the IBR plan. Then on November 15, 2024, the Department of Education issued an Interim Final Rule to ensure that it complied "with our statutory duty…to provide borrowers with an income contingent repayment plan option." Income Contingent Repayment Plan Option, 89 Fed. Reg. 90221, 901224 (Nov. 15,

---

[5] On July 19, 2024, the day after the Eighth Circuit granted an emergency stay, the Department placed all borrowers who had been making payments in the SAVE plan into a forbearance. The Department does not count months during this forbearance as months of eligible payment for PSLF purposes.

2024). Under this Rule, the Department reversed its sunsetting of the ICR and PAYE plans, allowing borrowers to enroll in these plans until July 1, 2027, thereby ensuring that borrowers had access to a plan under the income-contingent repayment statute. *Id.* The Rule became final on January 15, 2025. *See* Income-Contingent Repayment Plan Options, 90 Fed. Reg. 3695 (Jan. 15, 2025).

On February 26, 2025, the defendants, however, issued a Stop Work Order, directing all loan servicers to stop accepting and processing income-driven repayment applications.[6] The Stop Work Order shuts down all income-driven repayment options for at least three months, but did not specify when, if ever, they would be reinstated. The defendants' action applies to all online and paper applications. This effectively prevented hundreds of thousands of borrowers from switching out of the SAVE litigation forbearance into an IDR plan on which they could continue to accrue qualifying payment toward cancellation through either IDR or PSLF.

On March 18, 2025, AFT initiated this action against the Department to restore access to IDR for millions of borrowers and filed a motion for preliminary relief on March 24, 2025. The Department announced that it would restore the IDR application by March 26, 2025, and that it would begin processing applications by May 10, 2025.

Pursuant to a status conference held April 17, 2025, the Court ordered that the Department shall file a minimum of three monthly status reports, commencing May 15, 2025, in which it would provide the total outstanding number of pending IDR applications as of the end of the prior

---

[6] Tara Siegel Bernard, *Student Loan Borrowers Blocked From Affordable Repayment Plans*, N.Y. Times (Feb. 28, 2025) (last updated Mar. 3, 2025); Jessica Blake, *Applications for Some Student Loan Repayment Plans Frozen*, Inside higher Ed (Feb. 26, 2025); Adam S. Minsky, *Trump Administration Suspends 4 Student Loan Payment Plans—Here's What Borrowers Should Know*, Forbes (Mar. 3, 2025). https://www.insidehighered.com/news/government/politics-elections/2025/02/26/trump-admin-pauses-all-income-driven-repayment-plans; https://www.forbes.com/sites/adamminsky/2025/03/03/trump-administration-suspends-4-student-loan-payment-plans---heres-what-borrowers-should-know/.

calendar month, as well as the number of IDR applications processed during the prior calendar month. (ECF No. 34.)

The Department's status reports revealed that between April and July, the backlog of pending IDR applications dropped by only 263,468, from 1,649,874 to 1,386,406.[7] (ECF Nos. 36-39.) The data show an average net decrease each month of only 87,823 applications, and do not show a breakdown of approved or denied applications.

On or around July 18, 2025, it was reported that the Department would summarily deny pending IDR applications from borrowers who requested to be placed in the plan that would result in the lowest monthly payment.[8] The approved form in use prior to March 26, 2025, not just allowed, but recommended that borrowers select the option that would result in the lowest monthly payment. The terms and conditions articulated the way that the Department would place eligible borrowers in a plan, should multiple repayment plans provide the same payment amount.[9] According to reports, an estimated 460,000 borrowers will have their application rejected and will have to apply for IDR again and select a specific plan. Although this will likely result in a significant decrease in the number of pending IDR applications, it does not reflect the true processing rate demonstrated by the monthly status reports. Indeed, the status report that the Department filed for the month of August showed that 305,641 IDR applications were processed

---

[7] The Department's first monthly report in May 2025, which reflected the number of applications processed and pending for the month of April, stated that there were 1,985,726 applications pending. (ECF No. 36.) In the subsequent report, filed in June, the Department clarified that its previous report had overstated the number of pending applications by 335,852. (ECF No. 37.) It explained that this was "due to an error by one of the Department of Education's student-loan servicers in reporting data to the Department of Education." *Id.* The Department did not explain further what caused the error or provide whether precautions were taken by the Department or its student loan servicers to ensure no additional mistakes would be made.

[8] Rebecca Carballo, *460K student loan borrowers to be denied repayment plan*, Politico, July 18, 2025.

[9] In relevant part, the form stated: "If more than one of the plans that I selected provides the same initial payment amount, or if my loan holder is determining which of the income-driven plans I qualify for, that my loan holder use the following order in choosing my plan: SAVE (if my repayment period is 20 years), PAYE, SAVE (if my repayment period is 25 years), IBR, and then ICR."

and that 1,076,266 applications are pending. (ECF No. 42.) The Department did not specify how many of the 305,641 processed applications were blanket denials because the borrower requested the lowest monthly payment.

When a borrower applies for IDR, their loans are placed in an initial administrative processing forbearance for up to 60 days. During this time, their loans continue to accrue interest and the months count toward PSLF, even though no payment is due, although these months do not count toward the timeframe required for loan cancellation through IDR. After this initial 60-day administrative processing forbearance, however, borrowers whose IDR applications are still pending are placed in the special SAVE litigation forbearance. Months that pass while borrowers are in a SAVE litigation forbearance also do not count toward cancellation under either PSLF or IDR.

When the Department first announced the SAVE litigation forbearance, it explained that loans in the forbearance would not accrue interest, in recognition of the fact that borrowers' loans were placed into the forbearance due to no fault of their own. In January 2025, the Department told borrowers, "You will be in this forbearance until servicers are able to accurately calculate monthly payments, which FSA expects servicers to be able to do no earlier than September 2025."[10] On July 9, 2025, however, the Department announced that it was changing this policy, and began to charge interest on these loans beginning August 1, 2025. In its press release announcing this change, the Department wrongly stated that it was required to charge interest for these borrowers because of the Eighth Circuit's order in February, and that the Department lacked

---

[10] Email dated Jan. 16, 2025, from U.S. Department of Education to borrowers, "Update on the Saving on a Valuable Education Plan," available at https://perma.cc/FS7M-EJG4.

the authority to waive interest for these borrowers.[11] This policy change makes the Department's slow processing rate even more harmful for borrowers with pending applications.

During this lengthy processing time, borrowers are deprived of their rights to be enrolled in an IDR plan. Even if a borrower is ultimately deemed ineligible for the plan for which they applied, the months waiting for a determination is lost time during which they could have enrolled in a plan for which they are eligible and made meaningful progress toward repaying their loan. The time spent waiting for their applications to be processed harms borrowers, both because this time does not count toward certain statutory loan cancellation programs, and in that it allows interest to accrue at a time when borrowers have no monthly payment, increasing their overall debt and keeping them in debt longer.

### E.  The Department Continues to Withhold IDR and PSLF Debt Cancellation

In addition to depriving borrowers of their right to affordable payment options under IDR by delaying the processing of their applications, the Department is withholding loan cancellation from borrowers who qualify to have their loans cancelled under the Higher Education Act.

The IDR plans all provide for debt cancellation after a prescribed period of time, ranging from 20 to 25 years, or 240 to 300 monthly payments. Both the enjoined and the prior regulations stated that the Department would process debt cancellation automatically.[12]

---

[11] Press Release, *U.S. Department of Education Continues to Improve Federal Student Loan Repayment Options, Addresses Illegal Biden Administration Actions*, U.S. Dep't of Educ. (July 9, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-continues-improve-federal-student-loan-repayment-options-addresses-illegal-biden-administration-actions.

[12] The IBR regulations in effect immediately prior to the finalization of the now-enjoined rules further elaborate that "[w]hen the Secretary determines that a borrower has satisfied the loan forgiveness requirements under paragraph (f) of this section on an eligible loan, the Secretary cancels the outstanding balance and accrued interest on that loan. No later than six months prior to the anticipated date that the borrower will meet the forgiveness requirements, the Secretary sends the borrower a written notice that includes . . . An explanation that the borrower is approaching the date that he or she is expected to meet the requirements to receive loan forgiveness." 34 C.F.R. 685.221(f)(5)(i) (as it was in effect on June 30, 2024). The enjoined regulations state, "The Secretary tracks a borrower's progress toward eligibility for forgiveness under paragraph (k) of this section and forgives loans that meet the criteria under paragraph (k) of this section without the need for an application or documentation from the borrower." 34 C.F.R. 685.209(l)(11).

Although a preliminary injunction in the SAVE litigation prohibits the Department from providing IDR cancellation pursuant to the SAVE plan, nothing is preventing the Department from cancelling eligible borrowers' debts through the IBR, ICR, or PAYE plans. Despite this, as of September 2025, on its website in response to the question, "Is ED processing IDR forgiveness?" the Department's response is that, "Forgiveness as a feature of the SAVE, PAYE, and ICR plans is currently paused, because those plans were not created by Congress."[13]

This is false. Although there is pending litigation related to the SAVE plan, there is no lawsuit or court order addressing debt cancellation under PAYE or ICR, nor has the Department amended its regulations, which are still in force and are not affected by the states' litigation in Missouri, and which provide for debt cancellation under both plans.

The Department's answer on its website continues by acknowledging that it "can and will still process loan forgiveness for the IBR Plan," but that ". . . [c]urrently, IBR forgiveness is paused[.]"[14]  The Department is therefore refusing to provide lawful debt cancellation under the PAYE and ICR plans, and is withholding debt cancellation under IBR, which it concedes is required by law.

The Department is similarly withholding loan cancellation for borrowers who have accrued at least 120 qualifying payments under the PSLF program necessary for loan cancellation, or who have pending Buyback applications that, once reviewed and granted, would result in at least 120 qualifying payments. This is particularly harmful for borrowers who have been stuck in the SAVE litigation forbearance and seek to recuperate that time to count for PSLF using the PSLF Buyback program. Pursuant to the same court order requiring the Department to provide monthly status

---

[13] *IDR Plan Court Actions: Impact on Borrowers*, U.S. Dep't of Educ., https://studentaid.gov/announcements-events/idr-court-actions (listed visited Sept. 15, 2025).

[14] *Id.*

updates about its processing of the IDR application backlog, the Department has provided monthly status updates about the processing of the PSLF Buyback application backlog. For each month of reporting, the Department received more Buyback applications than it processed. (*See* ECF Nos. 36-39.) As of August 31, 2025, there are 74,510 pending Buyback applications. (ECF No. 42.) From May through August, the Department received an average of 9,902 new applications, but only processed an average of 3,604. (*See* ECF Nos. 36-39, 42.) For each month during which it reported, the Department saw a net increase in the number of pending Buyback applications, and so is clearly not making meaningful progress on processing these borrowers' applications. Eligible borrowers with pending Buyback applications are prevented from benefiting from PSLF until the Department processes their application,

### F. The Department's decisions harm borrowers, including AFT, its members, and named plaintiffs

The Department's decision to withhold IDR and PSLF benefits is actively harming borrowers. Although the Department has reopened the IDR application and commenced processing applications, over 1 million applications are still pending, and over 300,000 may have been improperly denied. This includes applications from thousands of eligible public service workers who are stuck in either the SAVE forbearance or in plans that are not PSLF-eligible. Until they are enrolled in an IDR plan or, for those who are eligible, have had their loans cancelled under IDR, borrowers are being deprived of their rights under Congress's IDR provisions. Similarly, the Department is failing to process eligible borrowers' PSLF cancellations or has left borrowers with pending buyback applications in limbo, as that backlog grows month to month.

Because of the Department's actions, thousands of eligible public service workers are being denied progress towards the student loan forgiveness to which they are statutorily entitled. For

borrowers who have satisfied statutory requirements to have their loans cancelled, through either IDR or PSLF, the Department is harming those borrowers by withholding that cancellation.

These harms—withholding of affordable payment options that count toward loan cancellation and the withholding of cancellation for loans that have met all statutory requirements to be cancelled—are exacerbated by two upcoming deadlines.

First, beginning January 1, 2026, the provision of federal tax code that provides student loan cancellation shall not be considered a taxable event for federal income tax purposes will expire. *See* 26 U.S.C. § 108(f)(5). Although some student loan cancellation programs are specifically exempt from federal income taxes, such as PSLF, *see* 26 U.S.C. § 108(f)(1), IDR cancellation is not one of them. Therefore, any borrower who is currently eligible to have their loans cancelled under an IDR plan, such as the IBR plan, but whose cancellation is being withheld by the Department, risks this cancellation being taxed as federal income if the cancellation is not processed before January 1, 2026.

Second, the resumption of interest accrual for borrowers whose loans are in the special SAVE litigation forbearance results in SAVE-enrolled borrowers being charged interest that they otherwise would not be charged if the SAVE provisions were not preliminarily enjoined. For borrowers seeking to enroll in another available IDR plan and whose loans are in the SAVE litigation forbearance while their IDR application is pending, the Department's inaction to enroll borrowers in another plan exacerbates this harm because it keeps borrowers in the interest-bearing forbearance rather than placing them in a plan through which they could make monthly payments. Although borrowers could make voluntary payments to cover interest, such payments would not count as a qualifying payment for IDR or PSLF purposes and would ultimately increase the total amount they will pay over the life of their loans. Finally, for borrowers who have satisfied the

requirements to have their loans cancelled under the IDR statute but from whom the Department is illegally withholding loan cancellation, accruing interest will increase their account balance and will increase their tax liability if their loan cancellation is not processed before the January 1, 2026 tax deadline.

These harms to AFT, its members, and to named plaintiffs, are significant.

Plaintiff Naugle has dutifully paid her loans for over 25 years, but the Department is depriving her of her statutory right to have her loans cancelled through IBR. When she finished her education, she accepted a position working at a university making $17,000 a year. Naugle Decl. ¶ 12. Her student loan payments at the time would have been $1,270 a month. *Id.* To manage her plans, she enrolled in an IDR plan, and understood that in exchange for committing a percentage of her income toward her loan payments for the next 25 years, the government agreed to cancel the remainder of her loans after that time. *Id.* at ¶ 13. She did not feel that she was "manipulat[ing] the system," but rather that she was using a program that Congress created for borrowers. *Id.* After years in the IBR plan, Plaintiff Naugle switched to the SAVE plan because it offered more affordable monthly payments but switched back to the IBR plan in order to continue making payments toward cancellation through IDR, although the IBR plan payments were more expensive. *Id.* at ¶ 7. According to the Department's own records, she reached 300 qualifying payments in May 2025, but the Department has refused to cancel her loans through IBR. *Id.* at ¶¶ 8-10. As a result, she has continued to make monthly payments of over $700, for fear of becoming delinquent or entering default on her loans. *Id.* at ¶¶ 10, 17. Plaintiff Naugle's loans have long been a source of financial and emotional stress. She has worked additional jobs in order to increase her income, which at times has fallen below the poverty line. *Id.* at ¶ 14. She has had her student loans in mind during every financial decision she has made for the past 25 years, and the anxiety

her debt causes her has resulted in many sleepless nights. *Id.* She feels as though she has upheld her end of the bargain, but that the government has routinely changed the rules on her. *Id.* at ¶ 15. If her loans are not cancelled before January 1, 2026, when her loans are eventually cancelled, she will face federal income tax liability on her discharged loan amount that she would not have to pay if her loans had been promptly cancelled. *Id.* at ¶ 16. Her loan balance is currently approaching $200,000, *id.* at ¶ 5, and now that she has reached the threshold for cancellation through IDR, she feels like she "has been swimming upstream for the past 25 years only to be thrown a bowling ball rather than a life preserver when [she] finally approached the shore." *Id.* at ¶ 16. She must continue to make payments until her loans are cancelled, or risk becoming delinquent or entering default. *Id.* at ¶ 17.

Plaintiff Whitley, an AFT member and a retiree, borrowed approximately $110,000 in federal student loans, which has ballooned to over $750,000. Whitley Decl. ¶¶ 1, 4-5. According to a message that he received from Federal Student Aid in February 2025, Plaintiff Whitley had 310 qualifying payments toward cancellation under IBR. *Id.* at ¶ 8. He has accrued additional time since then, putting him well beyond the 300 qualifying payments necessary to have his loans cancelled through the IBR plan. *Id.* at ¶ 9. Because the Department has refused to process his cancellation, he has had to continue to make monthly payments of approximately $105 to avoid becoming delinquent or entering default. *Id.* If his loans are not cancelled before January 1, 2026, when his loans are eventually cancelled, he will face federal income tax liability on his discharged loan amount that he would not have to pay if his loans had been promptly cancelled. Plaintiff Whitley has endured significant emotional stress as a result of his loans and the government's failure to cancel them. The uncertainty about whether his loans will ever be cancelled and the lack of communication from the government has caused him "incredible" stress, *id.* at ¶ 12, which has

caused him to seek the support of a therapist. *Id.* at ¶ 11. The fact that the vast majority of his outstanding balance is from compounded interest adds to this stress. *Id.* at ¶ 13. Until his loans are cancelled, Plaintiff Whitley will continue to experience this stress and will continue to pay on a loan that should no longer exist. *Id.* at ¶ 14.

Plaintiff Sandy Cashman, an AFT member, is a retired government worker who has over $115,000 in federal student loan debt. Cashman Decl. ¶¶ 1, 4-5. She has persistently made payments on her loans for decades, *id.* at ¶ 6. In February 2025, she checked the Federal Student Aid's online payment calculator tool, which indicated that she had 241 of the 240 necessary qualifying payments for loan cancellation under the IBR plan. *Id.* at ¶ 9. In March 2025, she checked the online payment calculator tool again, and again it indicated that she had 241 qualifying payments. *Id.* at ¶ 10. In July 2025, Federal Student Aid also informed her that she was eligible to have her loans cancelled through IDR. *Id.* at ¶ 8. The Department still has not cancelled her loans, forcing her to continue making monthly payments of $687. *Id.* at ¶ 11. These are unaffordable payments for Plaintiff Cashman, but she has continued to pay because of the severe consequences of becoming delinquent or entering default, *id.* at ¶ 12, despite the payments posing a "significant financial burden with cascading negative effects." *Id*. at ¶ 13. Due to the Department's failure to cancel her debts as required by federal law, Plaintiff Cashman has at times had to choose between paying her student loans and paying for her medical care. *Id*. She has also had to use some of her long-term household savings to cover these essential expenses. *Id.* She hoped to increase her household savings and also to make some necessary repairs on her home for her husband and her, but because of these monthly student loan payments she has had to "raid" their savings account and "hope nothing breaks." *Id.* If her loans are not cancelled before January 1, 2026, when her

loans are eventually cancelled, she will face federal income tax liability on her discharged loan amount that she would not have to pay if her loans had been promptly cancelled. *Id.* at ¶ 14.

Plaintiff Iverson, an AFT member, works in a medical testing lab and has approximately $250,000 in federal student loan debt. Iverson Decl. ¶¶ 1-5. For years she was paying $1,321 a month on her loans, before enrolling in the Saving on A Valuable Education ("SAVE") plan to lower her payments. *Id.* at ¶ 7. When the SAVE plan was blocked, Plaintiff Iverson instead enrolled in the Income-Contingent Repayment ("ICR") plan. *Id.* After being advised by Federal Student Aid to apply for the IBR plan because she already had 324 qualifying payments that, once enrolled in IBR, would qualify her for debt cancellation, in July 2025 she applied for the IBR plan. *Id.* at ¶¶ 8-11. Upon information and belief, she was advised to do this because, even though she is also eligible for cancellation under the ICR program plans, the Department had stopped cancelling loans under those plans. In August 2025, her application for IBR was denied on the grounds that she did not have a partial financial hardship, although that was not and is still not a requirement for IBR. *Id.* at ¶ 11. This left her enrolled in the ICR plan. Because of the Department's wrongful denial and refusal to cancel her loans under the ICR plan, Plaintiff Iverson will have to continue making payments on a loan that legally should no longer exist. *Id.* at ¶ 13. Plaintiff Iverson's student loans are a major source of financial and emotional stress. She feels the weight of her loans every day, and has not been able to save money for her future as a result of her loan payments. *Id.* at ¶ 14. Due to her loans, she feels "buried and stuck." *Id.* The process of trying to get her loan cancellation processed contributes to this stress; she was "devastated" to learn that she qualifies for cancellation but that her loans are "still hanging over [her] head." *Id.* If her loans are not cancelled before January 1, 2026, when her loans are eventually cancelled, she will face federal

income tax liability on her discharged loan amount that she would not have to pay if her loans had been promptly cancelled.

Patrice Holness, an AFT member, has approximately $109,000 in student loan debt. Holness Decl. ¶¶ 1, 5. She has been making payments on her loans while working as a social worker in a school for over 10 years. *Id.* at ¶ 6. Her standard monthly payments would have been approximately $1,500, so she has been enrolled in the Income-Based Repayment ("IBR") plan since around 2010 to lower her payments and qualify for PSLF. *Id.* at ¶ 7. Ms. Holness enrolled in the SAVE plan to further lower her payments, but then switched back to IBR because of the legal challenges against SAVE. *Id.* at ¶ 8. It was important to her that she continue accruing credit toward PSLF. She has been re-enrolled in IBR since around August 2025, with payments of approximately $600 per month. *Id.* According to a letter she received from the Department, as of September 7, 2025, she has 116 of the 120 qualifying payments she needs for her loans to be cancelled under PSLF. *Id.* at ¶ 9. In order to reclaim the final 4 months that she needs from the months in which she was in the SAVE plan litigation forbearance, she submitted buyback applications in or around January and March 2025. *Id.* at ¶ 10. Managing this debt has been extremely stressful, and maintaining these monthly payments in addition to her mortgage, car payments, insurance, and other living expenses has created ongoing financial and emotional strain. *Id.* at ¶ 11. Ms. Holness is dedicated to her career servicing communities and values the work deeply, but this has come with significant personal financial sacrifice. *Id.* Until her loans are cancelled through PSLF, she will continue to be saddled with this debt, its monthly payments, and the stress that they bring. *Id.* at ¶ 12.

Nicole Babcock, an AFT member, has approximately $46,000 in student loan debt. Babcock Decl. ¶¶ 1, 5. She works for the state as a Registered Nurse, is pursuing PSLF, and has

never been delinquent or in default. *Id.* at ¶¶ 4-6. She enrolled in the SAVE plan to lower her monthly payments, but has been stuck in the litigation forbearance for over a year, unable to make qualifying payments toward PSLF. *Id.* at ¶ 7. Ms. Babcock would have reached her 120th qualifying payment and become eligible to have her loans cancelled through PSLF in or around July 2025, if it were not for the SAVE plan litigation forbearance. *Id.* at ¶ 8. She submitted two PSLF buyback applications in June 2025 in an effort to obtain the final qualifying payments she needs for PSLF, but has not heard anything about the status of those applications. *Id.* at ¶ 9. Ms. Babcock entered public service and took on significant debt for her education relying on the promise of debt cancellation under PSLF. *Id.* at ¶ 11. The fact that her loans have not been cancelled creates uncertainty for her family. *Id.* at ¶ 12. Her husband and she both have student loan debt, and without having her loans cancelled, their payments will be greater than for their home mortgage. *Id.* at ¶¶ 12-13. She will continue to pay until her loans are cancelled, for fear of entering delinquency or default, and experiencing the harsh consequences that come with that. *Id.* at ¶ 14.

AFT itself has spent, and continues to spend, tens of thousands of dollars on debt clinics to educate members to better navigate their repayment options, and it has diverted more than two thousand hours of valuable staff time that would otherwise have been spent focused on issues like collective bargaining; retirement security; healthcare; student learning conditions; and educators', public employees' and health care workers' working conditions. Tammelleo Decl. ¶ 13. Since the Department shut down access to IDR plans, AFT staff have had to redraft clinic curriculum and have diverted significant additional staff time to answering member questions, including holding 11 student debt clinic webinars with approximately 420 registrants. *Id.* at ¶¶ 19-21. AFT staff have had to significantly update AFT's debt clinic curriculum twice since April 2025 to reflect the many

changes to the availability of IDR and PSLF. *Id.* The AFT is committed to expanding economic security programs for members and was developing a new financial literacy clinic curriculum to help members. *Id.* at ¶ 25. The program development has been delayed due to the actions of the Department and the new demand from members with student debt. *Id.* The AFT was preparing to end a multi-year contract with a tech company called Summer which provided direct services to members with student debt. Due to the uncertainty and lack of communication from the Department, the union has had to reallocate resources and extend the contract through June 2026. *Id.* at ¶ 26. AFT's mission requires it to provide its members with assistance and accurate information on student loan repayment and PSLF. Outside of its debt clinics, since April, it has had to provide individual assistance to approximately 30 members, including helping them navigate changes to the IDR and PSLF program and application processing—which is made all the more difficult by the defendants' misconduct, as well as the Trump Administration's firing of the Consumer Financial Protection Bureau's Student Loan Ombudsman[15] and the firing of nearly all of the staff at Federal Student Aid dedicated to resolving student loan borrower complaints.[16] This request for assistance related to IDR and PSLF since the Department has paused these programs puts significant strains on AFT staff, and takes times away from work they would otherwise accomplish related to other aspects of their mission, such as collecting bargaining and research. *Id.* at ¶ 24.

## III.    DISCUSSION

### A.  The plaintiffs have Article III standing.

---

[15] Katherine Knott, *Student Loan Watchdog on the Chopping* Block, Inside Higher Ed (Feb. 18, 2025), https://www.insidehighered.com/news/quick-takes/2025/02/18/cfpbs-student-loan-watchdog-chopping-block.

[16] Michael C. Bender and Dana Goldstein, *Education Department Fires 1,300 Workers, Gutting Its Staff*, N.Y. Times (Mar. 11, 2025), https://www.nytimes.com/2025/03/11/us/politics/trump-education-department-firings.html.

As a preliminary matter, both AFT and the individual plaintiffs have Article III standing to bring this case. With respect to the individual plaintiffs, each of them is being deprived their statutory rights forcing them to continue to make payments on loans that should be forgiven and also threatening them with impending tax consequences if the loans are not forgiven this year. They thus continue to live with debt on the books that they have a statutory right to be cancelled.

AFT also has standing on two independent grounds. First, the plaintiff has associational standing as a representative of its members. As discussed above, its members are harmed by the defendants' actions and would have standing to sue in their own right, the issue is at the heart of plaintiff's mission, and no individual participation is needed in the suit since it is a case challenging an unlawful government policy where the remedy would be broadly applicable to its members. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (providing three elements for associational standing); *Tanner-Brown v. Haaland*, 105 F.4th 437, 447 (D.C. Cir. 2024) (citing *Hunt* elements). Second, AFT has organizational standing on its own behalf because the defendants' actions, as described above, have impeded its activities and caused AFT to spend its resources on assisting its members in order to meet its mission; AFT has thereby suffered a concrete and demonstrable injury to its activities. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (discussing standard for organizational standing).

### B. Immediate injunctive relief is appropriate.

When seeking a preliminary injunction, the moving party must show: "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "These four considerations are factors, not

elements." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239 (LLA), 2025 WL 597959, at *12 (D.D.C. Feb. 25, 2025).

A preliminary injunction is appropriate here. ***First,*** the plaintiffs are likely to succeed on their two Administrative Procedure Act claims – the defendants have a non-discretionary and a non-transferrable duty to offer income-driven repayment plans, and to cancel loans eligible for forgiveness. The defendants also lack any legal or rational basis to stop all loan cancellations or to process applications at the pace at which they are being processed. ***Second,*** the plaintiffs face ongoing irreparable harm. The plaintiffs must choose between basic necessities and paying their loans, while others are considering bankruptcy, and still others are unable to plan for their future because they are saddled with loans that should be cancelled. The individual plaintiffs and AFT's members also face looming, significant tax consequences should their loans not be cancelled by the end of the year. ***Third,*** it is never in the public interest for the government to violate the law in this way, particularly when it comes as part of a broader campaign to dismantle a Congressionally created agency and program.

> **a. The plaintiffs are likely to succeed on their claims because the defendants are failing to meet their statutory and contractual obligations.**

The plaintiffs assert two claims under the Administrative Procedure Act in this case: (1) that defendants are unlawfully withholding borrowers' access to IBR and ICR-based repayment plans and loan cancellation and are unlawfully withholding PSLF forgiveness; and (2) that the defendants' decision to halt loan cancellation is arbitrary and capricious.

> **1. Under the Administrative Procedure Act, this Court is likely to compel the Agency to meaningfully offer an income-driven repayment plan, including loan cancellation, under § 706(1).**

Section 706(1) of the Administrative Procedure Act states that courts "shall [] compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). A plaintiff suing

under § 706(1) must show two things: first that the agency has a "ministerial or non-discretionary' duty amounting to a 'specific, unequivocal command," *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016), and second, that the agency "failed to take" that discrete agency action, *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004).

Here, there is no serious question as to either element. ***First,*** the defendants have a statutory, regulatory, and contractual obligation to provide access to plans under *both* the IBR and ICR statutes, to process applications, and to provide loan cancellation. Specifically:

- **Statutory.** Congress has said that the Secretary "shall" "carry out a program" for borrowers to "elect" an IBR plan. 20 U.S.C. § 1098e(b). Similarly, Congress stated that the Secretary "shall offer a borrower of a loan . . . an income contingent repayment plan." 20 U.S.C. § 1087e(d)(1)(D). By using "shall," language, Congress sought "to impose discretionless obligations[.]" *Lopez v. Davis*, 531 U.S. 230, 241 (2001); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 112 (2012) ("The traditional, commonly repeated rule is that *shall* is mandatory and *may* is permissive . . . .").

  Congress provided that the Secretary must cancel a borrower's outstanding principal and interest due if they have ever elected to participate in Income-Based Repayment and once they have made qualifying payments for a period not to exceed 25 years. *See* 20 U.S.C. § 1098e(b)(7). The Income-Contingent Repayment statute provides that the payment term for borrowers in an income-contingent repayment plan shall not exceed 25 years. 20 U.S.C. § 1087e(d)(1)(D). Congress also provided loan cancellation for public service workers who have worked for ten years in eligible public service jobs while making eligible payments on their loans in the PLSF program. *See* 20 U.S.C. § 1087e(m)(1).

- **Regulatory.** The defendants have also imposed this duty on themselves through their implementing regulations. In addition to its rules that broadly describe the plans, the income-driven repayment program regulations require, "[a]fter the Secretary obtains sufficient information to calculate the borrower's monthly payment amount," the Secretary must "calculate[] the borrower's payment and establishes the 12-month period during which the borrower will be obligated to make a payment in that amount." 34 C.F.R. § 685.209(l)(4). The regulations then mandates that the Secretary send the borrower a "repayment disclosure." *Id.* § 685.209(l)(4). In other words, the defendants' own regulations incorporate this statutory duty to provide borrowers with access to these plans. *See Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 21 (D.D.C. 2017) ("[T]he 'law' that generates a mandatory duty need not be a statute – it can also be an "agency regulation[] that has the force of law") (citations omitted). The defendants' own regulations also provide that "the borrower receives forgiveness" when they satisfy the applicable timeframe. *See* 34 C.F.R. § 685.209(k).

- **Contract.** As noted above, Congress directed the defendants to develop a master promissory note that identifies borrowers' obligations and rights. The defendants have done so, and every federal student loan borrower has signed such a contract. The borrowers' MPN specifically tells them that they have access to "an income-driven repayment plan," in which "your required monthly payment amount is based on your income and family size." *See* Ex. 1 attached hereto. The contract provides that for borrowers in the IBR, PAYE, and ICR plans who have remaining balances after the applicable timeframe, 20 or 25 years, "any remaining loan amount will be forgiven." *Id.* at 11.

The defendants have confirmed these mandatory duties. They have said they could not "sunset" the IBR plan because doing so was not "permitted by section 493C(b) of the [Higher Education Act] which authorized the IBR plan." 88 Fed. Reg. 43,820, 43,837 (July 10, 2023). Relatedly, the defendants have acknowledged their "statutory obligation under the [Higher Education Act] to offer borrowers an income-contingent repayment plan." Income-Contingent Repayment Plan Options, 90 Fed. Reg. 3695, 3696 (Jan. 15, 2025). Any argument to the contrary now would flout the defendants' prior, consistent position.

***Second,*** the defendants have breached their legal obligation by failing to process income-driven repayment plans to borrowers seeking to enroll, failed to cancel loans that are required to be cancelled, and by failing to timely process PSLF buyback applications. Further, as is the case with Plaintiff Iverson, the defendants are denying IBR applications based on non-existent requirements. Therefore, the defendants to have failed to "carry out a program" or "offer" borrowers these options. 20 U.S.C. § 1098e(b). This, of course, is all in the context of the defendants dismantling their own agency and having laid off hundreds of staff. The defendants' withholding and failure to meaningfully offer the required programs warrants relief and the plaintiffs are likely to succeed on this claim.[17]

---

[17] The Administrative Procedure Act includes § 706(1) relief for unlawful withholding and, separately, unreasonably delaying agency action. For the latter set of cases, courts have developed a series of factors to evaluate whether a delay is unreasonable. In this context though, where the relief is simply being shut off entirely, the inquiry ends.

### 2. The defendants' action is also unlawful under § 706(2) because it is inconsistent with the statute, regulation, and contract, and is without a rational basis.

In addition to section 706(1), the Administrative Procedure Act also directs courts to "hold unlawful and set aside agency action," when such action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Here, too, the plaintiffs meet their burden.

To start, the defendants' decision to halt all loan cancellation constitutes final agency action warranting review under § 706(2). To be final, an action must (1) "mark the consummation of the agency's decisionmaking process" and (2) be one by which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177– 79 (1997) (internal quotation marks omitted).

Here, the defendants' decision satisfies both requirements. The decision to halt loan cancellation represents the consummation of a decision – i.e., the defendants made the final decision that they will not process loan cancellation for IBR, PAYE, and ICR repayment plans, and as a result an entire population of otherwise eligible borrowers are affected. *See Nat'l Council of Nonprofits*, 2025 WL 597959, at *13 (finding that "ordering a nationwide pause on federal financial assistance" constitutes a final agency action); *see also Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239 (LLA), 2025 WL 368852, at *10 (D.D.C. Feb. 3, 2025) (contrasting guidance documents with final agency actions). And legal rights are curtailed by that decision. The individual plaintiffs and AFT's members are denied their right to loan cancellation. And for those eligible for cancellation under an IDR plan, there is a looming deadline with significant, and for some, devastating tax consequences.

*Second*, the decision is contrary to law and is arbitrary and capricious in many ways. As discussed above, there is a statutory, regulatory, and contractual obligation for the defendants to

cancel loans if the borrowers make all required payments. If the defendants are permitted to simply not cancel loans, notwithstanding these requirements, they would essentially have "unlimited power to rewrite the Education Act," and would "effect[] a 'fundamental revision of the statute, changing it from [one sort of] scheme . . . of regulation' into an entirely different kind." *Biden v. Nebraska*, 600 U.S. at 502 (citation omitted).

The decision is also irrational. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (explaining governing standard as including where the agency "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise"). This is particularly true with respect to the IBR plan as it is not involved at all in the litigation occurring in the Eighth Circuit. Further, stopping loan cancellation in the IBR plan is particularly irrational given the language in the Eighth Circuit's decision underscoring its legality. Again, the Eighth Circuit expressly pointed to the provisions and existence of IBR as a reason to strike down provisions of the SAVE Rule. *See, e.g., AFGE, AFL-CIO, Local 1929 v. Fed. Labor Rels. Auth.*, 961 F.3d 452, 459 (D.C. Cir. 2020) ("[T]he Authority departed from precedent based on a misreading of case law and without explaining the departure. Such a change is not 'sensibly explained.'") (citation omitted).

### 3. The Eighth Circuit's decision is not a valid reason for halting all loan cancellation.

Despite their legal obligations, the defendants will likely come into court and argue that the Eighth Circuit's decision left them no choice and that they had to stop loan cancellation. If the defendants make this argument, it will be flawed in several ways.

To start, nothing in the Eighth Circuit's decision casts any doubt on the legality of the IBR plan, and there is no valid justification halting loan cancellation for the IBR plan in light of that

decision. Indeed, the Eighth Circuit invoked the existence and terms of the IBR statute and plan to conclude that the forgiveness provision of income-contingent repayment plans was unlawful. Said plainly: even if the defendants had *some* justification for temporarily closing plans based on the ICR statute, they have *no* justification stopping loan forgiveness in the IBR plan.

Even if this Court would typically give the government the benefit of the doubt in light of the Eighth Circuit decision, the broader context—mass firing and an order directing the defendants to shutter themselves—suggests that this action is part of a broader scheme to completely stop all of the defendants' work. *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019) ("We are presented, in other words, with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process" and "[a]ccepting contrived reasons would defeat the purpose of the enterprise.").

> **b. The defendants' misconduct is causing the named plaintiffs, AFT and its members irreparable harm.**

The individual plaintiffs, on behalf of themselves and class members, and AFT, on its own behalf and on behalf of its members, seek an injunction because their injuries are "certain and great," "actual and not theoretical," and "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (emphasis in original). This is so in several ways.

***First,*** AFT as an organization is suffering irreparable harm because the defendants' conduct is causing it "to divert and expend" its "resources to address" the "allegedly wrongful conduct," which is "enough to satisfy the[] burden of showing a likelihood of suffering irreparable harm." *Ind. State Conf. of the NAACP v. Lawson*, 326 F. Supp. 3d 646, 662 (S.D. Ind. 2018) (citing *Action NC v. Strach*, 216 F. Supp. 3d 597, 643 (M.D.N.C. 2016)); *see also League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (stating defendant's actions "unquestionably make

it more difficult for the" organizations "to accomplish their primary mission," which "provide[s] injury for purposes both of standing and irreparable harm"). As AFT's representative explains in her declaration, the organization has had to put other projects, including a new financial literacy curriculum, on pause while it reallocates staff time to help its members with their student loans and to revise existing student loan resources in light of the defendants' actions. Tammelleo Decl. ¶¶ 23-25. AFT has also spent $250,000 to extend a contract with a technology company called Summer, which provides direct services to members with student debt, to help its members navigate this uncertainty. *Id*. ¶ 26. AFT had planned to end this contract but felt it could not given the turmoil. *Id*. Because the defendants have sovereign immunity as to those financial harms, these costs are not recoverable, rendering the injury irreparable. *Missouri v. Trump*, 128 F.4th at 996.

**Second,** the government's action is leaving the individual plaintiffs (some of whom are AFT members) and AFT's members in a position where they are financially harmed in a way that threatens their access to basic necessities. Indeed, "[a]lthough economic harm generally does not constitute irreparable injury, economic injury may be the basis for an injunction where a plaintiff lives on a fixed income and where minimal increases in the cost of living creates a 'potential [for] financial disaster' and the possible deprivation of 'life's necessities.'" *Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018) (quoting *United Steelworkers of Am., AFL-CIO v. Textron, Inc.*, 836 F.2d 6, 8 (1st Cir. 1987)); *see also Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 657 (6th Cir. 1996) (economic harm satisfied factor of irreparable injury because plaintiffs were "unable to absorb even relatively small increases in their expenses without extreme hardship"). Here, because the plaintiffs and AFT's members cannot access income-driven repayment plans and PSLF and the loan cancellation associated with it, some are considering bankruptcy as an

alternative,[18] have forgone basic and medical necessities,[19] and are in distress about how to navigate major life milestones.[20]

**Further,** plaintiffs who otherwise qualify for IDR loan forgiveness are facing devastating tax consequences if the loans are not cancelled by the end of the year.[21] And the fact that the debt is still associated with them affects their ability to get credit and prevents them from meaningfully planning their future. This constitutes irreparable harm since because they have no recourse, absent an injunction, to have loan cancellation before having severe tax consequences. And, not for nothing, it would be bizarre if *granting* borrowers forgiveness could constitute irreparable harm when a plaintiff challenges a student loan forgiveness program, *see Missouri v. Trump,* 128 F. 4th at 966, but for borrowers to be denied access to injunctive relief when the government *prevents* them from accessing loan forgiveness programs.

### c.   The public interest and balance of equities warrant an injunction.

When a government entity is a party to the case, the third and fourth factors merge. *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). "It is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Cmtys. Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)). "There is generally no public interest

---

[18] Tammelleo Decl. ¶ 15.

[19] Tammelleo Decl. ¶¶ 16, 18 (members struggling to afford childcare and children's basic needs); Cashman Decl. ¶ 13 ("I am stuck between choosing to pay for my private medical care for severe Rheumatoid Arthritis, about $800 a month, or paying student loan debt that should no longer exist. Since our family budget cannot absorb the full cost of home-care services and my student loan payment, we have chosen to use some household savings to cover both."); Whitley Decl. ¶ 11 (requiring the added expense of therapist due to stress of student loans).

[20] Iverson Decl. ¶ 14 (unable to save for a home); Holness Decl. ¶ 11 (balancing student loan payments against other household expenses is "both a financial burden" and causes "emotional stress"); Tammelleo Decl. ¶ 17 (member approaching retirement cannot obtain an affordable monthly payment).

[21] Naugle Decl. ¶ 17; Iverson Decl. ¶ 12; Cashman Decl. ¶ 14; Whitley Decl. ¶ 10.

in the perpetuation of an unlawful agency action." *Carson*, 286 F. Supp. 3d at 179 (citation omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws." *Id.* (citation omitted).

Here, in light of the ongoing and severe irreparable harm in continuing to deny access to statutorily mandated access to income-driven repayment plans and loan cancellation and forgiveness, there is no public interest in the continuation of the defendants' unlawful failure to process applications and halt all loan cancellations on these programs. The individual plaintiffs and AFT's members and anyone who cannot afford to repay their student loans will be continued to be forced into untenable financial circumstances, unable to pay bills and contemplating bankruptcy, while these programs remain on indefinite hold. The public has a strong interest in restoring access to these Congressionally mandated programs while the government cannot possibly claim any harm from operating these programs as Congress required them to do.

## IV.   CONCLUSION

At bottom, the defendants are failing to meet their legal obligations, all at the expense of hard-working public servants and vulnerable student loan borrowers. The Court should grant this motion and direct the defendants to allow access to income-driven repayment programs by timely processing applications, not denying IBR applications based on hardship requirements that do not exist, and stopping the unlawful halt on loan cancellation by resuming loan cancellation under the IBR, ICR, and PAYE plans, and to stop the unlawful halt on loan cancellation by processing PSLF buyback applications.[22]

---

[22] Any security under Rule 65(c) should be waived in this case. The Court has "broad discretion . . . to determine the appropriate amount of an injunction bond, including the discretion to require no bond at all." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (internal citation omitted). No bond is particularly appropriate in "public-interest litigation," which courts have recognized as "an exception to the Rule 65 security requirement." *City of Atlanta v. Metro. Atlanta Rapid. Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981). Indeed, "[i]t would be a mistake to treat a revenue loss to the Government the same as pecuniary damage to a private party." *Natural Res. Def. Council, Inc. v. Moorton,* 337 F. Supp. 167, 169 (D.D.C. 1971).

Respectfully submitted,

Date:   September 16, 2025                /s/ John G. Albanese

Julie Selesnick, DC Bar No. 485558
F. Paul Bland*
BERGER MONTAGUE PC
1001 G Street, NW
Suite 400 East
Washington, DC 20001
T. 202.221.5279
F. 215.875.4604
jselesnick@bergermontague.com
pbland@bergermontague.com

E. Michelle Drake*
John G. Albanese*
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T. 612.594.5999
F. 612.584.4470
emdrake@bergermontague.com
jalbanese@bergermontague.com

Persis Yu, DC Bar # 90014714
STUDENT BORROWER PROTECTION
CENTER (a fiscally sponsored project of the
Shared Ascent Fund)
1025 Connecticut Ave NW, #717
(202) 618-1328
persis@protectborrowers.org

R. T. Winston Berkman-Breen, NY Bar No.
5559372
Khandice Lofton*
STUDENT BORROWER PROTECTION
CENTER (a fiscally sponsored project of the
Shared Ascent Fund)
40 Rector Street, 9th Floor
New York, NY 10006

winston@protectborrowers.org
khandice@protectborrowers.org

*pro hac vice*
*Attorneys for Plaintiffs*